# EXHIBIT 1

Code word for this Charter Party
"SHELLTIME 4"

*Issued December 1984*

# Time Charter Party

~~LONDON,~~ *Copenhagen,*
*10th April 2014* ~~19~~

IT IS THIS DAY AGREED between *Space Shipping Ltd*     1

of *Valetta, Malta*     (hereinafter referred to as "Owners"), being owners of the     2

good *Motor Tanker*     vessel called *CV Stealth*     3

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and *ST Shipping and Transport Pte Ltd*     4

of *Singapore performance to be guaranteed by Glencore International AG of Switzerland*     5
(hereinafter referred to as "Charterers"):

**Description and Condition of Vessel**

1.    At the date of delivery of the vessel under this charter *all details "about"*     6
(a)   she shall be classed: *American Bureau of Shipping +A1, Oil Carrier, (E), +AMS, +ACCU, VEC, SH, RES, SHCM, RRDA, ESP, CRC, CPP, RW.*     7
(b)   she shall be in every way fit to carry crude petroleum and/or its *dirty* products;     8

(c)   she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in a good and efficient state:     9 10 11
(d)   her tanks, valves and pipelines shall be oil-tight;     12
(e)   she shall be in every way fitted for burning     13

~~at sea   fueloil with a maximum viscosity of~~     ~~Centistokes at 50 degrees Centigrade/any~~     14
~~commercial grade of fueloil ("ACGFO") for main propulsion, marine diesel oil/ACGFO for auxiliaries~~     15 16
~~in port   marine diesel oil/ACGFO for auxiliaries;~~ *See Clause 79 Vessel Speed and Consumption and Bunker Specs Description*     17

(f)   she shall comply with the regulations in force so as to enable her to pass through the Suez ~~and Panama Canals~~ by day and night without delay;     18 19
(g)   she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;     20 21
(h) she shall comply with the description in ~~Form B~~ *See Clause 79 Vessel Speed and Consumption and Bunker Specs Description and See Clause 92 Q88* appended hereto, provided however that if there is any conflict between the provisions of ~~Form B~~ *See Clause 79 Vessel Speed and Consumption and Bunker Specs Description and See Clause 92 Q88* and any other provision, including this Clause 1, of this charter such other provision shall govern.     22 23 24

**Shipboard Personnel and their Duties**

2.    (a)   At the date of delivery of the vessel under this charter     25
(i)   she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;     26 27 28
(ii)   all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;     29 30
(iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978;     31 32
(iv) there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently.     33 34 35 36
(b)   Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers,     37 38
(i)   prosecute all voyages with the utmost despatch;     39
(ii)   render all customary assistance; and     40
(iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.     41 42 43

**Duty to Maintain**

3.    (i)   Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.     44 45 46
(ii)   If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1.2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers     47 48

# Lax & Co
## SOLICITORS

78 Cornhill  London  EC3V 3QQ

WE CERTIFY THAT
THIS IS A TRUE COPY
OF THE ORIGINAL

LAX & CO LLP

*Cllens*    CATRIONA LEWIS
SOLICITOR, LAX & CO LLP    22.08.2017

1

for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost. 49 50 51

Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24. 52 53 54

~~(iii) If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in writing: and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.~~ 55 56 57 58 59

Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers rights under Clause 21 hereof). 60 61 62 63 64

**Period Trading Limits**

4. Owners agree to let and Charterers agree to hire the vessel for a period ~~of~~ *concluding not before 1st April 2015 and not later than 25th April 2015* 65

commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular *See Clause 43 Cargoes* 66 67

in any part of the world, as Charterers shall direct, subject to the limits of the current British Institute Warranties *See Clause 45 Trading Areas* 68

and any subsequent amendments thereof. Notwithstanding the foregoing, but subject to Clause 35. Charterers may order the vessel ~~to ice-bound waters or~~ to any part of the world outside such limits provided that Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order. 69 70 71 72

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter. Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide. 73 74 75 76 77 78 79 80 81

The vessel shall be delivered by Owners *dropping last outward sea pilot any time day or night Sundays and holidays included* at a *1 (one) safe* port in *USG/Caribs/UKC/MED* 82

at Owners' option and redelivered to Owners *dropping last outward sea pilot any time day or night Sundays and holidays included* at *1 (one) safe* a port in *USG/Caribs/UKC/MED included* 83

at Charterers' option. *Notwithstanding anything contained in this Charter Party and its riders, the vessel shall always be employed by Charterers via safe berths, ports, anchorages, and safe ice-free berths, ports, anchorages, always safely afloat and accessible.* 84

**Laydays/ Cancelling**

5. The vessel shall not be delivered to Charterers before *1st July 2014 / 00:01 hours* and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before *15th August 2014 / 23:59 hours* local in Owners option. 85 86

*Deliveries:*
*(a) Should the Vessel not be ready to deliver by the agreed cancelling date, the Charterers shall have the option of cancelling this Charter Party.*

*(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to delivery by the cancelling date, they shall notify the Charterers in writing by fax and/or email thereof stating the expected date of the Vessel's readiness to deliver and asking whether the Charteres will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.*

*Such option must be declared by the Charterers within 5 (five) working days after the receipt of the Owner's notice. If the Charterers do not exercise their option of cancelling by writing within 5 (five) working days after receiot of notice, then this Charter Party shall be deemed to be amended such that the new laycan stated in the Owners' notification to the Charterers shall be the new laycan.*

*(c) Should the Vessel be further delayed, Owners shall each time notify the Charterers in writing by fax and/or email of the expected date of vessel's readiness to deliver and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.*

*Such option must be declared by the Charterers within 5 (five) working days after the receipt of*

*the Owners' notice. If the Charterers do not exercise their option of cancelling by writing within 5 (five) working days after receipt of notice, then this Charter Party shall be deemed to be amended such that the new laycan stated in the Owners' notification to the Charterers shall be the new laycan.*

*Local time for laycan - G.M.T. for hire calculation*

| | | |
|---|---|---|
| Owners to Provide | 6. Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for ~~water~~ *fresh water for crew only*; for all drydocking, overhaul, | 87 88 89 |

maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. [90-96]

Charterers to Provide
7. Charterers shall provide and pay for all fuel, *water for steaming, rinsing, de-icing and cargo and trading related* (except fuel used for domestic services), towage and

pilotage *compulsory, customary and recommended* and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal, *river and seaways*

dues *compulsory garbage removal, compulsory sludge, slop removal* and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all

charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners. [97-103]

Rate of Hire
8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of **USD 14,500** per day, and pro rata **net to Owners** for any part of a day, from the time and date of her delivery ~~(local GMT time)~~ until the time and date of her redelivery ~~(local GMT time)~~ to Owners. [104-106]

*Plus USD 2,500 monthly covering the Charterers' Communications, Victualling and Entertainment.*

*Charterers not to deduct any money from hires/earnings without Owners' confirmation and to remit all hires/monies earned as per Owners's invoice without any deduction of bank transfer etc. expenses.*

Payment of Hire
9. Subject to Clause 3(iii), payment of hire shall be made in immediately available funds to: [107]

*Beneficiary: Space Shipping Ltd.* [108]

*Bank: T. Garanti Bankasi AS*
*Mecidiyekoy Ticari Branch / Istanbul*

*Swift Code: TGBATRIS*

*Account No.:* REDACTED

*IBAN No.:* REDACTED

*Corr. Bank: The Bank of New York, New York, USA*

*Swift Code: IRVTUS3N*

*Account No.:* REDACTED

~~Account~~
in                             per calendar month in advance, less: [109]
    (i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and [110]
    (ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and [111-112]
    (iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3(ii) or 24 hereof, [113-114]
any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment. [115-117]
    In default of such proper and timely payment, [118]

|  |  |  |
|---|---|---|
|  | (a)   Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and | 119 120 121 122 |
|  | (b)   Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date. or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually. | 123 124 125 126 127 128 |
| Space Available to Charterers | 10.   The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed *750*                   tonnes *excluding fresh water* at any time during the charter period. | 129 130 131 132 |
| Overtime | 11.   Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. | 133 134 135 |
| Instructions and Logs | 12.   Charterers shall from time to time give the master all requisite instructions, and sailing directions, and *always in writing and verbal instructions to be confirmed in writing as soon as possible* he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. | 136 137 138 139 140 141 |
| Bills of Lading | 13.   (a)   The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise | 142 143 144 145 |
|  | (i)   from signing bills of lading in accordance with the directions of Charterers, or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers or their agents orders: | 146 147 148 |
|  | (ii)   from any irregularities in papers supplied by Charterers or their agents. | 149 |
|  | (b)   Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo | 150 151 |
|  | (i)   at any place other than that shown on the bill of lading and/or | 152 |
|  | (ii)   without presentation of an original bill of lading | 153 |
|  | unless they have received from Charterers both written confirmation *invoking L.O.I. as per owners P&I Club Wording, as per additional Clause 113* of such orders and an indemnity in a form acceptable to Owners. | 154 155 |
| Conduct of Vessel's Personnel | 14.   If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. | 156 157 158 159 |
| Bunkers at Delivery and Redelivery | ~~15.   Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then current market prices at the port of delivery or redelivery, as the case may be, or if such prices are not available payment shall be at the then current market prices at the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree.~~ | 160 161 162 163 164 165 166 167 |
| Stevedores, Pilots, Tugs | 16.   Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that | 168 169 170 171 172 173 174 |
|  | (i)   the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and | 175 176 |
|  | (ii)   Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores. | 177 178 179 |
| Supernumeraries | 17.   Charterers may send representatives *at their own risk, subject to Charterers to provide Owners L.O.I. and satisfactory insurance coverage for each of their representatives* in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers paying at the rate of *USD 25*                   per day for each representative while on board the vessel. | 180 181 182 |
| Sub-letting | 18.   Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. | 183 184 |

Final Voyage

19.  If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for

(i)   disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and

(ii)  bunkers on board at redelivery pursuant to Clause 15.

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.

If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.

Loss of Vessel

20.  Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

Off-hire

21.  (a)   On each and every occasion that there is loss of time *for more than 6 (six) hours* (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner)

(i)   due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than ~~three~~ *6 (six)* consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than ~~three~~ *6 (six)* hours (if resulting from partial loss of service); or

(ii)  due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), *or landing stores, spares, provisions* and such loss continues for more than ~~three~~ *6 (six)* consecutive hours; or

(iv)  due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

(v)   due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire ~~from the commencement~~ *after six (6) hours time allowance* of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b)   If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between

(i)   the time the vessel would have required to perform the relevant service at such guaranteed speed, and

(ii)  the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c)   Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d)   If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e)   Time during which the vessel is off-hire under this charter shall count as part of the charter period.

Periodical Drydocking

~~22.  (a)   Owners have the right and obligation to drydock the vessel at regular intervals of~~

~~On each occasion Owners shall propose to Charterers a date on which they wish to~~

~~drydock the vessel, not less than~~ ~~before such date, and Charterers shall offer a port for~~ 259
~~such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as~~ 260
~~practicable.~~ 261
~~Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers~~ 262
~~place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be~~ 263
~~responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have~~ 264
~~the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of~~ 265
~~lading or this charter.~~ 266
~~(b)   If a periodical drydocking is carried out in the port offered by Charterers (which must have~~ 267
~~suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall~~ 268
~~be off hire from the time she arrives at such port until drydocking is completed and she is in every way ready to~~ 269
~~resume Charterers' service and is at the position at which she went off hire or a position no less favourable to~~ 270
~~Charterers, whichever she first attains. However,~~ 271
~~(i)   provided that Owners exercise due diligence in gas freeing, any time lost in gas freeing to~~ 272
~~the standard required for entry into drydock for cleaning and painting the hull shall not count as off hire, whether~~ 273
~~lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and~~ 274
~~(ii)   any additional time lost in further gas freeing to meet the standard required for hot work or~~ 275
~~entry to cargo tanks shall count as off hire, whether lost on passage to the drydocking port or after arrival there.~~ 276
~~Any time which, but for sub Clause (i) above, would be off hire, shall not be included in any~~ 277
~~calculation under Clause 24.~~ 278
~~The expenses of gas freeing, including without limitation the cost of bunkers, shall be for~~ 279
~~Owners account.~~ 280
~~(c)   If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical~~ 281
~~drydocking at a special port selected by them, the vessel shall be off hire from the time when she is released to~~ 282
~~proceed to the special port until she next presents for loading in accordance with Charterers' instructions,~~ 283
~~provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at~~ 284
~~the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but~~ 285
~~Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage~~ 286
~~calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any~~ 287
~~benefit they may gain in purchasing bunkers at the special port.~~ 288
~~(d)   Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of~~ 289
~~tank cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which~~ 290
~~Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.~~ *See Clause* 291
*82 Drydocking*

Ship Inspection      23.   Charterers shall have the right at any time during the charter period to make such inspection of the 292
vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in 293
their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all 294
necessary co-operation and accommodation on board provided, however, 295
(i)   that neither the exercise nor the non-exercise, nor anything done or not done in the exercise 296
or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or 297
responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase 298
Charterers' responsibilities to Owners or third parties for the same; and 299
(ii)   that Charterers shall not be liable for any act, neglect or default by themselves, their 300
servants or agents in the exercise or non-exercise of the aforesaid right. 301

Detailed            24.   (a)   Owners guarantee that the speed and consumption of the vessel shall be as follows:- 302
Description
and Performance

| Average speed | Maximum average bunker consumption | | 303 |
|---|---|---|---|
| in knots | main propulsion | -   auxiliaries | 304 |
| | fuel oil/diesel oil | fuel oil/diesel oil | 305 |
| Laden | tonnes | tonnes | 306 |

Ballast   *See Clause 79 Vessel Speed and Consumption and Bunker Specs Description* 307

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning 308
and shall be pro-rated between the speeds shown. 309
The service speed of the vessel is *as per Clause 79 Vessel Speed and Consumption and Bunker* 310
*Specs Description* knots laden and                                   knots in ballast and in the absence
of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one 311
laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to 312
steam at any speed within the range set out in the table (the "ordered speed"). 313
~~If the vessel is ordered to proceed at any speed other than the highest speed shown in the table,~~ 314
~~and the average speed actually attained by the vessel during the currency of such order exceeds such ordered~~ 315
~~speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or~~ 316
~~decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed~~ 317
~~actually attained.~~ 318
For the purposes of this charter the "guaranteed speed" at any time shall be the then-current 319
ordered speed or the service speed, as the case may be 320
The average speeds and bunker consumptions shall for the purposes of this Clause 24 be 321
calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each 322
period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22(b) (i) 323
would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction 324
of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds 325
exceed force 8 ~~4~~ on the Beaufort Scale for more than 12 hours. 326
(b)   If during any year from the date on which the vessel enters service (anniversary to anniversary) 327

6

the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess results 328

    (i)  from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid: 330 331 332

    (ii)  from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. 333 334 335 336

    The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period. 337 338 339 340 341

    Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers. 342 343

    (c)  Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require. 344 345 346 347 348 349 350

    Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase. 351 352

*Notwithstanding the above, no claim for over and under performance, i.e; neither Owners nor the Charterers have the possibility of claiming in case of over and under performance.*

**Salvage**     25.  Subject to the provisions of Clause 21 hereof, all loss of time and all expenses ( excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25. 353 354 355 356 357

    All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share. 358 359

**Lien**     26.  Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter. 360 361 362

**Exceptions**     27.  (a)  The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel: fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea, explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery: provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people. 363 364 365 366 367 368 369 370 371 372

    (b)  The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property. 373 374

    (c)  Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in respect of 375 376

    (i)  loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or 377 378 379

    (ii)  any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague-Visby Rules. 380 381 382 383 384

    (d)  In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. 385 386

**Injurious Cargoes**     28.  No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments. 387 388 389 390

**Grade of Bunkers**     29.  ~~Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of~~ ~~Centistokes at 50 degrees Centigrade/ACGFO for main propulsion and diesel oil/ACGFO for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof. Charterers warrant that all bunkers provided herewith shall be of a quality complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and with its specification for marine fuels as amended from time to time.~~ *See Clause 79 Vessel Speed and Consumption and Bunker Specs Description* 391 392 393 394 395 396

**Disbursements**     30.  Should the master require advances for ordinary disbursements at any port, Charterers or their agents 397

shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per 398
cent, and all such advances and commission shall be deducted from hire. 399

**Laying-up**   31.   Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the 400
vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be 401
adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should 402
reasonably be made by Owners as a result of such lay-up, Charterers may exercise the said option any number of 403
times during the charter period. *See Clause 60 Laying up - Fouling* 404

**Requisition**   32.   Should the vessel be requisitioned by any government, de facto or de jure, during the period of this 405
charter, the vessel shall be off-hire during the period of such requisition. and any hire paid by such government in 406
respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of 407
the charter period. 408

**Outbreak of War**   33.   If war or hostilities break out between any two or more of the following countries: U.S.A., ~~U.S.S.R.,~~ 409
P.R.C., U.K., Netherlands, *CIS (but not between memberstates themselves), Russia, Turkey* ~~both~~ Owners 410
and Charterers shall have the right to cancel this charter. *However, neither party shall be entitled to terminate
this Charter Party as a consequence of minor and/or local warlike operations or warfare which
will not interfere with the Vessel's trading.*

**Additional War
Expenses**   34.   If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, 411
Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which 412
are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of 413
such expenses as soon as practicable and in any event before such expenses are incurred, and provided further 414
that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any 415
claims by Owners under their war risk insurance arising out of compliance with such orders. 416

**War Risks**   35.   (a)   The master shall not be required or bound to sign bills of lading or any place which in his or 417
Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, 418
war, hostilities, warlike operations, civil war, civil commotions or revolutions. 419
  (b)   If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in 420
Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach 421
or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter 422
(a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and 423
Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or 424
discharged, as the case may be, at any other place within the trading limits of this charter (provided such other 425
place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been 426
received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at 427
liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in 428
their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due 429
fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned. 430
  (c)   The vessel shall have liberty to comply with any directions or recommendations as to departure, 431
arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever 432
given by the government of the state under whose flag the vessel sails or any other government or local authority 433
or by any person or body acting or purporting to act as or with the authority of any such government or local 434
authority including any de facto government or local authority or by any person or body acting or purporting to 435
act as or with the authority of any such government or local authority or by any committee or person having under 436
the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by 437
reason of or in compliance with any such directions or recommendations anything is done or is not done, such 438
shall not be deemed a deviation. 439
  If by reason of or in compliance with any such direction or recommendation the vessel does not 440
proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed 441
to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part 442
of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners obligations under this 443
charter so far as cargo so discharged is concerned. 444
  Charterers shall procure that all bills of lading issued under this charter shall contain the ~~Chamber of 445
Shipping War Risks Clause 1952.~~ *Conwartime 2004.* 446

**~~J~~oth to Blame
Collision Clause**   36.   If the liability for any collision in which the vessel is involved while performing this charter falls to be 447
determined in accordance with the laws of the United States of America, the following provision shall apply: 448
  "If the ship comes into collision with another ship as a result of the negligence of the other ship and any 449
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the 450
management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or 451
liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or 452
damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying 453
ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying 454
ship or her owners as part of their claim against the carrying ship or carrier." 455
  "The foregoing provisions shall also apply where the owners, operators or those in charge of any ship 456
or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or 457
contact." 458
  Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 459
foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be 460
determined in accordance with the laws of the United States of America. 461

**New Jason**   37.   General average contributions shall be payable according to the York/Antwerp Rules, 1974, *1990/1994 and* 462
*as amended* and shall 
**Clause**   be adjusted in London in accordance with English law and practice but should adjustment be made in accordance 463
with the law and practice of the United States of America, the following provision shall apply: 464
  "In the event of accident, danger, damage or disaster before or after the commencement of the 465
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the 466

consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo." 467
468
469
470

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery." 471
472
473
474

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America. 475
476
477

| | |
|---|---|
| Clause Paramount | 38.   ~~Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the following clause:~~ |

478
479

"~~(1) Subject to sub clause (2) hereof, this bill of lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague Visby Rules") Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the "Hague Visby Rules."~~ 480
481
482
483
484
485

"~~(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, to the exclusion of the Hague Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."~~ 486
487
488
489

"~~(3) If any term of this bill of lading is repugnant to the Hague Visby Rules, or Hague Rules if applicable, such term shall be void to that extent but no further.~~" 490
491

"~~(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law."~~ *See Clause 112 New Paramount* 492
493

| | |
|---|---|
| TOVALOP | 39.   ~~Owners warrant that the vessel is:~~ |

494

~~(i)     a tanker in TOVALOP and~~ 495

~~(ii)    properly entered in~~                                                                    ~~P & I Club~~ 496

~~and will so remain during the currency of this charter.~~ 497

~~When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to Owners or master, undertake such measures as are reasonably necessary to prevent or minimize such Pollution Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such measures taken by them and, if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that:~~ 498
499
500
501
502
503
504
505
506

~~(1)    any such escape or discharge or Threat was caused or contributed to by Charterers, or~~ 507

~~(2)    by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or~~ 508
509
510

~~(3)    the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL.~~ 511
512
513
514
515
516

~~PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued. Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this Clause 39 shall thereupon cease.~~ 517
518
519
520

~~The above provisions are not in derogation of such other rights as Charterers or Owners may have under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP.~~ 521
522

~~The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this Clause 39 have the meanings ascribed to them in TOVALOP.~~ *See Clause 98 ITOPF* 523
524
525
526
527

| | |
|---|---|
| Export Restrictions | 40.   The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped. |

528
529
530

Charterers shall procure that all bills of lading issued under this charter shall contain the following clause: 531
532

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place 533
534
535
536
537
538
539
540
541

on which they or the master may in their or his absolute discretion decide and which is not subject to the 542
prohibition, and such discharge shall constitute due performance of the contract contained in this bill 543
of lading so far as the cargo so discharged is concerned". 544

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading 545
being deemed to be references to this charter. 546

**Law and Litigation**

41.  (a)  This charter shall be construed and the relations between the parties determined in accordance 547
with the laws of England. 548

(b)  Any dispute arising under this charter shall be decided by the English Courts to whose 549
jurisdiction the parties hereby agree. *See Clause 111 BIMCO Dispute Resolution adn Law* 550

(c)  Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain 551
the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect 552
to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the 553
provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being 554
in force. 555

(i)  A party shall lose its right to make such an election only if: 556
   (a)  it receives from the other party a written notice of dispute which – 557
      (1)  states expressly that a dispute has arisen out of this charter; 558
      (2)  specifies the nature of the dispute; and 559
      (3)  refers expressly to this clause 41(c) 560
   and 561
   (b)  it fails to give notice of election to have the dispute referred to arbitration not later than 562
         30 days from the date of receipt of such notice of dispute. 563

(ii)  The parties hereby agree that either party may – 564
   (a)  appeal to the High Court on any question of law arising out of an award; 565
   (b)  apply to the High Court for an order that the arbitrator state the reasons for his award; 566
   (c)  give notice to the arbitrator that a reasoned award is required; and 567
   (d)  apply to the High Court to determine any question of law arising in the course of the 568
         reference. 569

(d)  It shall be a condition precedent to the right of any party to a stay of any legal proceedings in 570
which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that 571
party furnishes to the other party security to which that other party would have been entitled in such legal 572
proceedings in the absence of a stay. *For smaller disputes upto USD 50,000 the small claim procedure* 573
*laid down by the London Maritime Arbitrations Association and any subsequent amendment*
*thereto shall apply.*

**Construction**

42.  The side headings have been included in this charter for convenience of reference and shall in no way 574
affect the construction hereof. *Additional Clauses 43 to 122, as attached hereto shall be deemed* 575
*included in this Charter Party.*

*Space Shipping Ltd*                          *ST Shipping and Transportation Pte. Ltd.*
*as Owners*                                    *as Charterers*

*Name:*                                        *Name:*
*Position:*                                     *Position*

This Charter Party is a computer generated copy of the SHELLTIME4 Charter Party form, printed using software which is the copyright of Strategic Software Limited.

This is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

43.   CARGOES

44.   MSDS CLAUSE

45.   TRADING

46.   LAYCAN NOTICES

47.   ON/OFF - HIRE

48.   HIRE PAYMENT

49.   CHARTER PERIOD EXTENSION AND ACCUMULATED OFF-HIRE

50.   MANAGEMENT/OWNERSHIP/SALES

51.   TAXES

52.   P&I INSURANCE

53.   WAR RISK PREMIUM

54.   RETURN INSURANCE

55.   ADHERENCE TO VOYAGE INSTRUCTIONS

56.   ETA

57.   SEA TERMINALS

58.   AGENTS

59.   WATCHMEN

60.   LAYING UP - FOULING

61.   BIMCO WEATHER ROUTEING CLAUSE

62.   PUMPING

63.   INERT GAS SYSTEM

64.   MANIFOLD MATERIAL

65.   CARGO TRANSFER INSPECTION

66.   CARGO RETENTION

67.   HEATING

68.   BALLAST

69.   IN-TRANSIT LOSS

70.   TANK CLEANING

71.   VAPOUR RECOVERY SYSTEM

72.   ULLAGING SYSTEM

73.   WATER QUALITY AND FMCC

74.   CRUDE OIL WASHING (C.O.W.)

75.   CONDITION OF CARGO SPACES ON DELIVERY AND REDELIVERY

76.   BUNKERS

77.   BUNKER QUALITY / OFF SPEC BUNKERS

78.   BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME C/PS 2005

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

79.   SPEED AND CONSUMPTIONS AND BUNKER SPECS DESCRIPTION (All Details About And WOG)

80.   HYDROGEN SULPHIDE (H2S) & MERCAPTAN CLAUSE

81.   CLASSIFICATION

82.   DRYDOCKING

83.   REMEASUREMENT

84.   OIL COMPANIES' VETTING INSPECTIONS

85.   OIL COMPANY QUESTIONNAIRE

86.   SHIP TO SHIP LIGHTERING

87.   INSPECTION

88.   BIMCO Standard ISM Clause

89.   BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTERS PARTIES 2005

90.   IMO CLAUSE

91.   Q 88/ VESSEL PLANS

92.   Q88

93.   O.C.I.M.F.

94.   CIVIL LIABILITY CONVENTION

95.   Q.I SPILL RESPONSE PLANS

96.   SEA CARRIER INITIATIVE AGREEMENT

97.   ITF.

98.   I.T.O.P.F.

99.   OPA

100.  INSURANCE / USCG CHECKLIST REQUIREMENT

101.  ELIGIBILITY & COMPLIANCE

102.  U.S. COMPLIANCE

103.  USCG COMPLIANCE

104.  GENERAL COMPLIANCE

105.  UNITED STATES OF AMERICA TRADING/ TVEL CLAUSE

106.  BIMCO AMS / U.S. CUSTOMS ADVANCE NOTIFICATION & REGULATIONS

107.  NIGERIA

108.  LANGUAGE

109.  DRUG AND ALCOHOL POLICY

110.  CHARTERERS PERFORMANCE GUARANTEE

111.  BIMCO DISPUTE RESOLUTION AND LAW

112.  NEW PARAMOUNT

113.  BILL OF LADING INDEMNIFICATION L.O.I. / INVOCATION CLAUSE

2

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

114.  STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING OF ...........................CARGO WITHOUT PRODUCTION OF ORIGINAL B(s)L

115.  STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING OF CARG .................0 AT A PORT OTHER THAN TT STATED IN THE B(S)L.

116.  STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO AT A PORT OTHER TITAN STATED IN THE B(s)L AND W/0 PRODUCTION OF ORIGINAL B(s)L.

117.  OWNERS L.O.I. WORDING FOR CHARTERERS 'REPRESENTATIVE / INSPECTORS / ALL PARTIES ......................................................................... VISITING THE VESSEL

118.  COMMISSION CLAUSE

119.  PRIVATE AND CONFIDENTIAL

120.  BIMCO DESIGNATED ENTITIES CLAUSE FOR CHARTER PARTIES

121.  EU Advance Cargo Declaration Clause for Time Charter Parties 2012

122.  BIMCO Piracy Clause for Time Charter Parties 2013

3

13

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

**43.  CARGOES**

Always lawful cargoes, not harmful to the Vessel.

Crude oil and/or dirty petroleum products, but always excluding lswr (low sulphur waxy residue), orimulsion, clean condensate (cbfs is allowed basis wording below), bitumen / bituminous products, dirty ballast, sludge, slop, bilge, etc.

All cargoes loaded to be always in accordance with Vessel's technical capability (please see Clause. 67 Heating) and restrictions, class certificates, and to be consistent with Vessel's stability, trim and stress requirements, and lines, pumps, gaskets.

Vessel to be able to segregate 3 (three) grades double valve within her natural segregation.

Vessel to be able to maintain crude and dirty petroleum cargoes at loaded temperature, but maximum upto 135 degrees Fahrenheit (57 degrees Celsius ) and maximum loading temperature shall not exceed 165 degrees Fahrenheit (74 degrees Celsius ).

When Charterers request, Owners will endeavour to heat up the cargoes more than cp figures, if it is possible, but it is not guaranteed and shall be solely in Owners' discretion.

Charterers shall advise full cargo characteristics / specs before loading in advance if requested by Owners (please see Clause. 44 MSDS Clause).

Charterers guarantee to redeliver the Vessel with last cargo COW compatible crude oil or fuel oil or VGO or crude condensates.

<u>CBFS is allowed as per below.</u>

Owners agree to the carriage of carbon black feed stock (the cargo) provided the following condition are met in full:

a) Upon Owners' request Charterers shall provide full characteristics/specification of the cargo prior to vessel's arrival at port of loading.

b) Under no circumstances will the vessel be required to heat cargo above a maximum of 135 degrees Fahrenheit.

c) Owing to the viscosity of the cargo, warranties contained in the charter party in respect of both pumping performance and of consumption for cargo heating shall not apply for voyages involving their carriage.

d) Due to the high density of the cargo, there may be restrictions on tank filling levels because of structural strength requirements and Owners will not be responsible for loading less cargo than vessel's tank capacities.

4

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

**44.  MSDS CLAUSE**

Charterers shall, before the commencement of loading any cargo listed in MARPOL Annex I, provide the Master with a material safety data sheet (MSDS) which shall contain safety, handling and environmental information in accordance with the requirements and recommendations of IMO Resolution MSC150 (77).

**45.  TRADING**

Trading Worldwide always within IWL. Any extra insurance incurred for breaching Institute Warranty Limits to be for Charterers' account as per Clause 4. Any time lost whilst breaching Institute Warranty Limits to be considered as time on-hire provided Vessel otherwise is fully in compliance with the charter.

All voyage related costs including but not limited to COFR, OSRO, AMPD etc. to be fully for Charterers' account and will be payable as per this C/P.
All costs for calling / trading U.S.A. West Coast and Canada West Coast ports/places/areas to be for Charterers' account

Trading exclusions; North Korea, Greek Cyprus, Israel, Eritrea, Somalia, and Orinoco River and areas where contagious diseases or quarantine conditions apply. Ports whilst under UN sanctions are excluded as well, provided cargo carried is excluded.

If Vessel calls Cuba, the Vessel shall not be required to call USA the following 180 days.

With reference to Clause 34 (Additional War Expenses) and Clause 35 (War Risks), Owners advise, that on the time of fixing, there may exist additional insurance premia for countries and areas listed in Joint War Committee (Hull, War, Piracy, Terrorism and Related Perils Listed Areas) to be excluded. To trade such areas in Owners option against premium if any to be paid by Charterers.

Additional insurance premia is for Charterers' account as per clause 34.

Charterers will keep Owners advised of Vessel's intended ports of call through voyage orders given to the master.
Vessel not to force ice nor follow ice breaker nor proceed to areas where there is an expectation of encountering ice as per information/forecast by local navigational authorities or relevant body.

**46.  LAYCAN NOTICES**

Laycan to be narrowed to 20 Days period latest by 30 Days prior to new Narrowed Laycan and to be narrowed to 10 days while giving 20 days approx. notice. Owners/Charterers to give 20/15 Days approximate and 10/7/5/3/1 Days Definite Delivery/Redelivery Notices to counterparty.

Local time for Laycan - G.M.T for Hire Calculation.

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

1st July 2014/00:01 Hours - 15th August 2014/23:59 Hours Local Time in Owner's option.

**47.  ON/OFF - HIRE**

On hire survey to be held at first port of call or ex yard prior to delivery and off-hire survey to be held prior to redelivery. Cost of both surveys to be split fifty/fifty (50/50) between Owners and Charterers.

Times for On-Hire Survey to be Owners Account and Times for Off-Hire Survey to be Charterers Account.

**48.  HIRE PAYMENT**

Owners' bank account details:

| | |
|---|---|
| Beneficiary: | SPACE SHIPPING LTD. |
| Bank: | T.Garanti Bankasi AS |
| | Mecidiyekoy Ticari Branch / Istanbul |
| Swift Code: | TGBATRIS |
| Account No.: | 9089599 |
| IBAN No: | TR49 0006 2000 1190 0009 0895 99 |
| Corr. Bank: | The Bank of New York, NY |
| Swift Code: | IRVTUS3N |
| Account No.: | 8900509910 |

Hire and all monies due to the Owners under the Charter Party will be paid to the Owners' bank account above.

If hire due is not received, the Owners before exercising the option withdrawing the Vessel shall give Charterers two (2) days' notice, Saturdays, Sundays and Holidays excluded and will not withdraw the Vessel if the hire is paid within two (2) days.

**49.  CHARTER PERIOD EXTENSION AND ACCUMULATED OFF-HIRE**

Charterers have the option to add to the Charter period to be declared latest thirty (30) days prior to earliest redelivery date, and the rate for the added off-hire periods to be the same as that for the existing year.

If the Vessel is off-hire for more than sixty (60) days (scheduled drydocking excepted) within a period of twelve (12) calendar months, Charterers are entitled to cancel the Charter Party.

**50.  MANAGEMENT/OWNERSHIP/SALES**

Deleted

**51.  TAXES**

All taxes and/or dues on Vessel and/or hire and/or freight and/or cargo, including but not limited to flag waiver arrangements and fees to be for Charterers to settle

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

the same directly. Any income tax on hire imposed by country of Vessel's flag to be for Owners' account.

### 52. P&I INSURANCE

Owners warrant that from the time of delivery and throughout Vessel's service under this Charter, the Vessel shall be entered for full Protection and Indemnity by a first class P&I Club, which is a member of the International Group of P&I Clubs, Owners shall promptly furnish to the Charterers proper evidence of such entry immediately upon signing this Charter.

### 53. WAR RISK PREMIUM

Owners to be responsible only for the basic annual contributions payable to obtain war risk cover. Charterers shall be responsible for the full amount of any sums payable by way of additional premiums to maintain that full cover as a result of the Vessel proceeding to any areas designated as additional war risk premium areas.

Whenever requested by Charterer, Owners shall arrange for war risk underwriters to advise Charterers via Owners about actual net 'additional premium' then in effect. If requested by Charterer, Owners shall arrange in advance for war risk underwriters to furnish such information to Charterers via Owners 48 hours before Vessel enters 'additional premium' zone, weekends and local holidays are excluded.

Any 'additional premiums' due from Charterers shall be documented by underwriters and Charterers shall pay only the net premium charged to Owners i.e. gross premium less rebate, if any.

### 54. RETURN INSURANCE

Charterers to have the benefit of any return insurance premium received by Owners from Underwriters (as and when received from Underwriters) by reason of the Vessel being in port from a minimum period of thirty (30) days provided Vessel is on hire.

### 55. ADHERENCE TO VOYAGE INSTRUCTIONS

Owners shall be responsible for any time, cost, delay or loss to the Vessel associated with the Vessel deviating from Charterers' voyage instructions including loading any cargo quantity in excess or short of voyage orders. If a discrepancy arises at loading terminal, Master is to contact Charterers at once concerning said discrepancy, before loading to clarify situation. Terminal orders shall never supersede Charterers' voyage instruction.

Owners further undertake that, unless Charterers require otherwise, the Master will follow voyage orders issued by Charterers.

Owners shall be responsible for expenses directly related to the Vessel arising from non-compliance with this Clause, but Charterers to ensure that all voyage instructions to be in compliance with this Charter Party.

Charterers' communication details:

17

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

ST SHIPPING AND TRANSPORT PTE LTD

Corresponding address:

| | |
|---|---|
| Address: | 3 Temasek Avenue |
| | Centennial Tower #25-01 |
| | Singapore 039190 |
| Telephone: | +65 6415 7700 |
| Fax: | +65 6235 7219 |
| E-mail: | operations@st-shipping.co.uk |

**56.   ETA**

Owners undertake that, unless Charterers require otherwise, the Master shall telex/e-mail his noon position on every day during the currency of this Charter. Furthermore, the Master to keep Charterers fully advised of Vessel's ETA's at all times and that any change in ETA of more than six (6) hours immediately be notified to Charterers.

Charterers' communication details:

ST SHIPPING AND TRANSPORT PTE LTD

Corresponding Address:

| | |
|---|---|
| Address: | 3 Temasek Avenue |
| | Centennial Tower #25-01 |
| | Singapore 039190 |
| Telephone: | +65 6415 7700 |
| Fax: | +65 6235 7219 |
| E-mail: | operations@st-shipping.co.uk |

**57.   SEA TERMINALS**

Owners warrant that the Vessel unless otherwise agreed with Charterers and/or terminal when calling at a sea terminal will maintain her engines in readiness, and will be loaded and discharged in such manner that she, at any stage of loading or discharging operations is able, if necessary for any reason, to immediately shut down cargo operations, and promptly disconnect hoses and mooring lines and proceed to another anchorage or area.

**58.   AGENTS**

Owners to appoint their own agents when and if there is a major Owners' business such as extensive repairs, docking and other extended off-hire, etc.

However, Charterers' agents shall within the agency agreement between Charterers and agents attend to minor matters such as postage, cash advance to Master, crew change, transportation's, medical, telexes, etc., on Owners' behalf free of agency fee but actual costs to be paid by Owners.

18

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

59. **WATCHMEN**

Any watchmen required by Owners during the term of this charter shall be for Owners' account, unless it is compulsory and customary

60. **LAYING UP - FOULING**

In case the Vessel's bottom is fouled due to lay up or prolonged stay over 24 days in a port and/or berth and/or anchorage which will affect Vessel's performance on speed/consumption, then Owners will not be responsible for change of Vessel's description on speed and/or consumption.

In the event of the Vessel remaining at a place or port for more than 24 days resulting in fouling of the vessel's hull and/or rudder and/or propeller then Charterer's to arrange for underwater cleaning at their time and expense and the interim period shall be excluded from performance calculations.

61. **BIMCO WEATHER ROUTEING CLAUSE**

(a) The Vessel shall, unless otherwise instructed by the Charterers, proceed by the customary route, but the Master may deviate from the route if he has reasonable grounds to believe that such a route will compromise the safe navigation of the Vessel.

(b) In the event the Charterers supply the Master with weather routeing information, although not obliged to follow such routeing information, the Master shall comply with the reporting procedure of that service.

62. **PUMPING**

Owners warrant that the Vessel shall have cargo pumps which, when the Vessel is laden with a homogeneous cargo, are capable of: discharging her full cargo within 24 hours or of maintaining an average pressure of 100 PSI at ship's rail provided that shore facilities permit and excluding time required for stripping and COW operations.

Owners are requested to instruct the Master to clarify by Protest Letter or remarks in Time Sheets, countersigned by receivers if possible, whenever pumping time exceeds warranted period, It is agreed that time lost as a result of Vessel being unable to load or discharge her cargo in accordance with the warranty stated above shall count as off-hire. Discharge terminal shall have the right to guage line pressure.

If the Vessel's performance is below above referenced standard and pumping is delayed due to the Vessel's deficiency, Charterers have the right of withdrawing the Vessel from the berth until such deficiencies are remedied. Extra cost to the Vessel incurred as a result of this to be for Owners' account and any time lost to be deducted from hire.

63. **INERT GAS SYSTEM**

Owners warrant that the Vessel has a working Inert Gas System and officers and crew are experienced in the operation of the system.

9

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

The Master may be requested by terminal personnel or independent inspectors to breach the Inert Gas System for the purpose of guaging, sampling temperature determination and/or the quantity of cargo remaining on board after discharge. The Master shall comply with these requests but it shall be at his sole discretion (which not to be withheld unreasonably) consistent with the safe operation of the Vessel.

Any delays/expenses to the Vessel resulting from non-compliance with this clause shall be for Owners' account.

**64. MANIFOLD MATERIAL**

(a) Owners warrant that all piping, riser valves, spools, reducers and other fittings comprising that portion of the Vessel's manifold system outboard of the last fixed rigid support to the Vessel's deck and used in the transfer of cargo, bunkers or ballast will be made of steel or nodular iron. The fixed rigid support for the manifold system must be designed to prevent both lateral and vertical movement of the manifold. Owners further warrant that no more than one reducer or spacer will be used between the Vessel's manifold valve and the terminal hose or loading arm connection.

(b) Owners warrant that all piping, valves, fitting and reducers on the manifold system or area used in the transfer of cargo and ballast will be made of steel or nodular iron.

**65. CARGO TRANSFER INSPECTION**

Charterer may at his option place his representative on board to observe preparation for and discharging cargo during the period Vessel is in port. He will not, however, under any circumstances order or direct the taking of any particular action by crew or interfere in any way with the Master's exercise of his sole authority.

Owners shall not perform any cargo transfer between Vessel' tanks.

**66. CARGO RETENTION**

In the event that any cargo remaining on board upon completion of discharge is liquid (+) and pumpable and reachable by Vessel's means as determined by two (2) independent surveyors, 1 appointed and paid by Charterers, the other appointed and paid by Owners, Charterers shall have the right to deduct from hire, when deemed reasonable, the value of this liquid equal to the f.o.b, port of loading value of such cargo, plus prorata freight and insurance due with respect thereto.

Charterers hereby agree to indemnify Owners against any liability, under this clause, to a Bill of Lading holder resulting from non-delivery of any such cargo in respect of which a deduction from freight is made provided, however, that Charterers shall in no event be liable to indemnify Owners in an amount greater than the amount of the deduction from freight.

Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

This clause does not apply unless Charterers can demonstrate to Owners that they themselves have suffered an identical loss as a result of cargo remaining on board by way of deduction from sub-time Charterer hire or retention of freight.

(+) note:
R.o.b. will be considered liquid if :
It can be sampled and tests show that it has a dynamic viscosity of less than 600 centipoise by rheometric testing, using a Ferranti, Brookfield or similar viscometer, at the temperature it has when in the ship's tanks.

This notation does not apply if it is demonstrated by the above two independent surveyors that the samples taken from the cargo remaining on board proved to be liquid and flow.

### 67. HEATING

Owners warrant that the Vessel is capable of;
1. Maintaining crude and dirty petroleum cargoes at loaded temperature but maximum up to 135 degrees Fahrenheit (57 degrees Celsius),

2. If time/voyage permits, raising same up to a maximum temperature of up to 135 degrees Fahrenheit (57 degrees Celsius),

3. Maximum loading temperature shall not exceed 165 degrees Fahrenheit (74 degrees Celsius).

When Charterers request, Owners will endeavor to heat up the cargoes more than cp figures, if it is possible, but it is not guaranteed and shall be solely in Owners' discretion.

Upon request, Master to report daily to Charterers average cargo temperature of all tanks and to keep voyage heating records for Charterers inspection.

Charterers to allow Owners sufficient time for the Vessel to raise temperature bearing in mind length of loaded passage, outside ambient air and sea temperatures and weather conditions.

Failure to follow Charterers heating instructions shall be considered off hire if any time is lost until such time as the cargo is heated to Charterers instruction but always provided that Charterers to suffer same and prove by original documents.

### 68. BALLAST

Owners warrant that Vessel is able to handle ballast simultaneously with loading/discharging operations in accordance with Vessel's trim and stability. Any time lost due to Vessel being unable to ballast/deballast concurrently with cargo operations to be for Owners' account and will count as off-hire, provided local authorities or regulations permit ballasting/deballasting concurrently with cargo operations.

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

**69.  IN-TRANSIT LOSS**

Owners to be responsible for any cargo in-transit loss exceeding 0.5 percent, In-transit loss is defined as the difference between net Vessel's volume after loading at the load port and before unloading at the discharge port, based on ship figures.

Calculations to be based on same cargo temperature.

At load port, in case there is a difference between ship and shore figures, which is beyond than V.E.F., than Owners and Charterers to arrange a joint survey to be carried out and agreed quantities to be inserted on the B(s)/L.

**70.  TANK CLEANING**

Any cleaning between cargoes to be at Charterers' time and expense, including slop removal, cost of fresh water, chemical cleaning agents/soaps/detergents and additional riding crew or shore labor if required. Owners/Master and/or crew not to be blamed and/or held responsible if holds are not approved at loading port and Vessel always to remain on hire, providing Master and crew have adhered to Charterers' instructions and exercised due diligence.

Crew not to be involved in manual tank cleaning operations.

**71.  VAPOUR RECOVERY SYSTEM**

Vessel's vapor recovery system to be approved by Vessel's class and by the United States Coast Guard throughout the currency of the Charter Party.

**72.  ULLAGING SYSTEM**

Owners confirm Vessel is fitted with closed ullaging system.
Brand: ENRAF AUXITROL MARINE SAS
Type: Tank Radar System

**73.  WATER QUALITY AND FMCC**

Owners warrant to have and carry aboard the Vessel a U.S. Federal Maritime Commission Certificate of Financial Responsibility and to comply with the U.S. Federal Water Pollution Control Act as amended by the Clean Water Act 1977 (Water Pollution/and any subsequent amendment thereto). Furthermore, Owners to provide evidence of financial responsibility in respect not only of oil but also of hazardous substance.

**74.  CRUDE OIL WASHING (C.O.W.)**

Owners warrant that the Vessel is capable of Crude Oil Washing (C.O,W.) of all cargo tanks.

If requested by Charterer, Owners agree to conduct crude oil washing of cargo tanks at discharge port(s) simultaneously with the discharge of the cargo to shore, Under no circumstance shall the Vessel utilize more than 10 hours to effect C.O.W. or prorata on the basis of the number of tanks washed to the total number of tanks unless authorized by Charterers.

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

Owners agree to comply with applicable port and terminal regulations and, if necessary, to submit any advance information or technical data.

**75.  CONDITION OF CARGO SPACES ON DELIVERY AND REDELIVERY**
Vessel will be delivered with tanks, pipes and pumps clean for the carriage of crude oil and/or dirty petroleum products to the satisfaction of Charterer's inspector.

Vessel to be redelivered to Owners free of slops and sludge in cargo and slop tanks. Charterers to arrange COW, compatible crude oil for the last 1 (one) cargo of the Vessel before redelivery and drydock. Fuel oil and VGO and crude condensate are also allowed as the last cargo before redelivery

**76.  BUNKERS**
Vessel to be delivered with bunkers as on board at prices actually paid by Owners at last bunkering port prior delivery substantiated by actual invoices, but sufficient to reach nearest main bunkering port. Charterers shall endeavour to inform Owners about bunker supplies in advance.

Charterers have the option to bunker the Vessel before delivery provided above quantities agreed on delivery provided not interfering with the discharge operation or delaying delivery.

Vessel to be redelivered with about same quantities as on delivery excluding any bunkers taken for Charterers' account before delivery at prices actually paid at last bunkering port prior redelivery, but always with sufficient bunkers to reach nearest main bunkering port.

**77.  BUNKER QUALITY / OFF SPEC BUNKERS**
Should bunker analysis confirm that bunkers are off specification, (as per agreed specification in Vessel description), Owners will notify Charterers and provide the bunker analysis performed by DNV and Charterers will be notified regarding Owners intentions. Should Owners decide to use the bunkers supplied then Charterers are not entitled to present Owners with a speed or consumption claim for any period during which Vessel is using bunkers that do not meet the specified requirements. Owners shall not be obliged to use off-spec bunkers that are not within the agreed specs of this Charter Party.

If Owners and Charterers cannot find a solution for the consumption of off-spec bunkers then, upon request of Owners, Charterers are fully responsible to pump out off-spec fuel at their own time and expense. Any time lost will not count as off-hire time.

Charterers reserve the right to appoint an independent inspector to witness the re-testing of the alleged off spec bunkers.

13

**Rider Clauses to Time Charter Party
"CV Stealth – ST Shipping and Transport Pte Ltd"
dated 10th April 2014**

**78.   BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME C/PS 2005**

a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:
(i)  the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**79.   SPEED AND CONSUMPTIONS AND BUNKER SPECS DESCRIPTION (All Details About And WOG)**

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

## GENEL DENIZCILIK NAKLIYATI AS
### MT CV STEALTH
### SPEED AND BUNKER SPECS AND CONSUMPTIONS

| [ As Outside Above ] | Page | 1 of 2 |
|---|---|---|

### FUEL CONSUMPTIONS

#### MAIN ENGINE

MAN B&W 6S60 MC-C, M.C.R 13,460 BHP X 105 RPM          DENSITY LESS THAN 0.991 G/CM3, 9,480 KCal/Kg

#### SPEED & CONSUMPTIONS
[ IFO ( RMG 380 ) & MGO ( DMA ) / AS DEFINED BY OWNERS' BUNKER DESCRIPTION IN NEXT PAGES ]

| LADEN | | | | | | BALLAST | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Abt 14.50 | Knots | = | Abt 47.00 | Mts | / Day | Abt 14.50 | Knots | = | Abt 42.00 | Mts / Day |
| Abt 14.00 | Knots | = | Abt 42.00 | Mts | / Day | Abt 14.00 | Knots | = | Abt 38.00 | Mts / Day |
| Abt 13.50 | Knots | = | Abt 39.00 | Mts | / Day | Abt 13.50 | Knots | = | Abt 34.50 | Mts / Day |
| Abt 12.50 | Knots | = | Abt 36.00 | Mts | / Day | Abt 12.00 | Knots | = | Abt 31.00 | Mts / Day |

With reference to our accenting vessel can proceed with 15% Engine Power. For the clear listing, bunker consumptions and speed figures are not determined. For testing purposes, Vessel needs to be operated at one week before procedures in order to determine consumptions figures accordingly. When the main engine runs on low load operation, manual load up procedure is to be applied as a requirement of Engine Maker. It is necessary to increase the engine load significantly, also an extended period of low load running, the following procedures should be informed for cleaning of the turbochargers and exhaust gas boiler at least one time every 24 hours running. These are determined and will be decided after result of inspection on low load operation.

Load up 25 – 40% load          30 increases
Load up 40 – 75% load          nil increase

ALL SPEED/CONSUMPTION FIGURES ARE TO BE CONSIDERED AS ABOUT +/- 0.5 KNOT FOR SPEED AND +/- 5% FOR CONSUMPTION) ARE ALWAYS SUBJECT TO GOOD WEATHER AND SMOOTH SEA BASIS NO ADVERSE CURRENTS AND NO SWELL I.E. MAX BEAUFORT FORCE 4 AND MAX SEASTATE DOUGLAS 3

#### GENERATOR ENGINES

| AT VOYAGE | | = | Abt | 8.60 | Mts | / Day |
|---|---|---|---|---|---|---|
| LOADING | | = | Abt | 6.00 | Mts | / Day |
| UNLOADING | | = | Abt | 7.00 | Mts | / Day |
| TANK CLEANING | | = | Abt | 9.00 | Mts | / Day |
| MANOEUVERING | | = | Abt | 4.00 | Mts | / Day |
| TANK HEATING | | = | Abt | 5.00 | Mts | / Day |
| IDLE / ANCHORAGE | | = | Abt | 2.60 | Mts | / Day |
| IGS TOPPING / PURGING | | = | Abt | 8.00 | Mts | / Day |

#### AUXILIARY BOILERS

| LOADING | | = | Abt | 12.00 | Mts | / Day |
|---|---|---|---|---|---|---|
| UNLOADING | [ FOR EACH RUNNING C.O. & BALLAST PUMP ] | = | Abt | 0.85 | Mts | / Hour |
| TANK CLEANING | [ FOR EACH RUNNING C.O. PUMP ] | = | Abt | 0.75 | Mts | / Hour |
| MANOEUVERING | | = | Abt | 6.00 | Mts | / Day |
| TANK HEATING | | | | | | |
| TO MAINTAIN LOADED CARGO TEMPERATURE OF | 67 °C | = | Abt | 24.00 | Mts | / Day |
| IDLE / ANCHORAGE | | = | Abt | 2.50 | Mts | / Day |
| IGS TOPPING / PURGING | | = | Abt | 1.25 | Mts | / Hour |
| LOADING TIME | | = | Abt | 20.00 | Hrs | |
| UNLOADING TIME | [ EXCLUDING STRIPPING & COW OPERATION ] | = | Abt | 24.00 | Hrs | |

#### MGO CONSUMPTION

Vessel has liberty to consume MGO ( DMA ) When Manoeuvering in Shallow/Narrow/Busy and Restricted Waters, Canals, Rivers, in/out Ports, during bad weather, if required.

Diesel Generators / Boilers will also burn MGO ( DMA ) during the Starting and Stopping Operation for an hour or enough time to flush the Fuel Oil System. If load of engines drops less than 40% of MCR ( Maximum Continious Rating ), fuel has to be shifted to Diesel Oil instead of Heavy Fuel Oil.

15

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

## GENEL DENIZCILIK NAKLIYATI AS

### MT CV STEALTH

### SPEED AND BUNKER SPECS AND CONSUMPTIONS

[ All Details About ]                                              Page          2 of 3

Specification of Vessel - Continued

Charterers hereby confirm and commit that they'll comply to provide / replenish Fuels & Bunkers as described in this description throughout the Charter Party Period without any exception.

1   BUNKER   SPECS

1).     All bunker fuels to be supplied to be within ISO 8217 / 2005 Third Edition.

2).     The net calorific value of fuels delivered for main propulsion plant consumption is to have a minimum value of 40.8 MJ/Kg. Claims arising from underperformance of vessel where fuel supplied has a lower level of energy than 40.0 MJ/Kg, are to be adjusted accordingly to the reduction in net calorific value from 40.8 MJ/Kg.

3).     All fuels supplied to the vessel shall be derived from standard refinery processes of petroleum crude oils and are not to include waste materials such as spent lubricating oils and /or chemical waste.

4).     Silicon + Aluminium contents will not exceed 60 mg / kg.

5).     a.  Sampling shall be carried out at the ship's receiving manifold by continuous drip method.
        b.  Sampling device will be checked and sealed by both parties at the beginning of the bunkering.
        c.  Both parties shall attend to witness breaking the seal at the end of the bunkering.
        d.  Sufficient volume to be taken for splitting into 5 samples duly signed as follows;
                Sample # 1.   To be sent to DNV Laboratories.
                Sample # 2.   To be given to the Bunker Supplier.
                Sample # 3.   To be retained on board of the Vessel.
                Sample # 4.   To be retained on board of the Vessel for Marpol requirement.
                Sample # 5.   To be given independent bunker surveyor ( if engaged )

        e.  Sample bottles to be provided by the vessel.

        f.  The seal numbers of these samples must be recorded on the bunker delivery note.
            Sample labels must not be pre-signed and samples not taken by continuous dripping method during the bunker delivery shall not be accepted/binding.

        g.  Incase of any dispute regarding the result of the sample sent to DNV Laboratory by Owners, then the sample #3 retained on board of the vessel to be sent to a Laboratory for a Joint Bunker Analysis agreed by both Owners and Charterers ( if possible DNV ). In this case sample is govern quality /quantity of the bunkers supplied shall be the sample #3 which retained on board of the vessel.

            The test result of this Bunker Sample #3 ( which is kept on board of the vessel ), to be binding for all parties including density which to be used in calculating the actual Bunkers Quantity information.
            Cost of the All Bunker Analysis for the samples to be shared 50 / 50 pct between Owners and Charterers unless Charterers fail to provide proper bunkers along with the Charter Party Specs.

            Bunker Supplier and the Charterers can leverage a survey for the Sample #2 which kept by the Bunker Supplier but this shall not be binding & representative for any party.

6).     Sodium to Vanadium ratio to be less than 1 : 3.

7).     Marine gas oil/distillate fuel must not have a sulphur content of more than 0.10% m/m in accordance with EU Council Directive 2005/33/EC when the vessel is entering EU member territorial waters.

        Any grade of fuel which are in use at berth in EU community ports and ports in Non EU countries that have adopted Directive 2005/33/EC must not have a sulphur content of more than 0.10% m/m in accordance with EU Council Directive, 2005/33/EC as of 01 january 2010.

8).     Any Auxiliary Diesel Engines, Main Engines and Auxiliary Boilers shall be operated only with Marine Gas Oil (MGO) with a maximum of 1.5% sulphur by weight (0.10% as of 01 January 2012) while the vessel operates in any "Regulated California Waters" in accordance with California Code of Regulations, title 13, section 2299.2 & title 17, section 93118.2. Changes of fuel type when entering and leaving "Regulated California Waters" shall be documented by entries in the ship's logbook.

9).     Should Charterers fail to fully meet above bunker specs, Owners shall have right to ask Charterers to debunker all off spec bunkers replenished by Charterers. Charterers to arrange ( at their costs, risk, time and expenses etc. ) debunkering off spec bunkers if Owners found off spec bunkers unacceptable without any further discussion.

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

## GENEL DENIZCILIK NAKLIYATI AS
### MT CV STEALTH
### SPEED AND BUNKER SPECS AND CONSUMPTIONS

[ All Details About ]                                    Page         3 of 3

Specification of Vessel - Continued

2 . MARPOL ANNEX VI

Below described definitions shall be applied by Charterers for fuel oil supply of No 1 port and starboard fuel oil tanks which are dedicated for low sulphure fuel oil tanks as provision of Marpol Annex VI. Charterers guarantee to provide bunkers always in accordance with MARPOL ANNEX VI ( including all Appendixes and Amendments ).

1). The fuel shall not contain inorganic acid.

2). The fuel shall not include any added substances or chemical waste which either jeopardizes safety of ship or the performance of the engine, is harmful to personnel, or contributes to additional air pollution. This shall not preclude incorporation of small amounts of additives intended to improve some aspects of performance.

3). The bunker delivery note shall be accompanied by a sample of the fuel delivered, sealed and signed by the supplier's representative and master or officer in charge of the bunker operation. The sample shall be retained under the ship's control until the fuel is consumed but not for less than twelve months after the time of delivery.

4). The sampling equipment and test procedures shall comply with the DNVPS Guidelines: "Marine Fuel Management" based on the standards referred to in Table B1, Sec.1 B408.

5) SOx emission limits are generally achieved by use of low sulfur content fuel oil. When in port or SOx controlled areas, the maximum sulfur content in fuel oil used is 1.5 % m/m (1.0% m/m as of 01 July 2010). Changes of fuel type when entering and leaving port, or SOx controlled areas shall be documented by entries in the ship's logbook.

6). The emission criteria specified for oil fired boilers.

7). SOx emission controlled areas shall include:
   a. The Baltic Sea areas as defined in Marpol 73/78/97 regulation 13(1)b of Annex I; and
   b. Any other area, including port areas, designated by the Organization in accordance with criteria and procedures for designation of SOx emission controlled areas with respect to the prevention of air pollution from ships contained in appendix III to this Annex (Marpol 73/78/97 Annex VI)
   c. Charterers shall provide/replenish Low Sulphur Bunker minimum 4 (four) days prior to vessel's entrance to "SOx Emission Controlled Areas" in order to comply with mentioned regulations.

8). Charterers understand and agree that, As per Owners' policy, newly Supplied Bunkers are not mixed with the bunkers already on board of the vessel.

3 . OTHERS

If there will be any further alterations / amendments other than above, Charterers shall immediately take necessary steps without any notice from Owners. The Owners shall in no case be liable for any time losses / expenses / costs / consequences / speed reductions / over consumptions etc / whatsoever as a result of Charterers failure due to not supply the bunkers in accordance with the calling port/place authorities regulations / rules / circulars etc.

18

28

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

### 80.   HYDROGEN SULPHIDE (H2S) & MERCAPTAN CLAUSE

Owners shall comply with the requirements in ISGOTT (as amended from time to time) concerning hydrogen sulphide and ensuring that the hydrogen sulphide level is always below the threshold limit value (TLV).

Owners/Masters to liaise with Charterers on extra time required to comply with this requirement.

### 81.   CLASSIFICATION

Owners shall keep the Vessel with unexpired Classification in force at all times during the charter period and will comply with SOLAS 1974 Protocol 1978 and amendments and with U.S. Coast Guard and U.S. Federal Maritime Commission requirements (See Clause 54 and Clause 55).

Owners further warrant that the Vessel is in all aspects eligible for trading to the countries, ports and places specified in Clause 3 of this Charter Party and that at all times the Vessel shall have on board all necessary certificates, records and other documents required for such services, including the Vessel's compliance with United States Department of Labour Safety and Health Regulations.

### 82.   DRYDOCKING

No drydock unless under emergency conditions during this CP will take place.

### 83.   REMEASUREMENT

Charterers have the option to remeasure the Vessel at their time and expense.

### 84.   OIL COMPANIES' VETTING INSPECTIONS

Owners warrant that on delivery and throughout the duration of the TCP the vessel will always have a valid discharge sire report available to download on OCIMF website subject to the Vessel's trading pattern permitting inspection by Oil Majors and provided that the Charterers give Owners a minimum of five days' notice of final discharge port(s) with agent details and Inspectors are available and willing to perform the SIRE inspection.

A valid SIRE report shall mean;

The report must not contain any "BP High risk" deficiencies (as defined in the latest uploaded list produced by BP, leading to rejection of Vessel by BP.

Not more than one Oil Major shall have rejected the vessel since the inspection leading to the latest valid SIRE report registered on the SIRE system.

The SIRE report must be no more than 4 months old, counting from the date of inspection.

An invalid SIRE report shall not itself constitute a reason for the Charterers to put the vessel offhire or enable the Charterers to assert a claim under this charter

19

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

unless Owners have been unable to rectify the situation within 60 days, always subject to suitable trading pattern and availability of inspectors.

The OCIMF's "30 Day Rule" shall always be exercised in between the consecutive SIRE inspections.
Following a SIRE Inspection, the Owners shall exercise due diligence and use best endeavors to release the report on the SIRE database as soon as possible, but latest within 14 days after the receipt date. The vessel shall remain on hire and the Charterers shall not assert a claim throughout this period.

Owners warrant that at the time of delivery, the vessel is not unacceptable to and/or on technical hold by any MOC.

If the vessel later becomes unacceptable and/or on technical hold to any two of the MOCs, the Owners must take all reasonable steps to rectify or clarify all deficiencies/observations based on existing rules and regulations and invite for a screening/inspection as applicable, as soon as is reasonably practical (within 60 days from the time when loss of suitability is known). But in case a certain period is required by the Oil Major to lapse, such invitations shall be placed only at the end of that period.

The vessel shall remain on hire and the Charterers shall not assert a claim throughout this period of reinstating the eligibility.

Should the vessel when re-vetted still not obtain back the acceptance, and this lack of acceptability affects the vessel's trading, then the Charterers shall have the right to put the vessel offhire until such time as Owners are again compliant with their obligations.

**WARRANTIES**
Owners warrant that the Vessel has not been involved in any pollution, grounding, serious casualty or collision incident during the past 12 months.

Owners to advise date of last port state control (psc) inspection and warrant that any deficiencies have been closed out with the relevant psc and the Vessel was not detained by the port state control within the last 12 months.

Owners warrant that the Vessel's current classification status (as on the date of fixing this charter) is free of any conditions of class or recommendations.

Owners warrant that at the time of delivery the Vessel has a valid discharge port SIRE report that is less than four months old and warrant that such report does not contain any serious or high risk observations.

Owners warrant that at the time of delivery the Vessel is not unacceptable and/ or on technical hold to any oil companies (including but not limited to Shell, BP, Chevron, ExxonMobil, Total, Statoil hydro).

20

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

Owners warrant that at the time of fixing the charter, the Vessel, Owners, Managers and disponent Owners (where applicable), are free of any encumbrances other than mortgages and legal issues that may affect the Vessel's acceptance by an oil company and/ or a charterer and/or the performance of the charter.

Owners are bound by the above warranties and if whilst Vessel is on hire to Charterers any of the above warranties cannot be fulfilled Owners shall be given 60 days period for rectification, during which the Vessel shall remain onhire.

If at the end of the 60 days period, Owners fail to comply with the warranties, then the Charterers shall have the right to put the vessel offhire.

**85. OIL COMPANY QUESTIONNAIRE**
Owners will tender all possible prompt assistance in completing oil company questionnaires on delivery and when a change occurs.

**86. SHIP TO SHIP LIGHTERING**
Charterers have the option to load or discharge the Vessel via ship-to-ship transfer, weather permitting and subject to Master's approval, which is not to be unreasonably withheld, at a safe place at anchor.

Charterer to provide and pay onboard all necessary equipment, including hoses and adequate and sufficient number of Yokohama fenders, for such safe lightering operation to Master's full satisfaction. Charterers shall arrange supervisory personnel on board, including mooring Master to assist the performance of the lightering operations.

Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-To-Ship Transfer Guide.

The master has the right to suspend the lightening operation, if in his sole opinion, the safety of the Vessel or the smooth conduct of the operation is in jeopardy, in which case the Vessel will continue to remain on hire and all expense will be for Charterers account.

Charterers have the right to use as a dedicated lighterage vessel.

Charterers to advise full details of STS operations in advance to master including name of the Vessel, number and size and place of fenders etc.

During lightering operations, if the other Vessel does not have inert gas system then Charterers guarantee that detonation arrester, insulation flange/hoses etc. to be provided at Charterers' cost, time and expense as per United States Coast Guard CFR 49.

Extra cost of insurance if any to be for Charterers' account.

**87. INSPECTION**
Charterers shall have the option to put on board, before Vessel's arrival at loading port(s), an inspector to supervise the loading operations.

21

31

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

Charterers to provide Owners' L.O.I. wording for each of their inspectors on their headed paper, signed and stamped.

The inspector will be paid and insured by Charterers and victualling will be for Charterers account.

**88.   BIMCO Standard ISM Clause**

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners of "the Company" to comply with the ISM Code shall be for the Owners' account.

**89.   BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTERS PARTIES 2005**

a)

(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii)Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

b)

(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall

22

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, Vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**90. IMO CLAUSE**

Owners warrant that during the term of this Charter Party and any extension thereof the Vessel will be in full compliance with; the requirements of the United States Port and Tanker Safety Act of 1978 and applicable regulations promulgated there under (hereinafter called "U.S. Regulations") the International Convention for the Prevention of Pollution from Ships (Marpol 1973) and the 1978 protocol thereto as applicable and the International Convention for Safety of Lives at Sea (Solas 1974) and the 1978 protocol thereto as applicable (the foregoing conventions and protocols hereinafter called 'IMO Regulations'). Owners warrant that it will carry onboard certifications evidencing compliance with the aforementioned U.S. Regulations, compliance with IMO regulations and any other records or documentation as may be required by the U.S. government authorities at the date of the charter. The Vessel will be ISM certified and will remain so during the duration of this charter (please see Clause 88 BIMCO Standard ISM Clause).

**91. Q 88/ VESSEL PLANS**

Provided available the Owner shall arrange to deliver the following documents twenty one (21) days prior to delivery:

a) General Arrangement and Capacity Plans including Deadweight Scale
b) Detailed Cargo Manifold Arrangement Drawing
c) Cargo Pumping and Pipeline Arrangement Plans (types of valves fitted to be clearly shown)
d) Plan of Cargo Tank Ventilating and Inert Gas Systems
e) Mooring Arrangement Plan
f) OCIMF Ship Information Questionnaire for Bulk Oil Carriers (latest edition)
g) OCIMF Inspection Guidelines for Bulk Oil Carriers (latest edition)

23

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

**92.   Q88**

INTERTANKO'S STANDARD TANKER CHARTERING QUESTIONNAIRE 88 (Q88)                                         Version 3

| | | | | |
|---|---|---|---|---|
| 1. | **VESSEL DESCRIPTION** | | | |
| 1.1 | Date updated: | | Mar 17, 2014 | |
| 1.2 | Vessel's name: | | Cv Stealth | |
| 1.3 | IMO number: | | 9292993 | |
| 1.4 | Vessel's previous name(s) and date(s) of change: | | Not Applicable | |
| 1.5 | Date delivered: | | Jun 28, 2005 | |
| 1.6 | Builder (where built): | | Shanghai Wangaoqiao Shipbuilding Co.Ltd. | |
| 1.7 | Flag: | | Malta | |
| 1.8 | Port of Registry: | | Valetta | |
| 1.9 | Call sign: | | 9HA2428 | |
| 1.10 | Vessel's satcom phone number: | | 764665497 | |
| | Vessel's fax number: | | 783169854 | |
| | Vessel's telex number: | | 424859110 GDTS | |
| | Vessel's email address: | | cvstealth@SkyFile.com | |
| 1.11 | Type of vessel: | | Oil Tanker | |
| 1.12 | Type of hull: | | Double Hull | |
| Classification | | | | |
| 1.13 | Classification society: | | American Bureau of Shipping | |
| 1.14 | Class notation: | | +A1, OIL CARRIER, (E), +AMS,+ACCU, VEC, SH, RES, SHCM, RRDA,ESP, CRC, CPP, RW. | |
| 1.15 | If Classification society changed, name of previous society: | | | |
| 1.16 | If Classification society changed, date of change: | | Not Applicable | |
| 1.17 | IMO type, if applicable: | | N/A | |
| 1.18 | Does the vessel have ice class? If yes, state what level: | | No, NA | |
| 1.19 | Date / place of last dry-dock: | | Apr 28, 2010      JOHOR | |
| 1.20 | Date next dry dock due | | Jun 27, 2015 | |
| 1.21 | Date of last special survey / next survey due: | | May 05, 2010      Jun 27, 2015 | |
| 1.22 | Date of last annual survey: | | Apr 02, 2013 | |
| 1.23 | If ship has Condition Assessment Program (CAP), what is the latest overall rating: | | | |
| 1.24 | Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS): If yes, what is the expiry date? | | N/A Not Applicable | |
| Dimensions | | | | |
| 1.25 | Length Over All (LOA): | | | 243.8 m |
| 1.26 | Length Between Perpendiculars (LBP): | | | 233 m |
| 1.27 | Extreme breadth (Beam): | | | 42 m |
| 1.28 | Moulded depth: | | | 21.4 m |
| 1.29 | Keel to Masthead (KTM) / KTM in collapsed condition (if applicable): | | 49.45 m | m |
| 1.30 | Bow to Center Manifold (BCM) / Stern to Center Manifold (SCM): | | 121.7 m | 122.1 m |
| 1.31 | Distance bridge front to center of manifold: | | | 90.8 m |

| | | Lightship | Normal Ballast | Summer Dwt |
|---|---|---|---|---|
| 1.32 | Parallel body distances: | | | |
| | Forward to mid-point manifold: | 40 m | 60.55 m | 61.1 m |
| | Aft to mid-point manifold: | 28.2 m | 51 m | 71 m |
| | Parallel body length: | 68.2 m | 111.55 m | 132.1 m |
| 1.33 | FWA at summer draft / TPC immersion at summer draft: | | 353 mm | 92.1 MT |

| | | Full Mast | Collapsed Mast |
|---|---|---|---|
| 1.34 | What is the max height of mast above waterline (air draft) | | |
| | Lightship: | 46.26 m | 0 m |
| | Normal ballast: | 42.163 m | 0 m |
| | At loaded summer deadweight: | 34.828 m | 0 m |

| | | | |
|---|---|---|---|
| Tonnages | | | |
| 1.35 | Net Tonnage: | 31117 | |

25

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

| | | | | | |
|---|---|---|---|---|---|
| 1.36 | Gross Tonnage / Reduced Gross Tonnage (if applicable): | | | 58419 | 45652 |
| 1.37 | Suez Canal Tonnage - Gross (SCGT) / Net (SCNT): | | | 59565.75 | 54300.8 |
| 1.38 | Panama Canal Net Tonnage (PCNT): | | | | |

**Loadline Information**

| | 1.39 Loadline | Freeboard | Draft | Deadweight | Displacement |
|---|---|---|---|---|---|
| | Summer: | 6.616 m | 14.822 m | 104469.4 MT | 122569 MT |
| | Winter: | 6924 m | 14.514 m | 101670.8 MT | 119740.8 MT |
| | Tropical: | 6.308 m | 15.13 m | 107344.2 MT | 125413.9 MT |
| | Lightship: | 18.248 m | 3.19 m | | 18069.74 MT |
| | Normal Ballast Condition: | 14.151 m | 7.287 m | 37247.9 MT | 55317.8 MT |

| | | | |
|---|---|---|---|
| 1.40 | Does vessel have multiple SDWT? | | Yes |
| 1.41 | If yes, what is the maximum assigned deadweight? | | 104469.4 MT |

**Ownership and Operation**

| | | |
|---|---|---|
| 1.42 | Registered owner - Full style: | Fsara Energy Limited<br>Trust Company Complex Ajeltake Road, Ajeltake<br>Island, Majuro, MH96960Marshall Islands<br>Tel: +30 210 4293223<br>Fax: +30 210 4293228<br>Telex: Not Applicable<br>Email: piraeus@register-iri.com |
| 1.43 | Technical operator - Full style: | GENEL DENIZCILIK NAKLIYATI AS<br>Buyukdere caddesi Yapi Kredi Plaza, A:Blok Kat:12<br>80620 Levent-Istanbul-Turkey<br>Tel: +90 212 3195100<br>Fax: +90 212 283 18 04 /<br>Telex: 26501 GDE.Tr<br>Email: tanker@gedenlines.com |
| 1.44 | Commercial operator - Full style: | GENEL DENIZCILIK NAKLIYAT AS.<br>PLAZA MAREIN 21ST FLOOR JLN JEND<br>SUDIRMAN KAV 76-78 JAKARTA, INDONESIA<br>Tel: +90 212 2631604<br>Fax: +90 212 2631604<br>Telex: 26501 GDE.Tr<br>Email: TANKER@GEDENLINES.COM |
| 1.45 | Disponent owner - Full style: | Space Shipping Ltd.<br>198 OLD BAKERY STREET, VALLETTA / MALTA |

| 2. | CERTIFICATION | Issued | Last Annual<br>or Intermediate | Expires |
|---|---|---|---|---|
| 2.1 | Safety Equipment Certificate: | Apr 02, 2013 | Apr 02, 2013 | Jun 27, 2015 |
| 2.2 | Safety Radio Certificate: | Jun 11, 2012 | Apr 02, 2013 | Jun 27, 2015 |
| 2.3 | Safety Construction Certificate: | Jun 25, 2010 | Apr 02, 2013 | Jun 27, 2015 |
| 2.4 | Loadline Certificate: | Jun 25, 2010 | Apr 02, 2013 | Jun 27, 2015 |
| 2.5 | International Oil Pollution Prevention Certificate (IOPPC): | Apr 02, 2013 | Apr 02, 2013 | Jun 27, 2015 |
| 2.6 | Safety Management Certificate (SMC): | Dec 30, 2010 | Not Applicable | Nov 12, 2015 |
| 2.7 | Document of Compliance (DOC): | May 29, 2013 | Not Applicable | Jul 05, 2018 |
| 2.8 | USCG (specify: COC, LOC or COI): COC | Jul 18, 2013 | Not Applicable | Jul 18, 2015 |
| 2.9 | Civil Liability Convention Certificate (CLC): | Feb 20, 2015 | | Feb 20, 2015 |
| 2.10 | Civil Liability for Bunker Oil Pollution Damage Convention<br>Certificate (CLBC): | Feb 20, 2014 | | Feb 20, 2015 |
| 2.11 | U.S. Certificate of Financial Responsibility (COFR): | Jul 22, 2016 | | Jul 22, 2016 |
| 2.12 | Certificate of Fitness (Chemicals): | Not Applicable | Not Applicable | Not Applicable |
| 2.13 | Certificate of Fitness (Gas): | Not Applicable | | Not Applicable |
| 2.14 | Certificate of Class: | Aug 24, 2010 | Apr 02, 2013 | Jun 27, 2015 |
| 2.15 | International Ship Security Certificate (ISSC): | Nov 12, 2010 | Not Applicable | Nov 11, 2015 |
| 2.16 | International Sewage Pollution Prevention Certificate (ISPPC): | Jun 11, 2012 | | Jun 27, 2015 |
| 2.17 | International Air Pollution Prevention Certificate (IAPP): | May 06, 2010 | Apr 02, 2013 | Jun 27, 2015 |

**Documentation**

26

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

| | | |
|---|---|---|
| 2.18 | Does vessel have all updated publications as listed in the Vessel Inspection Questionnaire, Chapter 2- Question 2.24, as applicable: | Yes |
| 2.19 | Owner warrant that vessel is member of ITOPF and will remain so for the entire duration of this voyage/contract. | Yes |
| **3.** | **CREW MANAGEMENT** | |
| 3.1 | Nationality of Master: | Turkish |
| 3.2 | Nationality of Officers: | Turkish |
| 3.3 | Nationality of Crew: | Turkish |
| 3.4 | If Officers/Crew employed by a Manning Agency - Full style: | Officers: Not Applicable<br>Not Applicable<br>Tel: Not Applicable<br>Fax: Not Applicable<br>Telex: Not Applicable<br>Email: Not Applicable<br>Crew: Not Applicable<br>Not Applicable<br>Tel: Not Applicable<br>Fax: Not Applicable<br>Telex: Not Applicable<br>Email: Not Applicable |
| 3.5 | What is the common working language onboard: | Turkish, English |
| 3.6 | Do officers speak and understand English: | Yes |
| 3.7 | In case of Flag Of Convenience, is the ITF Special Agreement on board: | Yes |
| **4.** | **HELICOPTERS** | |
| 4.1 | Can the ship comply with the ICS Helicopter Guidelines: | Yes |
| 4.2 | If Yes, state whether winching or landing area provided: | Winching |
| **5.** | **FOR USA CALLS** | |
| 5.1 | Has the vessel Operator submitted a Vessel Spill Response Plan to the US Coast Guard which has been approved by official USCG letter: | Yes |
| 5.2 | Qualified Individual (QI) - Full style: | GALLAGHER MARINE SYSTEMS<br>200 Century Parkway, Suite D Mt. Laurel, NJ 08054<br>Tel: +1 703 683 4700<br>Fax: +1 856 642 3945<br>Email: info@ghgms.com |
| 5.3 | Oil Spill Response Organization (OSRO) -Full style: | National Response Corporation<br>3500 Sunrise Highway Suite T103 Great River, NY<br>11730<br>Tel: 1 631 224 9141<br>Fax: 1 631 224 9082<br>Email: loodo@nrcc.com<br>Web: www.nrcc.com |
| 5.4 | Has technical operator signed the SCIA / C-TPAT agreement with US customs concerning drug smuggling: | No |
| **6.** | **CARGO AND BALLAST HANDLING** | |
| | **Double Hull Vessels** | |
| 6.1 | Is vessel fitted with centerline bulkhead in all cargo tanks: | Yes |
| 6.2 | If Yes, is bulkhead solid or perforated: | Solid |
| | **Cargo Tank Capacities** | |
| 6.3 | Capacity (98%) of each natural segregation with double valve (specify tanks): | Seg#1: 39120.82 m3 (COT 1W, 4W and SLOP W)<br>Seg#2: 39810.94 m3 (COT 2W and 5W)<br>Seg#3: 39148.0 m3 (COT 3W and 6W) |
| 6.4 | Total cubic capacity (98%, excluding slop tanks): | 113658.08 m3 |
| 6.5 | Slop tank(s) capacity (98%): | 4420.68 m3 |
| 6.6 | Residual/Retention oil tank(s) capacity (98%), if applicable: | m3 |
| 6.7 | Does vessel have Segregated Ballast Tanks (SBT) or Clean Ballast Tanks (CBT): | SBT |
| | **SBT Vessels** | |

28

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

| | | | | |
|---|---|---|---|---|
| 6.8 | What is total capacity of SBT? | | | 40459.5 m3 |
| 6.9 | What percentage of SDWT can vessel maintain with SBT only: | | | 39.55 % |
| 6.10 | Does vessel meet the requirements of MARPOL Annex I Reg 18.2: (previously Reg 13.2) | | Yes | |
| | **Cargo Handling** | | | |
| 6.11 | How many grades/products can vessel load/discharge with double valve segregation: | 3 | | |
| 6.12 | Maximum loading rate for homogenous cargo per manifold connection: | | | 4000 m3/hr |
| 6.13 | Maximum loading rate for homogenous cargo loaded simultaneously through all manifolds: | | | 10080 m3/hr |
| 6.14 | Are there any cargo tank filling restrictions. If yes, please specify: | | No NA | |

**Pumping Systems**

| | | No. | Type | Capacity |
|---|---|---|---|---|
| 6.15 | Pumps: | | | |
| | Cargo: | 3 | Centrifugal | 2500 M3/HR |
| | Stripping: | 1 | Reciprocating | 200 m3/hr |
| | Eductors: | 1 | Other | 550 m3/hr |
| | Ballast: | 2 | Centrifugal | 1500 m3/hr |
| 6.16 | How many cargo pumps can be run simultaneously at full capacity: | 3 | | |

| | | | | |
|---|---|---|---|---|
| | **Cargo Control Room** | | | |
| 6.17 | Is ship fitted with a Cargo Control Room (CCR): | | Yes | |
| 6.18 | Can tank innage / ullage be read from the CCR: | | Yes | |
| | **Gauging and Sampling** | | | |
| 6.19 | Can ship operate under closed conditions in accordance with ISGOTT: | | Yes | |
| 6.20 | What type of fixed closed tank gauging system is fitted: | | Radar | |
| 6.21 | Are overfill (high-high) alarms fitted? If Yes, indicate whether to all tanks or partial: | | Yes, all | |
| | **Vapor Emission Control** | | | |
| 6.22 | Is a vapor return system (VRS) fitted: | | Yes | |
| 6.23 | Number/size of VRS manifolds (per side): | 1 | | 406.4 mm |
| | **Venting** | | | |
| 6.24 | State what type of venting system is fitted: | | Common Line | |
| | **Cargo Manifolds** | | | |
| 6.25 | Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment': | | Yes | |
| 6.26 | What is the number of cargo connections per side: | 3 | | |
| 6.27 | What is the size of cargo connections: | | | 450 mm |
| 6.28 | What is the material of the manifold: | | Steel | |
| | **Manifold Arrangement** | | | |
| 6.29 | Distance between cargo manifold centers: | | | 2500 mm |
| 6.30 | Distance ships rail to manifold: | | | 4615 mm |
| 6.31 | Distance manifold to ships side: | | | 4615 mm |
| 6.32 | Top of rail to center of manifold: | | | 650 mm |
| 6.33 | Distance main deck to center of manifold: | | | 1950 mm |
| 6.34 | Manifold height above the waterline in normal ballast / at SDWT condition: | | 16.3 m | 9.55 m |
| 6.35 | Number / size reducers: | | 6 x 450/400mm (18/16") 3 x 450/300mm (18/12") 3 x 450/250mm (18/10") 3 x 450/200mm (18/8") | |
| | **Stern Manifold** | | | |
| 6.36 | Is vessel fitted with a stern manifold: | | N/A | |
| 6.37 | If stern manifold fitted, state size: | | | 0 mm |
| | **Cargo Heating** | | | |
| 6.38 | Type of cargo heating system? | | Steam | |
| 6.39 | If fitted, are all tanks coiled? | | Yes | |

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

| | | | | | |
|---|---|---|---|---|---|
| 6.40 | If fitted, what is the material of the heating coils: | | | Yorkalbro | |
| 6.41 | Maximum temperature cargo can be loaded/maintained: | | | 73.0 Å°C / 163.4 Å°F | 57 Å°C / 134.6 Å°F |

**Tank Coating**

| | | | | | |
|---|---|---|---|---|---|
| 6.42 | Are cargo, ballast and slop tanks coated? | | Coated | Type | To What Extent |
| | Cargo tanks: | | Yes | Epoxy | only top and bottom |
| | Ballast tanks: | | Yes | Epoxy | Whole Tank |
| | Slop tanks: | | Yes | Epoxy | Whole Tank |
| 6.43 | If fitted, what type of anodes are used: | | Zinc | | |

**7.   INERT GAS AND CRUDE OIL WASHING**

| | | | |
|---|---|---|---|
| 7.1 | Is an Inert Gas System (IGS) fitted: | | Yes |
| 7.2 | Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen: | Flue Gas | |
| 7.3 | Is a Crude Oil Washing (COW) installation fitted: | | Yes |

**8.   MOORING**

| | | No. | Diameter | Material | Length | Breaking Strength |
|---|---|---|---|---|---|---|
| 8.1 | Mooring wires (on drums) | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | | mm | Not Applicable | m | MT |
| | Main deck fwd: | | mm | Not Applicable | m | MT |
| | Main deck aft: | | mm | Not Applicable | m | MT |
| | Poop deck: | | mm | Not Applicable | m | MT |
| 8.2 | Wire tails | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 4 | 75 mm | Nylon Multifilament 8 - Strand Rope | 11 m | 103 MT |
| | Main deck fwd: | 4 | 75 mm | Nylon Multifilament 8 - Strand Rope | 11 m | 103 MT |
| | Main deck aft: | 2 | 75 mm | Nylon Multifilament 8 - Strand Rope | 11 m | 103 MT |
| | Poop deck: | 6 | 75 mm | Nylon Multifilament 8 - Strand Rope | 11 m | 103 MT |
| 8.3 | Mooring ropes (on drums) | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 4 | 32 mm | SuperMax Plus Rope | 220 m | 75 MT |
| | Main deck fwd: | 4 | 32 mm | SuperMax Plus Rope | 220 m | 75 MT |
| | Main deck aft: | 2 | 32 mm | SuperMax Plus Rope | 220 m | 75 MT |
| | Poop deck: | 6 | 32 mm | SuperMax Plus Rope | 220 m | 75 MT |
| 8.4 | Other mooring lines | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 1 | 64 mm | POLYESTER 40% POLYPROP 60% | 220 m | 75 MT |
| | Main deck fwd: | 1 | 64 mm | POLYESTER 40% POLYPROP 60% | 220 m | 80 MT |
| | Main deck aft: | 1 | 68 mm | POLYESTER 40% POLYPROP 60% | 220 m | 85 MT |
| | Poop deck: | 1 | 68 mm | POLYESTER 40% POLYPROP 60% | 220 m | 85 MT |

| | | | No. | # Drums | Brake Capacity |
|---|---|---|---|---|---|
| 8.5 | Mooring winches | | No. | # Drums | Brake Capacity |
| | | Forecastle: | 2 | Double Drums | 45 MT |
| | | Main deck fwd: | 2 | Double Drums | 45 MT |
| | | Main deck aft: | 1 | Double Drums | 45 MT |
| | | Poop deck: | 3 | Double Drums | 45 MT |

| | | | No. | SWL |
|---|---|---|---|---|
| 8.6 | Mooring bitts | | No. | SWL |
| | | Forecastle: | 2 | 46 MT |
| | | Main deck fwd: | 4 | 40 MT |
| | | Main deck aft: | 2 | 46 MT |
| | | Poop deck: | 4 | 46 MT |

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

| | | No. | SWL |
|---|---|---|---|
| 8.7 | Closed chocks and/or fairleads of enclosed type | | |
| | Forecastle: | 8 | 48 MT |
| | Main deck fwd: | 7 | 48 MT |
| | Main deck aft: | 7 | 48 MT |
| | Poop deck: | 12 | 48 MT |

**Emergency Towing System**

| | | | |
|---|---|---|---|
| 8.8 | Type / SWL of Emergency Towing system forward: | SPM FITTING | 200 MT |
| 8.9 | Type / SWL of Emergency Towing system aft: | UNIQUE SYSTEM | 200 MT |

**Anchors**

| | | | |
|---|---|---|---|
| 8.10 | Number of shackles on port cable: | 13 | |
| 8.11 | Number of shackles on starboard cable: | 13 | |

**Escort Tug**

| | | | |
|---|---|---|---|
| 8.12 | What is SWL and size of closed chock and/or fairleads of enclosed type on stem: | 75 MT | 600 |
| 8.13 | What is SWL of bollard on poopdeck suitable for escort tug: | | 48 MT |

**Bow/Stern Thruster**

| | | | |
|---|---|---|---|
| 8.14 | What is brake horse power of bow thruster (if fitted): | 0 bhp | 0 Kw |
| 8.15 | What is brake horse power of stem thruster (if fitted): | 0 bhp | 0 Kw |

**Single Point Mooring (SPM) Equipment**

| | | | |
|---|---|---|---|
| 8.16 | Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)': | Yes | |
| 8.17 | Is vessel fitted with chain stopper(s): | Yes | |
| 8.18 | How many chain stopper(s) are fitted: | 2 | |
| 8.19 | State type of chain stopper(s) fitted: | Tongue type | |
| 8.20 | Safe Working Load (SWL) of chain stopper(s): | | 200 MT |
| 8.21 | What is the maximum size chain diameter the bow stopper(s) can handle: | | 76 mm |
| 8.22 | Distance between the bow fairlead and chain stopper/bracket: | | 3570 mm |
| 8.23 | Is bow chock and/or fairlead of enclosed type of OCIMF recommended size (600mm x 450mm)? If not, give details of size: | Yes | |

**Lifting Equipment**

| | | | |
|---|---|---|---|
| 8.24 | Derrick / Crane description (Number, SWL and location): | Cranes: 2 x 15 Tonnes port and starboard | |
| 8.25 | What is maximum outreach of cranes / derricks outboard of the ship's side: | | 8.2 m |

**Ship To Ship Transfer (STS)**

| | | | |
|---|---|---|---|
| 8.26 | Does vessel comply with recommendations contained in OCIMF/ICS Ship To Ship Transfer Guide (Petroleum or Liquified Gas, as applicable): | Yes | |

**9.    MISCELLANEOUS**

**Engine Room**

| | | | |
|---|---|---|---|
| 9.1 | What type of fuel is used for main propulsion? | IFO 380 CST | |
| 9.2 | What type of fuel is used in the generating plant? | IFO 380 CST | |
| 9.3 | Capacity of bunker tanks - IFO and MDO/MGO: | 3569.687 m3 | 257.759 m3 0 m3 |
| 9.4 | Is vessel fitted with fixed or controllable pitch propeller(s)? | Fixed Pitch | |

**Insurance**

| | | | |
|---|---|---|---|
| 9.5 | P & I Club - Full Style: | STEAMSHIP MUTUAL Aquatical House 39, Bell Lane London E1 7LU | |
| 9.6 | P & I Club coverage - pollution liability coverage: | 1000000000 US$ | |

**Port State Control**

| | | | |
|---|---|---|---|
| 9.7 | Date and place of last Port State Control inspection: | Jul 18, 2013 / BAYTOWN-USA | |
| 9.8 | Any outstanding deficiencies as reported by any Port State Control: | No | |
| 9.9 | If yes, provide details: | None | |

**Recent Operational History**

9.10

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

32

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

| | |
|---|---|
| Has vessel been involved in a pollution, grounding, serious casualty or collision incident during the past 12 months? If yes, full description: | Pollution: No , None<br>Grounding: No , None<br>Serious casualty: No , None<br>Collision: No , None |
| 9.11  Last three cargoes / charterers / voyages (Last / 2nd Last / 3rd Last): | Contact owner for details |
| Vetting | |
| 9.12  Date/Place of last SIRE inspection: | Dec 25, 2013 / PORT ARTHUR |
| 9.13  Date/Place of last CDI inspection: | N/A |
| 9.14  Recent Oil company inspections/screenings (To the best of owners knowledge and without guarantee of acceptance for future business)": | SHELL / INEOS / CONOCO / CHEVRON/ CITGO / STATOIL |
| *"Blanket "approvals" are no longer given by Oil Majors and ships are accepted for the voyage on a case by case basis.* | |

Version 3 (INTERTANKO / Q88.com)

33

43

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

93. **O.C.I.M.F.**
Owners warrant that Vessel is equipped to Oil Company International Marine Forum (OCIMF) Standards relating to:

a) Standards for Oil Tanker Manifold and Associated Equipment
b) Ship to Ship Transfer Guide (Petroleum)
c) Recommendations for Equipment Employed in the Mooring of Ships at Single Point Moorings

Vessel meets mentioned standards as of delivery.

94. **CIVIL LIABILITY CONVENTION**
Owners warrant that the Vessel performing under this Charter carries on board a certificate furnished as evidence of insurance pursuant to Article 7 of the International Convention of Civil Liability for Oil Pollution Damage 1969. Owners further warrant that the said certificate will be maintained in effect throughout the duration of performance of this Charter. Any delay or consequences due to failure to have or maintain said certificate to be for Owners' account.

95. **Q.I SPILL RESPONSE PLANS**
Owners confirm this covers all of the United States of America including Hawaii and Alaska.

96. **SEA CARRIER INITIATIVE AGREEMENT**
In order to assist in the prevention of smuggling for drugs, the U.S. Customs encourages Owners to sign a carrier initiative agreement. Owners confirm they have signed such an agreement.

97. **ITF.**
Owners guarantee that the employment of the Vessel's officers and crew is covered by a bona fide trade union agreement to ITF worldwide and will remain so during the currency of Charter Party.

The Vessel to carry such agreement on board during the service.

In the event that the Vessel is delayed by strikes, labour boycotts or any other discrimination/difficulty against the Vessel because of previous trade and/or the Ownership and/or officers and crew and/or officers' crews' employment condition, all such time lost is to be considered as off-hire and expenses directly incurred thereby are to be for Owners' account including bunker fuel consumed during such periods.

98. **I.T.O.P.F.**
Provided membership available further to the warranty of Owner made in this charter party, Owners warrant that it is and, during the currency of the Charter Party, will remain a member of the International Tanker Owners Pollution

34

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

Federation (I.T.O.P.F.) nothing set forth in this Charter Party shall prejudice Charterers rights to take such preventive actions in relation to pollution or threatened pollution as may be permissible under applicable law and the rights and duties of the Owner and Charterer herein shall be and remain subject to and in accordance with any applicable law.

**99. OPA**

Owners to have in place for duration of charter USD 1.0 BILLION worldwide Standard Oil Pollution cover from their P&I club(s) and must obtain any additional Oil Pollution Insurance cover which becomes available in line with industry standards via their P&I club(s) or through Underwriters providing first class security if this additional Oil Pollution Cover is widely accepted and compulsory by the shipping industry. Evidence of oil pollution coverage from the Vessel's P & I club insurance broker will be provided as required If unavailable and therefore restricts the Charterers from trading into the U.S. then Charterers shall have the right to redeliver the Vessel provided the Vessel is free of cargo.

Furthermore, pursuant to clause 2(c) of this charter, Owners warrant (a) that the Vessel Owner or operator will have, prior to delivery, submitted to the U.S. Coast Guard for approval a response plan for the Vessel ("VRP") which meets in full the requirements of the U.S. Oil Pollution Act of 1990 the governmental regulations issued thereunder, the U.S. Coast Guard Navigational and Vessel Inspection Circular No. 8-92 and any rule or regulation in substitution of, or supplementary to, such circular (collectively VRP requirements), (b) that the VRP shall be approved, and the Vessel operated in compliance therewith, when and is required by the VRP requirements and (c) that the Owners shall ensure that the Owner or operator of the Vessel and the Vessel fully meet all other requirements of OPA and any governmental regulations or guidelines issued thereunder. This clause does not, in any way, lessen the overall effect of clause 2(c) of this charter, or relieve the Owner of any state obligations in respect of Vessel response plans or other pollution requirements.

**100. INSURANCE / USCG CHECKLIST REQUIREMENT**

The following questions / assurance are to be advised by Owners as soon as possible but by latest on delivery except TVEL which can only be obtained after the inspection Vessel first USA call.

1. The Vessel is currently entered with TBN.
2. The insured value of the Vessel is TBN.
3. Owners warrant Vessel has valid TVEL certified on board which expire as will be advised and will be renewed as necessary.
4. The Ship Owners insurance and guarantee company Shoreline Mutual will provide security to the United States Coast Guard (U.S.C.G.) in respect of the certificate of financial responsibility for oil pollution (C.O.F.R.)

**101. ELIGIBILITY & COMPLIANCE**

Owners warrant that on delivery  the Vessel is in all respects eligible under application conventions, laws and regulations for trading to and from the ports and

35

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

places specified in Clause 4 of the Charter Party and that she shall have on board for inspection by the authorities all certificates, records, compliance letters and other documents required for such services, including, but not limited to, a U.S. Coast Guard Certificate of Financial Responsibility (Oil Pollution) and the certificate required by Article VII of International Convention on Civil Liability for Oil Pollution Damage of 1969, as amended.

Owners further warrant that on delivery the Vessel does, and will, fully comply with all applicable conventions, laws, regulations and ordinances of any international, national, state or local government entity having jurisdiction including, but not limited to, the U.S. Port and Tanker Safety Act, as amended, the U.S. Federal Water Pollution Control Act, as amended, MARPOL 1973/1978 as amended and extended and SOLAS 1974/1978/1983 as amended and extended and OPA 1990.

In the interest of safety, the Owners will recommend that the Master observes the recommendations as to traffic separation and routing which are issued from time to time by the International Maritime Organisation (IMO) or as promulgated by the Flag State of the Vessel in which the effective management of the Vessel is exercised.

Any delays, losses, expenses or damages to the Vessel arising as a result of failure to comply with this Clause shall be for the Owners' account and the Charterers shall not be liable for any delay caused by the Vessel's failure to comply with the foregoing warranties.

## 102. U.S. COMPLIANCE

Owners represent and guarantee that Owners and its Vessel are not in any way directly or indirectly owned, controlled by or related to any Cuban, North Korean, Yugoslavia (Serbian or Montenegran), Iranian, Libyan or Iraqi interests. Owners further represent and guarantee that the Vessel has not called to a Cuban port within one hundred and eighty (180) days of the date of this Charter Party.

## 103. USCG COMPLIANCE

Owners certify that the Vessel complies with the provisions of current U.S. Coast Guard Regulations and any subsequent amendment thereto. Owners further certify that the Vessel is not presently under an outstanding Letter of Discrepancy issued by the U.S. Coast Guard as a result of Coast Guard inspection of the Vessel at a prior call at a United States of America port.

## 104. GENERAL COMPLIANCE

Throughout the period of the Charter Party Vessel to be in possession of the necessary valid equipment and all certificates necessary to comply with all applicable IMO Regulations. Safety and Health Regulations, International Regulations and all requirements at all ports of call, Suez Canal included. Any delays or expense to the Vessel by reason of non-compliance with such regulations. Lack of proper documentation or equipment, to be for Owners' account.

36

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

**105. UNITED STATES OF AMERICA TRADING/ TVEL CLAUSE**

Any time lost during which the Vessel awaiting U.S. Coast Guard TVEL inspection, or in the case of calls at non-U.S. ports where any similar certificate is required to be issued by a state authority at these ports prior to loading or discharging cargo, and until such time as she has secured TVEL certificate / COC or any similar certificate, Vessel will be considered on hire provided that Vessel is found acceptable. All relevant for TVEL / COC etc. costs to be Charterers account.

**106. BIMCO AMS / U.S. CUSTOMS ADVANCE NOTIFICATION & REGULATIONS**

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

   (i)   Have in place a SCAC (Standard Carrier Alpha Code);

   (ii)  Have in place an ICB (International Carrier Bond);

   (iii) Provide the Owners with a timely confirmation of i) and ii) above; and

   (iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature; including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**107. NIGERIA**

Owners warrant that:

(a) Vessel is not owned directly or through subsidiaries or chartered or managed by companies or persons in South Africa, Namibia, Rhodesia or Israel or registered in any of these countries.

(b) Vessel has not called at a port in South Africa, Namibia, Rhodesia or Israel (unless as per Charterers' orders). (A port call includes the calling of near a port for the purpose of receiving service from the shore by helicopter or launch boat).

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

(c) Deleted.

(d) Deleted.

(e) Deleted.

### 108. LANGUAGE

Master, Chief Officer and all personnel involved with cargo operations to be fluent in English. Owners/ Managers undertake to have English speaking personnel available to ensure appropriate communication between Charterers/Owners/ Managers.

### 109. DRUG AND ALCOHOL POLICY

Owners have an active policy on drug and alcohol abuse applicable to the Vessel meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines for the Control of Drugs and Alcohol onboard Ships (OCIMF-January 1990).

Owner's further warrant that said policy is in compliance with Exxon Standards.

### 110. CHARTERERS PERFORMANCE GUARANTEE

Glencore International AG "of" reg. P.O Box 777 Baaremattstrasse 3 CH-6431, Baar Switzerland " guarantee the fulfilment of the Charter Party dated 10th April 2014 between Space Shipping Ltd. and

ST SHIPPING AND TRANSPORT PTE LTD.

This will be on Glencore International AG headed paper signed and stamped by authorized company representative.

### 111. BIMCO DISPUTE RESOLUTION AND LAW

English law with London Arbitration to govern this Charter Party.
a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof saves to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

and gives notice that it has done so within the 14 days specified.  If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply;

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration
Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

39

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits).

## 112. NEW PARAMOUNT

Charterers shall procure that all Bills of Lading issued under this Charter shall contain the following Clauses;

1. Have effect subject to any national legislation making the Hague Rules as amended by Protocol signed at Brussels on the 23rd February 1968 (The Hague Visby Rules) compulsory applicable to this Bill of Lading and nothing herein contained shall be deemed to be surrender by the carrier of any of his rights or immunities under the said legislation. The Hague Visby Rules shall not apply to this contract where the goods carried hereunder consist of cargo which by this contract is stated as being carried on deck and so carried, or, in the absence of such legislation

2. Have effect to any additional legislation making The Hague Rules compulsory applicable to this Bill of Lading and nothing herein contained shall be deemed to be surrender by the carrier of any of this rights or immunities under the said legislation or an increase of any of his responsibilities under the said legislation, or

3. In any other case have effect as if the contract of carriage to which The Hague Rules applied and the carrier shall be entitled to the benefit to the privileges, rights and immunities conferred by The Hague Rules as if the same were herein specifically set out.

   If any term of this Bill of Lading shall be repugnant to The Hague Visby Rules, or to The Hague Rules, as the case may be, such term shall be void to that extent, but no further.

## 113. BILL OF LADING INDEMNIFICATION L.O.I. / INVOCATION CLAUSE

Owners to accept orders from time Charterers to release cargo where no original bills of lading available during the whole period of the time charter and/or to discharge the cargo at a port other than the named in the bill of lading.

Charterers agree not to give such order without the consent and approval of all cargo interests and related parties.

Format of the invocation is given below;

Qte

40

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

| | |
|---|---|
| To | : . . . . Shipping Ltd, Owners of M/T . . . |
| Fm | : ST Shipping . . . / Glencore . . . |
| Date | : |
| C/p dtd | : dd/mmm/yyyy |
| Vessel | : M/T . . / voy . . |
| Load port | : |
| Disch' port | : |
| Subject | : L.O.I. invocation of voy nr . . . |

Please find hereunder L.O.I. invocation for delivering the cargo without production of the original Bill of Lading.

| | |
|---|---|
| Voyage | : |
| Bills of Lading details | : |

1st Bill of Lading

| | |
|---|---|
| Scac code | : . . . |
| Quantity | :. . . . |
| Cargo | : . . . Crude oil |
| Dated | : dd/mmm/yyyy |
| Shipper | : |
| Consignee | : |
| Load place | : |
| Discharging place | : |

We, Charterers, ST Shipping . . / Glencore . . . , hereby invoke clauses no . . and no . . Of governing t/cp dated dd/mmm/yyyy and with the approval of all cargo interests, request you to instruct the Vessel's master to deliver cargo of . . . . M/T of . . . Crude oil at port of . . . . To

Consignee                          :

Kindly confirm by return message that Master has been duly instructed accordingly.

Yours faithfully

Signed

Full name of the Charterers' operations manager
(who has authority to sign)

For and on behalf of Charterers' . . .

41

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

Unqte

In the event of any such order being given and complied with, Charterers shall be liable to indemnify Owners as if they had on each occasion executed a Letter of Indemnity in Owners' P and I. Club wording (invocation of the L.O.I.) as attached herewith as;

Clause 114. In the case of discharge without Bills of Lading and
Clause 115. In the case of a change of destination and/or
Clause 116. In the case of delivering cargo at a port other than that stated in the Bills of Lading and without production of original Bills of Lading except that in both cases any dispute arising out of the Letter of Indemnity shall be dealt with the dispute had it arisen under the Charter Party.

**114. STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING OF CARGO WITHOUT PRODUCTION OF ORIGINAL B(s)L**
Standard form letter of indemnity to be given in return for delivering cargo without production of the original Bill of Lading.

To              : *[insert name of Owners]*                    *[insert date]*
                 The Owners of the *[insert name of ship]*
                 *[insert address]*

Dear Sirs

Ship            : *[insert name of ship]*

Voyage          : *[insert load and discharge ports as stated in the bill of lading]*

Cargo           : *[insert description of cargo]*

Bill of lading  : *[insert identification numbers, date and place of issue]*

The above cargo was shipped on the above ship by [*insert name of shipper*] and consigned to [*insert name of consignee or party to whose order the bill of lading is made out, as appropriate*] for delivery at the port of [*insert name of discharge port stated in the bill of lading*] but the bill of lading has not arrived and we, [*insert name of party requesting delivery*], hereby request you to deliver the said cargo to [*insert name of substitute port or place of delivery*] to [*"X [name of the specific party] or to such party as you believe to be or to represent X or to be acting on behalf of X"*] at [*insert place where delivery is to be made*] without production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which

42

**Rider Clauses to Time Charter Party
"CV Stealth - ST Shipping and Transport Pte Ltd"
dated 10th April 2014**

you may sustain by reason of delivering the cargo in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivery to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you, whereupon our liability hereunder shall cease.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
*[insert name & title of Requestor]*
The Requestor

-------------------------------

Signature

43

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

**115. STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING OF CARG 0 AT A PORT OTHER THAN TT STATED IN THE B(S)L.**

Standard form letter of indemnity to be given in return for delivering cargo at a port other than that stated in the Bill of Lading.

| | | |
|---|---|---|
| To | : *[insert name of Owners]* | *[insert date]* |
| | The Owners of the *[insert name of ship]* | |
| | *[insert address]* | |

Dear Sirs

Ship           : *[insert name of ship]*

Voyage        : *[insert load and discharge ports as stated in the bill of lading]*

Cargo         : *[insert description of cargo]*

Bill of lading  : *[insert identification number, date and place of issue]*

The above cargo was shipped on the above ship by [insert name of shipper] and consigned to [insert name of consignee or party to whose order the bill of lading is made out, as appropriate] for delivery at the port of [insert name of discharge port stated in the bill of lading] but we, [insert name of party requesting substituted delivery], hereby request you to order the ship to proceed to and deliver the said cargo at [insert name of substitute port or place of delivery] against production of at least one original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo against production of at least one original bill of lading in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated Ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the Vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may

44

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4.   The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5.   This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
[insert name & title of Requestor]
The Requestor

-------------------------------

Signature

116. **STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO AT A PORT OTHER THAN THAT STATED IN THE B(s)L AND W/0 PRODUCTION OF ORIGINAL B(s)L.**

Standard form letter of indemnity to be given in return for delivering cargo at a port other than that stated in the Bill of Lading and without production of the original Bill of Lading.

To            : [insert name of Owners]                    [insert date]
              The Owners of the [insert name of ship]
              [insert address]

Dear Sirs

Ship          : [insert name of ship]

Voyage        : [insert load and discharge ports as stated in the bill of lading]

Cargo         : [insert description of cargo]

Bill of lading : [insert identification number, date and place of issue]

45

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

The above cargo was shipped on the above vessel by [insert name of shipper] and consigned to [insert name of consignee or party to whose order the bills of lading are made out, as appropriate] for delivery at the port of [insert name of discharge port stated in the bills of lading] but we, [insert name of party requesting substituted delivery], hereby request you to order the vessel to proceed to and deliver the said cargo at [insert name of substitute port or place of delivery] to [X [name of the specific party] or to such party as you believe to be or to represent X or to be acting on behalf of X] without production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows :

1.  To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo in accordance with our request.

2.  In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3.  If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4.  If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivery to the party to whom we have requested you to make such delivery.

5.  As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you.

6.  The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

46

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully

For and on behalf of
*[insert name & title of Requestor]*
The Requestor

-------------------------------

Signature

**117. OWNERS L.O.I. WORDING FOR CHARTERERS 'REPRESENTATIVE / INSPECTORS / ALL PARTIES VISITING THE VESSEL**

**Letter of Indemnity**

Charter Party dated .. / .. /                                    [insert date]

To the Master of M/T. . .

With respect to the charter party dated            between

,I hereby request you to allow me as the supervisor/inspector/representative supercargo on board your Vessel during (the forthcoming voyage/loading/ discharging operations).

In consideration of your complying with this request, I hereby assume all risk of loss of life, personal injury, loss or damage to personal effect or luggage or other property, whilst on board or whilst embarking or disembarking. Furthermore, I hereby waive all rigths against you and/or (insert name of Owners, Managers, Operators and Charterers, as applicable) and/or your subsidiary, affiliated or associated companies and/or your contract partners, in respect of any such loss, damage, illness, injury or death.

I recognize that the Vessel is not a passenger ship and there is no warranty that the Vessel is fit for the carriage of passengers, any undertaking as to seaworthiness that might otherwise exist being hereby expressly waived.

Name of person:
Company:
Title:
Address of residence:
Passport number:

**Rider Clauses to Time Charter Party
"CV Stealth - ST Shipping and Transport Pte Ltd"
dated 10th April 2014**

Signed by:

**118. COMMISSION CLAUSE**
Lumpsum USD 160 per day pro rata to Arrow Tankers payable by Owners.

**119. PRIVATE AND CONFIDENTIAL**
The negotiations and fixture of this Charter Party shall remain private and confidential and not to be reported.

**120. BIMCO DESIGNATED ENTITIES CLAUSE FOR CHARTER PARTIES**
a) The provisions of this clause shall apply in relation to any sanction, prohibition or restriction imposed on any specified persons, entities or bodies including the designation of specified vessels or fleets under United Nations Resolutions or trade or economic sanctions, laws or regulations of the European Union or the United States of America.

b) Owners and Charterers respectively warrant for themselves (and in the case of any sublet, Charterers further warrant in respect of any sub-charterers, shippers, receivers, or cargo interests) that at the date of this fixture and throughout the duration of this Charter Party they are not subject to any of the sanctions, prohibitions, restrictions or designation referred to in Sub-clause (a) which prohibit or render unlawful any performance under this Charter Party or any sublet or any Bills of Lading. Owners further warrant that the nominated vessel, or any substitute, is not a designated vessel.

c) If at any time during the performance of this Charter Party either party becomes aware that the other party is in breach of warranty as aforesaid, the party not in breach shall comply with the laws and regulations of any Government to which that party or the Vessel is subject, and follow any orders or directions which may be given by anybody acting with powers to compel compliance, including where applicable the Owners' flag State. In the absence of any such orders, directions, laws or regulations, the party not in breach may, in its option, terminate the Charter Party forthwith or, if cargo is on board, direct the Vessel to any safe port of that party's choice and there discharge the cargo or part thereof.

d) If, in compliance with the provisions of this Clause, anything is done or is not done, such shall not be deemed a deviation but shall be considered due fulfilment of this Charter Party.

e) Notwithstanding anything in this Clause to the contrary, Owners or Charterers shall not be required to do anything which constitutes a violation of the laws and regulations of any State to which either of them is subject.

f) Owners or Charterers shall be liable to indemnify the other party against any and all claims, losses, damage, costs and fines whatsoever suffered by the other party resulting from any breach of warranty as aforesaid.

48

**Rider Clauses to Time Charter Party**
**"CV Stealth - ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

g) Charterers shall procure that this Clause is incorporated into all sub-charters, contracts of carriage and Bills of Lading issued pursuant to this Charter Party.

## 121. EU Advance Cargo Declaration Clause for Time Charter Parties 2012

(a) If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU ("Exported") or loads cargo outside the EU destined for an EU port or place or passing through EU ports or places in transit ("Imported"), the Charterers shall, for the purposes of this Clause, comply with the requirements of the EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall, in their own name, and in their time and at their expense:

(i)   Have in place an EORI number (Economic Operator Registration and Identification);

(ii)  Provide the Owners with a timely confirmation of (i) above as appropriate; and

(iii) Where the cargo is being:

1. Exported: Submit, or arrange for the submission of, a customs declaration for export or, if a customs declaration or a re-export notification is not required, an exit summary declaration; or

2. Imported: Submit, or arrange for the submission of, an entry summary declaration.

   Unless otherwise permitted by the relevant customs authorities, such declarations shall be submitted to them electronically.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

## 122. BIMCO Piracy Clause for Time Charter Parties 2013

(a) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which, in the reasonable judgement of the Master and/or the Owners, is dangerous to the Vessel, cargo, crew or other persons on board the Vessel due to any actual, threatened or reported acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"), whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid which only becomes dangerous, or

49

**Rider Clauses to Time Charter Party**
**"CV Stealth – ST Shipping and Transport Pte Ltd"**
**dated 10th April 2014**

may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading or third parties caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of complying with such orders shall not be considered off-hire.

(c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:
   (i) to take reasonable preventative measures to protect the Vessel, crew and cargo including but not limited to re-routeing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel and/or deploying equipment on or about the Vessel (including embarkation/disembarkation).
   (ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);
   (iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group (including military authorities) whatsoever acting with the power to compel compliance with their orders or directions; and
   (iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
   and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).

(d) Costs
   (i) If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;
   (ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual

**Rider Clauses to Time Charter Party
"CV Stealth – ST Shipping and Transport Pte Ltd"
dated 10th April 2014**

    bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

  (iii) If the Vessel proceeds to or through an Area exposed to the risk of Piracy, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with Piracy risks which may include but not be limited to War Loss of Hire and/or maritime K&R.

  (iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e) If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f) If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure until release. The Charterers shall pay hire, or if the Vessel has been redelivered, the equivalent of Charter Party hire, for any time lost in making good any damage and deterioration resulting from the seizure. The Charterers shall not be liable for late redelivery under this Charter Party resulting from the seizure of the Vessel.

(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail.

(h) Time-bar. Owners to submit HRA bonus related claims within 90 days of completion of each transit through HRA.