# EXHIBIT 2

# SAVILLE & CO

—— SCRIVENER NOTARIES ——



GB00337653A
www.uinfsna.com

One Carey Lane
London EC2V 8AE
Tel: +44 (0)20 7776 9800
Fax: +44 (0)20 7776 9801
www.savillenotaries.com
mail@savillenotaries.com

Sophie Milburn
Nicholas Thompson
Robert Kerss
Andrew MacNab
Christopher Higgins
(General Notary)

Eleonora Ceolin
(General Notary)
Richard Saville
(Consultant)

TO ALL TO WHOM THESE PRESENTS SHALL COME, I
ROBERT SCOTT KERSS of the City of London NOTARY PUBLIC
by royal authority duly admitted and sworn DO HEREBY CERTIFY
the genuineness of the signature of BRUCE ANTHONY HARRIS
subscribed to the certificate appearing on the copy partial final award
hereunto annexed relating to the vessel "CV STEALTH", such
signature being in the own true and proper handwriting of the said
Bruce Anthony Harris, the arbitrator therein named and described.

IN FAITH AND TESTIMONY WHEREOF I the said notary have
subscribed my name and set and affixed my seal of office at London
aforesaid this twenty fourth day of August two thousand and
seventeen.

 



| | | |
|---|---|---|
| | **APOSTILLE** | |
| | (Convention de La Haye du 5 octobre 1961) | |
| **1.** Country:<br>Pays / Pais: | United Kingdom of Great Britain and Northern Ireland | |
| **This public document**<br>Le présent acte public / El presente documento público | | |
| **2. Has been signed by**<br>a été signé par<br>ha sido firmado por | | Robert Scott Kerss |
| **3. Acting in the capacity of**<br>agissant en qualité de<br>quien actúa en calidad de | | Notary Public |
| **4. Bears the seal / stamp of**<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | | The Said Notary Public |
| | **Certified**<br>Attesté / Certificado | |
| **5.** at<br>á / en | London | **6.** the<br>le / el día | 24 August 2017 |
| **7.** by<br>par / por | Her Majesty's Principal Secretary of State<br>for Foreign and Commonwealth Affairs | |
| **8.** Number<br>sous no / bajo el numero | APO-506818 | |
| **9. Seal / stamp**<br>Sceau / timbre<br>Sello / timbre | | **10.** Signature<br>Signature<br>Firma | D. O'Sullivan |

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached
UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that
have been photocopied and certified in the UK confirm the signature of the UK official who conducted the certification only.
It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country not party to the Hague Convention of the 5th of October
1961, it should be presented to the consular section of the mission representing that country

**To verify this apostille go to www.verifyapostille.service.gov.uk**

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**

*I hereby certify that I have had sight of the original
document and that this is a complete and accurate
copy of the original*

Signed: ............................................

Name: BRUCE HARRIS ...............

Position: ARBITRATOR ..............

Date: 23 AUGUST 2017 ...........

SPACE SHIPPING LTD
of Malta

Claimants
(Owners)

and

ST SHIPPING AND TRANSPORT PTE LTD
of Singapore

Respondents
(Charterers)

**"CV STEALTH" – C/P dd 10.4.12**

**PARTIAL FINAL AWARD**

1.  By the Shelltime 4 charter in this case, the claimant owners fixed *CV Stealth* to the respondent charterers for a period of 8 months. The charter provided for any disputes to be referred to arbitration in London and when disputes arose the owners appointed me, Bruce Harris, of Flat 101, 7 High Holborn, London, WC1V 6DR as their nominated arbitrator in respect of all disputes arising under the charter. The charterers failed to appoint an arbitrator within the relevant period or at all, and in due course I was appointed as sole arbitrator in default. The seat of this arbitration is London, England.

2.  This case is, on any view, most unusual.

3.    The ship arrived to load at Puerto La Cruz, Venezuela, on 11 September 2014.  Following the production of a document purporting to be a confirmation of the berthing/loading window in the standard form issued by shippers, PDVSA (the Venezuelan state oil company) which was not genuine, on 19 September a local court made an order prohibiting the ship from sailing.  That order continues in effect and the ship is still in Venezuela.

4.    The respondent charterers contend that the charter was frustrated at the latest on 29 January 2015, but if that is not the case they say they redelivered the ship on 1 April 2015, the earliest date for redelivery under the charter.  The claimant owners deny that the charter was frustrated and claim hire until 1 April and damages in respect of lost earnings thereafter, as well as other items of alleged loss.  The claim for hire is agreed, assuming the owners' success, at $824,661.57, in addition to which the owners claim $2,000 in respect of the cost of modifying the ship so that she could bunker whilst at Puerto la Cruz.  Their claim for lost earnings is advanced at this stage only (simply as a matter of convenience) in respect of the period to 21 July 2015, and it has been agreed that their other damages claims are to be stood over.  If the owners are successful a further award may be necessary, if the parties cannot agree the position, in respect of their trading losses after 21 July and their other claims.  Their lost earnings claim to 21 July is in the region of $4 million.

5.    Happily the facts are substantially not in dispute, though the interpretation to be put upon them is occasionally subject to debate.  I am indebted to the opening submissions of Mr Simon Croall QC, leading counsel for the owners, for the following factual outline, which I have taken the liberty of amending as appropriate for this award.

**The Charter**

6.    By the charter of 10 April 2014 the owners let *CV Stealth* to the charterers for a period from the date of her delivery, in the event 10

2

August 2014, until between 1 April 5 and 25 April 2015.  Hire rate was payable at a rate of US$14,500 a day.

7.    The express terms of relevance to the present dispute are as follows:

*Clause 4*

> *4. Owners agree to let and Charterers agree to hire the vessel for a period concluding not before 1st April 2015 and not later than 25th April 2015 commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular See Clause 43 Cargoes....*
> *The vessel shall be delivered by Owners dropping last outward sea pilot any time day or night Sundays and holidays included at 1 (one) safe port in USG/Caribs/UKC/MED at Owners' option and redelivered to Owners dropping last outward sea pilot any time day or night Sundays and holidays included at 1 (one) safe port in USG/Caribs/UKC/MED included at Charterers' option.*

*Clause 8*

> *8.      Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of USD 14,500 per day, and pro rata net to Owners for any part of a day, from the time and date of her delivery (GMT time) until the time and date of her redelivery (GMT time) to Owners.*
>
> *Plus USD 2,500 monthly covering the Charterers' Communications, Victualling and Entertainment.*
>
> *Charterers not to deduct any money from hires/earnings without Owners' confirmation and to remit all hires/monies earned as per Owner's invoice without any deduction of bank transfer etc. expenses.*

*Clause 13*

> *13.      (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter.*
> *Charterers hereby indemnify Owners against all consequences or liabilities that may arise*
> *      (i) from signing bills of lading in accordance with the directions of Charterers, or their agents, to the extent that the*

*terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers or their agents orders:*

*(ii) from any irregularities in papers supplied by Charterers or their agents.*

*(b) Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo*

*(i) at any place other than that shown on the bill of lading and/or*

*(ii) without presentation of an original bill of lading.*

*unless they have received from Charterers both written confirmation invoking L.O.I. as per owners P&I Club Wording, as per additional Clause 113 of such orders and an indemnity in a form acceptable to Owners.*

*Clause 21*

*21. (a) On each and every occasion that there is loss of time for more than 6 (six) hours (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner)*

*(i) due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than 6 (six) consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than 6 (six) hours (if resulting from partial loss of service); or*

*(ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or*

*(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), or landing stores, spares, provisions and such loss continues for more than 6 (six) consecutive hours: or*

4

*(iv) due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or*

*(v) due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then*

*without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement after six (6) hours time allowance of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.*

*(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between*

*(i) the time the vessel would have required to perform the relevant service at such guaranteed speed, and*

*(ii) the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).*

*For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.*

*(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that*

at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e) Time during which the vessel is off-hire under this charter shall count as part of the charter period.

<u>Clause 27</u>

27.     (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel: fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of the boilers, breakage of shafts or any latent defect in hull, equipment or machinery: provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in the performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, restraints of labour, civil commotions or arrest or restraint of princes, rulers of people.

...

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to deduction of hire.

6

*Clause 28*

> 28.     *No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the Cargoes foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.*

*Clause 40*

> 40.     *The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to  which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped.*

*Rider Clause 46*

> 46. LAYCAN NOTICES

> ...*Owners/Charterers to give 20/15 Days approximate and 10/7/5/3/1 Days Definite Delivery/Redelivery Notices to counterparty.*

**The sub-charter between the charterers and AS Capital**

8.     On 4 September 2014 the charterers sub-chartered the vessel to AS Capital by a voyage charter on an amended BPVoy form. That sub-charter was for the carriage of "*MINIMUM 50,000 MT CHOPT UP TO FULL CARGO*" of "*CRUDE OIL, MAX 2 GRADES*" from "*1-2 SP VENEZUELA, EXCLUDING LAKE MARACAIBO INTENTION GUARANGO (PUERTA LA CRUZ), VENEZUELA*" to a range of ports in AS Capital's option.

9.     It was always the intention of AS Capital and thus of the charterers to carry a cargo of up to 400 kbbls, or as limited by draft at the discharge port, of Mesa Crude oil from Guaraguao Terminal, Puerto La Cruz, Venezuela for anticipated discharge at a United States terminal.

10.   The potential for a fixture with AS Capital appears to have been brought to the charterers' attention by brokers at SSY Tankers New York LLC ("SSY"). In an email of 19 August 2014 to Ryan Peterkin of the charterers, SSY described the potential deal as "*a promising first step towards a possible COA, or to the start of a Venezuelan Horror Film. I think it could be a good thing though, and with the right protections which of course would include freight and any oustanding load port demurrage BBB [before breaking bulk], and possible other protections like demurrage paid every 2 days as incurred, some pre-payment of freight or a bond as they mention below.  With the right mix of protections, the rewards could be worth it.*"

11.   Attached to Donovan's email was certain financial information and various documents of identification pertaining to AS Capital, and a note on the proposed deal.  In that note AS Capital said they recognised that chartering was a start-up activity for them and thus "*there is a sympathetic attitude regarding market's skepticism, especially given some of the awful track-record experienced by vessel owners with loading in Venezuelan ports.*" These documents were required by the charterers because, having never dealt with AS Capital in the past, their internal compliance procedures required certain due diligence to be undertaken before they could commence a business relationship.

12.   AS Capital's proposal involved at first the carriage of two cargoes of Mesa Crude from Puerto La Cruz which, although those loadings would be "handled spot", was said to be likely to lead to a 1-year firm supply agreement for which AS Capital would require two shipments a month.

13.   After being provided with that information the charterers commenced negotiations for the sub-charter in earnest. However, the result of their due diligence was apparently not such as to reassure them that AS Capital was not to some extent a credit risk. Accordingly, as part of the sub-charter, it was agreed that AS Capital would make an advance

payment of US$ 200,000 which would be forfeit in the event of cancellation.

14. It may also be that reservations on the charterers' part were reflected in a provision permitting the cancellation of the sub-charter if cargo operations had not commenced within 7 days of notice of readiness, with the freight premium to be forfeit, and/or a Venezuela Strike Clause which provided that all time, expenses, delays and damages in Venezuela for any reason whatsoever, provided they were not attributable to owners' lack of due diligence, were to be for AS Capital's account at the agreed demurrage rate. The freight premium of US$200,000 was duly paid by AS Capital.

15. There is no suggestion that, for their part, the owners had any knowledge of the charterers' concerns about AS Capital.

**The charterers' employment orders**

16. In an email to the master of 4 September 2014, Matthew Maciejewski (the charterers' operator for *CV Stealth*) instructed the vessel to sail to Puerto La Cruz in accordance with a document attached entitled "LOADPORT VOYAGE ORDERS" which had been sent to the charterers by AS Capital through broking channels and which is substantially reproduced here:

> *Vessel: MT CV Stealth*
>
> *Charterers: AS Capital LTD*
>
> *Owners / Master to confirm receipt and understanding of same to Charterers via email:*
>
> *E-mail: americansuissecapital@gmail.com*
>
> *Cc:egdv_consultants@bellsouth.net;educheny@comcast.net; cfrobles@jettenergyresources.com: chartering@ofmiami.com*
>
> *Load port: Guaraguao Terminal, PLC, Venezuela*
>
> *LAYCAN: 4-5 Sep 2014*
> *Master not to tender nor prior to laydays commencing without charterers prior approval*

9

*Cargo: Mesa Crude-no heating required; Total cargo up to 400 kbbls or as limited by draft at the discharge port.*

*Surveyors: SGS*

*Loadport Agents: Atlantic Marine Services SA*
*...*

*Send notice to Loadport agents on receipts of these orders and 72/48/24/12 hrs, also report eta loadport to:*

*Charterers email: Americansuissecapital@gmail.com*

*cc:egdv_consultants@bellsouth.net;educheny@comcast.net; cfrobles@jettenergyresources.com; chartering@ofmiami.com*

*Vessel to arrive load port in all respects ready to load the nominated cargo.*
*...*

*Anticipated discharge destination is TBN Terminal in Houston Ship Channel; complete information to follow.*

17.   In that email Mr Maciejewski also informed the master that in addition to Atlantic Marine Services SA ("Atlantic Marine"), there would be a second set of loadport agents in the form of Agemar, who were the charterers' protective agents to oversee events at Puerto La Cruz, as the charterers were unfamiliar with Atlantic Marine.

18.   Pursuant to these instructions from the charterers, the vessel proceeded to Puerto La Cruz, arriving there at 23.00 hours on 5 September 2014.

19.   During 5 and 6 September 2014 there was a certain amount of confusion which I need not narrate since it adds nothing relevant to the story.  The outcome was that Atlantic Marine were replaced by Grupo Acosta Marine Services ("GAMS") as AS Capital's agents, with whom the master was ordered to communicate.

**The PDVSA "authorisation"**

20.   On 11 September 2014, Mr Maciejewski was sent a document (through broking channels) purporting to be from PDVSA and

apparently detailing the cargo to be loaded and a loading window of 14-17 September as authorised by PDVSA.   At around the same time, GAMS sent a copy of the same document to the master of the vessel.

21.   Mr Maciejewski is familiar with documents of this nature.   In two statements made in November 2014 for the purposes of attempts to get the vessel released, he said that on reviewing the document he noticed that although it appeared to be stamped, it had not been signed by anyone from PDVSA. This, according to his statements, aroused his suspicion as to the document's authenticity, and accordingly he forwarded it to Agemar in short order, asking them to check with PDVSA as to its authenticity.   However in his oral evidence to me, given by video link, Mr Maciejewski said that his primary concern had been in relation to the loading window dates.  If that was so it is surprising that he did not say so in his statements; and I am unclear as to why the emphasis of his evidence changed in this way. However, it does not seem to me to matter at the end of the day.

22.   In his email to Agemar Mr Maciejewski said:

> Our charterers have sent us the attachment in which PDVSA is stating that the load window is 14-17 Sept.   I see that it's stamped by PDVSA, but not signed.
>
> Can you please check with PDVSA to see if this attachment is correct and official?

23.   Agemar did as instructed. The next day, 12 September, Mr Maciejewski received a telephone call from an official from the PDVSA Prevention and Loss Control Department who requested that Mr Maciejewski send him the original email to which the document had been attached, and Mr Maciejewski did as requested.  That same day he also instructed the master to ignore the PDSVA "authorisation" and reiterated that the master should "accept instructions ONLY from ST Shipping".

11

24.    On 13 September the vessel was boarded, initially by two Port State Control officers, and then by a large team of investigators, including six members of the National Guard, government lawyers, security officers from PDVSA, the Harbour Master, and customs officers. During the visit, the investigators inspected, amongst other things, the vessel's documents and cargo tanks (which were empty). The investigation team's interests were apparently only aroused when they were shown the PDVSA "authorisation". They informed the master that this document was in fact not an official PDVSA document.

25.    On 14 September Mr Maciejewski put AS Capital on notice that they would be liable for the time lost owing to lack of cargo to be loaded and the unofficial "authorisation":

> *Morning Indi,*
>
> *For good order, we remind charterers that they are on notice for all time lost to this point, including any and all expenses and penalties that have been incurred as a result of the delaying berthing due to lack of cargo, and due to the fact the cargo nomination received on PDVSA letterhead from charterers and charterers agents has been deemed not to have originated from PDVSA.*

26.    That day also Agemar provided Mr Maciejewski (with a copy to the vessel) with an update of the situation, informing him, amongst other things, that "...*No expecting to sail yet. Keep calm and wait for additional information...*".

27.    In an email to Agemar following on from this message, Mr Maciejewski noted that AS Capital "*have been very silent on the whole situation, probably because they know they have a big problem on their hands*".

28.    On 15 September 2014, the charterers cancelled the sub-charter with AS Capital "[p]*ursuant to the terms and conditions stated in the subject CP*".

12

29.    On 17 September, Agemar on behalf of the charterers sought permission from the harbour master for the vessel to sail. This was however rejected on 19 September, with the harbour master commenting that she would not be allowed to sail until further notice.

30.    The following day, 18 September, AS Capital responded to the charterers' notice of 14 September (paragraph 25 above). They rejected the charterers' position on the basis that it was the vessel and the charterers' protective agents, Agemar, that were the subject of investigation by the Venezuelan authorities, not AS Capital. AS Capital also sought the refund of the US$200,000 that had been paid in advance of the voyage. My understanding is that no refund has been made, but also that no proceedings have been pursued by the charterers against AS Capital.

*Venezuelan legal proceedings*

31.    In the course of its investigation into the unofficial authorisation, PDVSA obtained information that led to the arrest of a Mr Asuncion Rafael Barbosa on 12 September 2014. It appears that when questioned about the document, Ms Amundarain of GAMS (who had sent the document to the charterers) informed the National Guard that GAMS' services had been obtained by Barbosa. Barbosa was subsequently charged with several offences relating to the Illicit Traffic and Trading of Strategic Materials, the Utilisation of a Forged Public Document, Criminal Association and the Counterfeiting of Seals. The allegations included the attempt to export cargo without the necessary authorisation of PDVSA and the forgery of the PDVSA "authorisation".

32.    Pursuant to a request by the Regional Prosecutor, on 19 September 2014, the Sixth Court made a "*pre-precautionary or unnamed order*" prohibiting the vessel from sailing from Puerto La Cruz. The prohibitive measure was a precautionary measure pending and to assist in the investigation into Barbosa's alleged crimes.

13

33.   As a matter of Venezuelan criminal law procedure, after a period of investigation, the Prosecutor conducting the investigation is required to publish a "Conclusive Act" detailing what evidence has been reviewed, the Prosecutor's conclusion as to whether certain persons should be prosecuted, and if so, in respect of which crimes.

34.   On 30 October 2014, the Regional Prosecutor conducting the investigation into the "authorisation" published his Conclusive Act. While the Act makes several allegations against Barbosa and other Venezuelan individuals who are said to have co-operated with him (including Ms Amundarain of GAMS), it makes no allegations against any individuals related to the vessel, the owners, or the charterers. Indeed, to this day there is no suggestion of any such involvement either by the authorities in Venezuela or between the parties to this arbitration.

35.   By the end of October 2014 the owners' attention had turned towards obtaining the release of the prohibitive measure. In this respect, they instructed Clyde & Co.'s Venezuela office. As a result, on 24 October, Ms Mujica of Clyde & Co. made an application to the Prosecutor to evaluate the evidence, to conclude that the owners had no involvement in the crimes that Mr Barbosa was accused of, and to permit the repatriation of the crew. It is unclear what eventually became of this application.

36.   On 7 November, i.e. after the publication of the Prosecutor's Conclusive Act, Clyde & Co. filed a petition on the owners' behalf, seeking the lifting of the prohibitive measure. The application was on the basis that neither the master nor the crew had been involved in the commission of any crimes. This petition was rejected on 12 November 2014. The court's reasoning appears to have been that the circumstances that led to the imposition of the measure in the first place had not changed, and in circumstances where the Prosecutor had not made an application to lift the order, it would remain in place.

37.   On 11 November, Clyde & Co. sought to appeal the original decision of the Sixth Court to grant the prohibitive measure. At the time of writing, the appeal remains unheard. Its progress to date is as follows.

38.   On 17 November, the Sixth Court notified the National Prosecutor and the Regional Prosecutor that the owners had sought to appeal the detention order. It gave them three days to reply to the owners' appeal.

39.   For reasons that are not clear, the Prosecutors only lodged their submissions opposing the owners' appeal on 23 December 2014. The basis of their opposition appears to have been that the vessel should be detained, in some way to secure the potential imposition of sanctions against Mr Barbosa, since the vessel had been a means through which he committed the crime.

40.   On 14 January 2015, the Appeal Criminal Court allowed the appeal to continue. The file was initially sent back to the Sixth Court by the Appeal Criminal Court on 22 January 2015 because it had not included the decision under appeal. However, this was an administrative matter that was rectified as of 9 February 2015.

41.   In addition to appealing the original decision, on 11 November 2014, the owners offered to provide a bond as security in place of the vessel. This offer does not appear to have elicited a response. In any event, the consensus between the parties' Venezuelan lawyers, who gave evidence before me, is that such an offer is unlikely to have resulted in the release of the vessel because no claim had been made against the vessel. The detention had been for the purposes of assisting in the criminal investigation.

42.   On 20 November 2014, the owners filed a third party application (known as a "Terceria" application), seeking the release of the vessel. The essence of the application was that the owners sought to establish that they were innocent third parties who are adversely affected by an

order detaining property in respect of crimes of which they are not accused. The conduct of the Terceria application was as follows.

43.   On 25 November the Sixth Court admitted the owners' request for the application and accordingly it sent notices to the Regional and National Prosecutors.  As a result of a procedural error made in respect of the application, the owners had to file a complementary application on 19 December.  The procedural error was corrected on 7 January 2015, and the following day, the Sixth Court ordered that the National and Regional Prosecutors be notified of the same.

45.   The application was ultimately heard on 29 June 2015. At the hearing, the owners' case was supported by the charterers, and was expressly not opposed by the Prosecutor.  However, when the court published its decision on 13 July, it refused to suspend the prohibitive measure in respect of the vessel.  As with the decision of 12 November 2014 discussed above, the court's reasoning for rejecting the Terceria application appears to have been that the conditions prevailing at the time of the original prohibitive measure had not changed. Further, the mere lack of opposition by the Prosecutor to the owners' application was insufficient to justify suspending the order: the Prosecutor would have to make an application to lift the detention order.  Even the Prosecutor was surprised at this outcome.  The decision has been appealed.

46.   In addition to the various means by which the owners sought to obtain the vessel's freedom, it might have been open to them to make an application for her release at Barbosa's Preliminary Hearing. That is a hearing at which the court determines whether the merits of the case against the defendant are strong enough to warrant proceeding with the prosecution, as well as incidental issues such as the admissibility of evidence.

47.   However for a variety of reasons (none of them attributable to the owners), Barbosa's Preliminary Hearing, which was initially scheduled to take place on 21 November 2014, has been adjourned on many

occasions, including on 18 December 2014, 8 January, 29 January, 3 February, 12 February, 27 February, 13 March, 6 April, 30 April, 27 May, 11 June, and 3 July 2015.

48. The charterers have also contributed to efforts to lift the prohibitive measure. These include (i) formally seeking the release of the vessel on 18 December 2014, an application which was rejected on 22 January 2015; (ii) submitting a statement of facts and Mr Maciejewski's witness statement to the Sixth Court on 19 January 2015 with a view to clarifying matters; (iii) supporting the owners' Terceria application; and (iv) having various meetings with PDVSA and the National Prosecutors between March and May 2015.

### Post-detention: the vessel, the master and the crew

49. At the time of the hearing (8-11 September 2015) and so far as I know at the time of writing this award, the vessel remains detained at Puerto La Cruz.

### The master and her crew

50. Although neither the master nor her crew were accused of any involvement in the crimes attributed to Barbosa, they were initially required to remain on the vessel. On 7 October 2014, the master wrote to the vessel's P&I Club representatives ("Global"), (copied to several other email addresses) stressing the need for a crew change, especially in respect of two crew members who required medical assistance.

51. In the following days, efforts therefore turned towards obtaining permission for a crew change. As of 11 October 2014, Agemar informed Global that they had obtained verbal authorisation from the harbour master to proceed with arrangements for the crew change, but it was not until on or around 22 October that official permission was eventually obtained to disembark the ill crew members for the receipt of medical assistance. By this time, one had recovered, leaving the other still requiring medical treatment.

52.     Efforts continued to secure a general crew change. Such efforts included seeking the assistance of the Turkish Embassy in November 2014, the majority of the crew being Turkish. This does not however appear to have yielded any success, and on 29 December, the master wrote to Agemar to the effect that one of the vessel's crew required repatriation as soon as possible owing to his deteriorating mental health.

53.     On 16 January 2015, Agemar informed the master that they had been told by both Clyde & Co. and the harbour master that they had received official letters from the Prosecutor's office permitting a crew change. That was eventually effected on 31 January, although the master continued to be detained with the vessel, without explanation.

54.     The master was eventually deposed in the criminal proceedings against Barbosa on 30 March 2015, before she was ultimately permitted to leave the vessel on 9 April.

*The vessel*

55.     In the immediate period after the detention of the vessel, it is apparent that the charterers continued to seek out opportunities to fix her nearby.   For example, on 18 September 2014 there was an exchange between the charterers, the vessel and her technical agents as to the feasibility of loading certain cargo at Puerto Miranda, also in Venezuela; and on 30 September the charterers instructed the master to complete a Terminal Questionnaire for Jose Terminal, as they were trying to clear her for operations there. However, later on the same day, the charterers informed the master that "*we have presented your vessel for business loading crude oil in Bajo Grande. PDVSA accepted your vessel for this operation, so we are hoping this could be a step in the right direction in terms of getting your vessel authorised to sail*".

56.     On 20 November 2014 Mr Maciejewski emailed the master in the following terms:

*In the hopes that the vessel will soon be released from Venz
please assist with the below info for possible next employment.
Please advise basis full bunkers on the board…*

57.   Between 20 November and 23 December 2014, Mr Maciejewski and
      the master exchanged various emails pertaining to the vessel's bunker
      levels. In particular, Mr Maciejewski was keen to know whether there
      were sufficient bunkers to sail to Trinidad, Aruba or Curacao for
      replenishment. The master's view was that in order have sufficient
      bunkers to reach Trinidad or Curacao, the vessel would need to depart
      Puerto La Cruz on 25 December, whereas departing on that day for
      Aruba would be risky.

58.   On 26 December, Mr Maciejewski wrote to the owners' vessel
      operators (copied to various email addresses including the vessel)
      informing them that "*in the interest of safety of the vessel and the
      welfare of the crew*" the charterers had arranged bunkers for the
      vessel, offshore Trinidad. The message concluded:

          *Therefore we want to reiterate our request that the vessel depart
          in order to receive these bunkers. This is the most practical
          solution to this now urgent issue.*

59.   On receipt of this message, the master asked Agemar to seek port
      clearance to proceed offshore Trinidad for bunker replenishment.
      Agemar made the request to the harbour master. On 28 December,
      Agemar reported that they had spoken on the telephone with the
      harbour master who had informed them that in order to give clearance
      to sail to Trinidad, he needed, but did not have, certain information
      from the Prosecutor.

60.   Eventually, on 7 January 2015 the harbour master gave his official
      response to the request, considering that it was "*not appropriate*" to
      allow the vessel to sail to Trinidad given that the prohibitive measure
      was still in place.

19

61.   In the light of this refusal, between 9 and 13 January the charterers began to consider the possibility of replenishing the vessel's bunkers at Puerto La Cruz. In order to achieve this, it was necessary to make certain modifications to her bunker manifold with a view to making its freeboard 10 metres. The master considered that such modifications could be made, but using the vessel's tools and crew, it would cost the charterers US$2,000. The charterers instructed the master to proceed with the modifications. They were carried out and thereafter the charterers arranged for bunkers to be stemmed at Puerto La Cruz. This operation required the permission of the harbour master which was accordingly sought by Agemar. On this occasion his response was positive and bunkering operations accordingly commenced on 16 January.

62.   On the same day, Agemar reported to the vessel (copied to the charterers and other email addresses) that they had received separate telephone calls from Clyde & Co. and the harbour master, to the effect that they had both received an official letter from the Prosecutor which authorised a crew change and permitted the vessel to sail to Trinidad to stem bunkers and then to return to Puerto La Cruz after the completion of the operation. Agemar however also noted that they had not seen the official letter, that they had only requested permission to stem at Puerto La Cruz; and that the process of stemming bunkers onto the vessel had already commenced there.

63.   As bunkering had already started, the vessel completed that operation at Puerto La Cruz, and ultimately did not sail to Trinidad.

### Redelivery of the vessel

64.   By an email of 1 April 2015, and without prejudice to their position that the charter had been frustrated, the charterers purported to redeliver the vessel, thereby bringing an end to the charterparty.

*The parties' cases in outline*

65.  The owners say that the charter was not frustrated and that therefore they are entitled to be paid hire for the balance of the charter, i.e. to 1 April 2015.  Secondly, they claim costs and expenses incurred up to 1 April for which they say the charterers are liable under clause 7 and 13(a)(i) and (ii), and/or for breach of clauses 4 and/or 28 of the charter.

66.  Thirdly, relying again upon clauses 13(a)(i) and (ii) and/or clauses 4 and/or 28 of the charter, the owners claim damages/an indemnity in respect of losses incurred as a result of the vessel's continuing detention since 1 April, this claim being based on the amounts *CV Stealth* could have expected to earn in the market after that date.

67.  Fourthly, they claim damages/an indemnity, relying on the same clauses as just mentioned, in respect of costs, expenses and/or losses incurred as a result of the continuing detention since 1 April.

68.  In respect of the first two headings above the charterers contend that the charter was frustrated, and they say that the vessel was off hire because the precautionary measure amounted to detention attributable to legal action against the vessel and/or the owners within the meaning of clause 21(a)(v).

69.  The charterers deny that they were in breach of clause 28 of the charter, saying that it was not foreseeable that the vessel would be detained; and they also contend that they cannot be liable because the detention arises out of "arrest or restraint of princes, rulers or people", relying upon clause 27(a).

70.  The charterers dispute the owners' indemnity claim under clause 13, saying that the detention was caused by independent acts of the Venezuelan prosecuting authorities and judiciary, that the fact that the PDVSA "authorisation" was forged did not cause the detention, and again relying on clause 27.

21

71.   Whilst in the opening submissions before me Mr Croall first focussed on frustration, Mr Sean O'Sullivan QC for the charterers addressed first the arguments in relation to construction of the charter, this being the context in which the issue of frustration would fall to be decided. In general that seems to me to be an appropriate approach, but I think it helpful here first to comment on causation, since this is fundamental to most of the liability points in this case.

*Causation*

72.   Mr Croall for the owners said that the essential facts are as follows:

> (i)      the charterers ordered the vessel to proceed to Guaraguao Terminal, Puerto La Cruz, Venezuela to load the AS Capital cargo at the PDVSA Terminal;

> (ii)     that cargo was not authorised by PDVSA for sale and was not scheduled to be loaded, and hence the cargo was not one which could lawfully be shipped from Venezuela;

> (iii)    as an incidence of the order referred to in paragraph 16 above the charterers ordered the master to communicate directly with AS Capital's agents ("GAMS") - see paragraph 19 above;

> (iv)     as a result of, and as an incidence of the above orders, the vessel received the unauthentic PDVSA "authorisation";

> (v)      it was this forged document which, when raised with PDVSA, led on 12 September to the detention of Barbosa on suspicion of trafficking crude oil etc. (see paragraph 31 above);

> (vi)     it was the link between the vessel, AS Capital's cargo and this forged document which raised the particular interests of the National Guard when they boarded the vessel on 13 September;

> (vi)     it was the fact that the vessel was the intended means to carry the unauthorised AS Capital cargo, and the consequent possibility that the owners might have been involved in the crimes,

22

which led to the detention of the vessel on 19 September 2014. The detention was sought by the Prosecutor as a precautionary measure pending, and (it seems likely) to assist in the possible investigation into any alleged crimes;

  ˌ (vi)      that detention is the cause of all the subsequent delay because no case of the chain of causation being broken has ever been, or could be, advanced.

73.   The causative link between the order to load the AS Capital cargo and the detention is, argued Mr Croall, crystal clear. It could be tested by asking: if the vessel had been ordered to load a cargo bought by another party which had been authorised for sale by PDVSA would she have been detained? Of course not.

74.   I shall have to consider the relevance of causation more specifically when dealing below with the various bases on which the owners put their case, but at this stage I mention one response advanced by Mr O'Sullivan in respect of the above summary: the suggestion that there never was an AS Capital cargo identified and thus (as I understood the argument) there could have been no order to load it.  That does not seem to me a valid approach.  There plainly was cargo in PDVSA's shore tanks.  Crude oil, like all liquid ·cargoes, is not specifically identified in loading orders: it cannot be since it is impossible to know precisely which drops of it are to be loaded until loading takes place, and then it may come from different tanks.

75.   In any event, I do not see that for the purposes of causation (and the indemnities sought) the argument assists the charterers.  What is centrally important is what orders were given by or on behalf of the charterers; here those were to load a quantity of a particular type of crude oil at a particular time and place for their sub-charterers.  It is clear that both the charterers and AS Capital believed there was a cargo to be loaded pursuant to their orders.  Nothing more is required in my view.  Subject to that and what I say below when dealing with

the particular bases of claim, I consider that the summary of causation set out in paragraph 72 above is correct.

76.　　There is a question as to whether the orders were *the* cause, or an effective cause, of the detention.  In my view, if the question matters (and the decision in *The Kos* [2012] 2 Lloyd's Rep.292 would suggest that it does not) the former is the case.  Barbosa's activities, whatever they were, did no more than provide the occasion for what happened to the ship.  If the order and the "authorisation", which seems to me to have been part and parcel of the order although later in date, had not been given naming *CV Stealth*, there is no reason to believe that PDVSA/the Venezuelan authorities/the Prosecutors would ever have taken any interest in her or that her detention would have occurred.  On any view, however, the orders were at least an effective cause.

### Legal authorities

77.　　Before going further I should note that in respect of the legal arguments with which I now have to deal I was referred to a number of authorities and texts: *Anglo Northern* v. *Jones, Court Line* v. *Dant & Russell, The Hongkong Fir, Universal Cargo Carriers* v. *Citati, The Eugenia, The Nema, The Sea Angel, The Kos, The Kyla, The Eurus, The Greek Fighter, The B Atlantic, Italian State Railways* v. *Mavrogordatos, The Evia (No. 2), Treitel: Frustration and Force Majeure,* and *Time Charters*.  With one or two exceptions I have not made specific reference to any of these, but I have of course taken them into account in reaching my decisions.  However, I do not think the parties or the court (if it has to consider the matter) would be assisted by a dissertation from me on what I consider to be their effect: that will, I hope, appear sufficiently from what follows.

### Off-hire

78.　　The charterers contended that the detention was clearly "attributable to legal action against ... the vessel" and thus fell under clause 21 of the charter.  The owners denied that and said that in any event it was

"brought about by the act or neglect of charterers" within the "carve-out" in clause 21 so that even if it was legal action against the vessel, the charterers could not rely upon it.

79.   In this respect the owners' case seemed to be based on the facts that no claim or criminal prosecution has been advanced against the owners or the vessel or the crew, that neither the owners nor the crew have been named as witnesses in respect of the prosecution of Barbosa and that the Prosecutor has (latterly) not objected to the release of the vessel.

80.   None of those factors, to my mind, are of any importance.   The prohibition against sailing is clearly action against the vessel.   It was ordered by the local judiciary.   It is plainly legal action.   The facts of this case are much stronger in support of the charterers' contentions than the counter-factual considered by Colman J in *The Greek Fighter* [2006] 2 CLC 497 at paragraphs 366–368.   I have no hesitation in concluding that the charterers are right on this point.

81.   However, was the detention brought about by the act or neglect of the charterers?   At this point I comment on the charterers' position in respect of "act or neglect of charterers".

82.   Firstly, they said that the short answer to the owners' case on this point was that the words in question must mean conduct, whether by acting or neglecting to act, which is in some relevant sense blameworthy; and there was no evidence of any such conduct here. They said that the words should be construed narrowly because they are an exception, that "neglect" denotes a wrongful failure to act rather than mere inactivity; and that connotation must inform the meaning of "act" because these are intended to be opposite sides of the same coin.   To the extent it may be relevant I do not accept this last proposition.

83.   I do, however, accept their next argument, which was that it would always be possible to say that something which charterers have done

or not done has brought about delay, but that alone cannot be sufficient to bring the "carve out" into play.  So to interpret the words would render the off-hire provisions worthless.

84.   The charterers also say, and I accept, that they are under no suspicion, but are in the same position as the owners in relation to whatever happened in Venezuela.    There is no allegation of blameworthy conduct against them.  If there was a relevant causative act on their part, I do not see that any element of blame is required.

85.   However, the question is whether the detention here was "brought about" by the charterers' act.    Given the chain summarised in paragraph 72 above I have no hesitation in answering that question in the affirmative.  Accordingly the vessel was not off hire during the detention up to 1 April.

*Clause 13 indemnity*

*Clause 13(a)(ii)*

86.   The owners' case was that the PDVSA "authorisation" was a document containing irregularities and therefore they were entitled to an indemnity under clause 13(a)(ii) because the detention was a consequence of "any irregularities in papers supplied by charterers or their agents".

87.   The charterers' first answer to this was that the clause is concerned with papers which the charterers might supply *to the owners* in connection with a bill of lading.  I disagree.  It is correct that the side heading for the clause is "Bills of Lading", but that is not to be given any effect having regard to clause 42 of the charter.  It is also – and perhaps more significantly – right that the majority of the clause does address questions related to bills of lading.  But these factors do not seem to me to lead to the conclusion that the indemnity in clause 13(a)(ii) should be read as limited in the way the charterers suggest, any more than I consider that the immediately preceding words: "from

26

the master otherwise complying with Charterers or their agents orders" should be read in a limited way (see paragraph 94 and following below).

88. Charterparties - even established printed forms - are not noted for the quality of their drafting, even when lawyers may have had some involvement, as is probably the case with the Shelltime 4 form used here. Because of market conservatism such forms are almost invariably based on earlier, not legally-drafted, precedents. So it is not to be inferred that provisions such as those relied on here, the absence of which would be most surprising if they did not appear, are to be read as limited to matters related to cargo or bills of lading.

89. Similarly, just as I see no reason to limit the provision in question to the papers relating to cargo or bills of lading, I see no reason why the words should be limited to papers provided *to the vessel*. As with orders, there are many papers that charterers or their agents may supply that may lead to adverse consequences for owners. And there are many such papers that may have no relevance to cargo or bills of lading as such. During the hearing I suggested the example of a document which agents might produce to authorities falsely showing that a ship had free pratique, but it is not difficult to think of other examples, such as a document produced by agents to authorities which misrepresents the nationality or numbers of crew on a vessel. It is only right that owners should be indemnified in respect of the consequences arising from such matters.

90. Here, the charterers said, the owners had not suffered as a result of the "authorisation" being supplied to them. They were almost immediately told to disregard it and have not argued that they placed any reliance upon it. The highest the case could be put, said the charterers, was that the document's existence, not its supply, started a train of enquiry which resulted in the discovery of Barbosa's activities, and that discovery triggered concern on the part of the authorities which in turn led to the vessel being detained.

27

91.  The charterers said that if the "authorisation" had not been sent to the
     vessel, that would not have affected the situation that subsequently
     developed because Mr Maciejewski would still have raised the query
     he did with the agents, the problem would have come to light and the
     investigation would have started.  I accept that, but I do not think that
     it is ultimately to the point because, as between the owners and the
     charterers, it was the charterers who supplied the "authorisation".
     Had they not done so the ship would not have been detained.

92.  As Mr Croall argued in reply submissions, the prosecutors probably
     suspected that the ship had some complicity in whatever Mr Barbosa
     was up to, firstly because she had been instructed to load the
     purported cargo, secondly because she had been sent the PDVSA
     "authorisation" and thirdly, because the vessel was identified in that
     document.  Those links with her caused the suspicion which led to the
     detention and so there was no distinction between the existence and
     the supply of the documents.

93.  In these circumstances my conclusion is that the owners are entitled
     to the indemnity they claim under clause 13(a)(ii).

*Clause 13(a)(i)*

94.  I turn to consider the claim under clause 13(a)(i) for an indemnity for
     complying with the charterers' orders.  The owners said in this respect
     that the detention arose from the order to proceed to Puerto La Cruz
     to load the cargo of Mesa Crude identified in the loading instructions.
     The charterers said that in fact the order which they actually gave was
     not a cause of the detention at all.

95.  Mr O'Sullivan for the charterers said that the owners' case confused
     two different things, i.e. on the one hand the order of 4 September,
     which did not identify any specific cargo or loading window, and on the
     other the "authorisation" emailed by GAMS on 11 September which
     identified a specific loading window and a specific (apparently
     unauthorised) cargo.  Whilst the former could, counsel said, properly

28

be described as an order given by the charterers which the vessel followed, it did not link the vessel to any particular cargo. On the other hand, the "authorisation", if it amounted to an order at all, was immediately counter-manded by the charterers and never acted upon by the vessel. So, said counsel, it is impossible to characterise any of the problems in Venezuela as consequences of the vessel complying with the "order" of 11 September.

96.     The order to go to Puerto La Cruz simply provided the occasion for the unforeseeable events that followed, it was argued. The question should not be whether the prohibition against sailing was perverse as a matter of local law, or whether it broke the chain of causation, because that would assume that the orders to go to Venezuela caused the prosecutors to obtain the prohibition, but the vessel's presence in Puerto La Cruz was nothing more than background.

97.     If, Mr O'Sullivan argued, a reasonable commercial person asked "Why was the vessel detained?", some might answer that it was because Barbosa engaged in criminal action and the vessel got involved in the subsequent investigation, whilst others might reply that it was because the prosecutors suspected the vessel might be complicit in whatever Barbosa was doing. But no one would answer "Because the vessel was in Venezuela".

98.     That last assertion is, I consider, right; but it is not enough to help the charterers, for the reason the vessel became involved in the investigation into Barbosa's activities and was suspected of being complicit in those was, essentially, that the charterers had ordered her to load the AS Capital cargo and, through their agents, provided an "authorisation" that was false. I refer again to paragraphs 72 and 75 above.

*Clause 27*

99.     The charterers relied on clause 27(a) and in particular the provision that they, *inter alios*, should not be liable for "seizure under legal

process ... arrest or restraint of princes".  The owners pointed to the proviso: "unless otherwise in this charter expressly provided".  That, said the charterers, could not apply to the indemnity provisions in the charter where something happened that was beyond the control of either party.  That does not seem to me to be right as a matter of language or sense: if by an express provision the owners are entitled to an indemnity for the consequences of complying with the charterers' orders or because of the supply of papers with irregularities, for example and as I have found, that is sufficient to nullify the exception in clause 27(a).  As Mr Croall said in reply, "The cause [of the loss] is the key".  It would be a strange result indeed if, having with the one hand given an express indemnity to the owners, the charterers were able to take it away with the other hand by relying on a general (and mutual) exceptions clause.

### Clause 28

100. The charterers sought to answer the owners' purported reliance on clause 28 by saying that it is prospective in application, and that there is no evidential basis for assuming that the risk of detention existed at the date of the order relied on by the owners (4 September - see paragraph 16 above) because the orders cannot be said to have involved a request to load any particular cargo.  Even if they are right on the prospective nature of the clause (which I do not need to decide) however, I refer back to paragraphs 74 and 75 above, and I accept - as Mr Croall argued - that there is no reason to suppose that as at 4 September the intended cargo was any more authorised than it was later, e.g. as at 11 or 13 September.  Thus the risk existed at the earlier date as much as it did later.

101. Mr O'Sullivan for the charterers also argued that the owners' interpretation of clause 28 is inconsistent with other express terms of the charter, citing in particular clauses 27(a) and 21(a)(v).  This does not seem to me right, given that the charterers' orders were a causative act on their part: under clause 27(a) that means the proviso

30

to that clause comes into play (paragraph 99 above), and that the "carve-out" in clause 21 applies (paragraphs 81-85 above).

*Frustration*

102.  The owners suggested that one short answer to the charterers' plea that the charter was frustrated is that the charter itself provides for the consequences of the allegedly frustrating event and/or allocates the risks of its consequences, and so there is no scope for the doctrine of frustration to apply.  Mr Croall pointed to clause 20, dealing with the loss of the vessel, clause 32 on requisition and clauses 33-35 dealing with the outbreak of war.

103.  In respect of clause 32 in particular, he made the point that if in fact the vessel had been requisitioned it would have been quite impossible to argue frustration, however long the requisition continued; and so it is difficult to say that there is a provision for detention but it cannot possibly have been intended by the parties that detention might continue for a long time.  How could delay of the kind experienced here (up to 29 January) change the whole character of the parties' bargain when, for example, requisition could not do so?

104.  Whilst that is a powerful submission, I doubt that it provides a complete answer here, though it may be a factor to be taken into account when considering the multi-factorial approach to frustration exemplified by Rix LJ in *The Sea Angel* [2007] 2 Lloyd's Rep. 517 at [111].  As Mr O'Sullivan argued, even if (as I hold to be the case) the charterers are bound to indemnify the owners, if the vessel remains trapped for another 10 years it would seem difficult, to put it mildly, to say that the charter will not have been frustrated.

105.  However, even if Mr Croall's argument does not provide a complete answer to the charterers' plea of frustration, my conclusion on the facts is that there was no frustration here.  I shall set out shortly why I think that.  I was treated to a good deal of argument as to the law of frustration and referred to a number of authorities.  As I said in

31

paragraph 77 above, I do not believe that either the parties or the court (if it has to consider this matter) would be helped by my views on all the points discussed.  On what matters for the purposes of my decision, it does not seem to me that there was any real disagreement as to the law.  At the very least, I can proceed on the basis on which the charterers' case in this respect was put.

106. It was agreed between the parties that the mere fact of detention did not result in frustration of the charter.  The charterers' case is that it was frustrated when the detention had lasted, or when it became reasonable to take the view that the detention would last, for so long as to amount to a serious interference with performance, in the sense in which that expression is used in the context of discharge by temporary impossibility.  That, they said, was not later than the end of January 2015.  By that stage, efforts to secure the vessel's release in the Venezuelan courts had failed, and the manner in which those applications had failed meant that release could not reasonably be expected to be imminent.

107. Mr O'Sullivan for the charterers said that the essential question here is whether the parties can be taken to have foreseen and allocated the risk of a detention to the extent which had in fact occurred and could reasonably be expected to occur as at the end of January 2015. The starting point, he argued, must be to consider the relationship between the delay prior to January 2015 and the remaining period of the charter: that would be the best guide to whether the performance required as a result of the supervening event was *"radically different"* from what was envisaged at the time of contracting. He suggested that, in the context of delay, it is useful to recognise the analogy between this test and the (more regularly applied, if no more tightly-defined) test of whether a party has been deprived of substantially the whole benefit of his bargain for the purpose of ascertaining whether there has been a repudiatory breach.

32

108. As at the end of January 2015, there were only 2 months of the 9 month charter period left.  The charterers had already, counsel argued, been deprived of the substantial part of the benefit of their bargain.  The only remaining question was how much further delay might reasonably have been thought likely to occur as at the end of January 2015.

109. The background is found in paragraphs 8-63 above, but in particular for these purposes paragraphs 31-63.  However it is here necessary to enlarge somewhat on those facts to deal, in particular, with the Venezuelan proceedings and the evidence of the parties' Venezuelan lawyers.

110. That evidence discussed the nature of the legal proceedings concerning the detention of the vessel and was principally directed at the prospects, as at 29 January, of her being released, in particular within a time that would not frustrate the charter (if it was possible for that to occur).  The owners' lawyer had not been involved in the early stages of the case.  Whilst the charterers' lawyer, Mr Manzano had, I cannot help but feel - as was argued for the owners - that in a number of crucial respects his views were rather tinged, if not coloured, by hindsight.  I have therefore felt obliged to treat his evidence, in such respects, with a substantial degree of caution.

111. The underlying problem, it seems, was that the same judge dealt with all the applications related to the vessel, and he was (and seemingly still is) - as it turned out, at least - not willing to order her release unless the Prosecutors made a specific request to him to do so; a non-objection being insufficient.  That is almost certainly because of the involvement of a state-owned organism, PDVSA, and his unwillingness to take responsibility for a decision that might lead to a valuable vessel leaving the jurisdiction.  In turn, it seems that the Prosecutors themselves suffer from a similar unwillingness, no doubt - like the judge - fearing, at the very lowest, for their jobs.

112. However, I do not accept that it was apparent, or should reasonably have been apparent, prior to June 2015 that the judge required an actual request from the Prosecutors.   Until then I believe it was reasonable to consider that if they did not object to the vessel's release, it would be ordered upon application being made.

113. In their submissions of 23 December 2014 the Prosecutors contended that the prohibition against sailing should be maintained because they were continuing their investigations.   However, Mr Manzano in his witness statement said that to the best of his knowledge the Prosecutors had completed their investigation by January 2015 and yet there were still no indicia or even allegations against the owners, charterers, master or crew of the vessel: in these circumstances pursuant to Venezuelan law "the Prosecutor should have released the ship, failing which the Court should have done it".   He confirmed that under cross-examination.

114. In November 2014, in a ruling, the judge had specifically asked the Prosecutors to say whether they were investigating individuals other than Barbosa.   There was no evidence that they responded to this requirement, but in his ruling on 23 December, much of which was plainly "cut and pasted" from his previous ruling, the judge did not repeat the request.   That reinforces Mr Manzano's opinion that the investigation was concluded by January 2015 at the latest.

115. As at that time there were three possible ways by which the release of the vessel might have been obtained.  One was through the hearing of the Terceria application.   Secondly there was the appeal which had been filed on 20 November 2014.   Thirdly there was the Preliminary Hearing which, by that stage, had already been adjourned on a number of occasions.

*The Terceria*

116. By the end of January all that remained was for the application to be heard by the court (i.e. by the judge who had dealt with all the other

matters relating to this case).   There was, I find, no reason to believe that if the Terceria had been heard promptly (as it should have been as a matter of Venezuelan law - see below) the Prosecutors would have objected to the release of the vessel, any more than they did in June and, because of what I said in paragraph 112 above, no reason to believe at that stage that the judge would not then order the release.

*The appeal*

117.  The Appeal Court allowed the appeal to proceed on 14 January, but then sent the file back to the Sixth Court as it did not include the judgment under appeal.  That was corrected on 9 February and after that, as Mr Manzano accepted, at least in theory the hearing could have taken place quickly, the time limits for appeals being short.  The appeal judges would not have been trammelled by the factors the judge had considered or any prejudices of his, and could take account of matters that had occurred since his decision.

*The Preliminary Hearing*

118.  Under Venezuelan law this should have taken place within 20 days of the presentation of charges; and adjournments should not be for more than 20-day periods.  Although this had already been postponed on a number of occasions, and when it was due to be heard on 29 January there was another postponement to 3 February, it could be said that the fact it had been so long delayed might well support the view that it would be heard soon: perhaps even on 3 February.

*Venezuelan law and judges*

119.  The owners pointed to the facts that the judges in Venezuela owe a duty to act independently, without influence from the state of prosecutors; that criminal proceedings and applications in them are supposed to and can proceed quickly, and that the judges are required to apply the law when deciding matters.   Therefore, said the owners,

if properly applying Venezuelan law, the court (presumably either the Sixth Court or the Appeal Court) ought to have ordered the release of the vessel just after the end of January 2015.  In cross-examination Mr Manzano accepted that this was the case "conceptually speaking", but that the circumstances around this case "made you understand that the results were not going to be so".

*Discussion*

120.   As I have already indicated, I fear that - quite understandably in my view - Mr Manzano's evidence in this last respect was affected by hindsight.  I was not, of course, shown or told what advice either party's Venezuelan lawyers was giving as to the prospects of release at any stage of this saga (assuming they gave such advice) and so have to do my best to assess what reasonable parties in the position of these owners and charterers must have perceived as being the prospects in late January 2015 on the basis of other, non-privileged material, some of which I have just summarised.

121.   I note in passing that in responding to an application made to me by the owners in February 2015 for a *Kostas Melas*-type partial award for unpaid hire, although the charterers took the position that the charter was frustrated, their solicitors did not suggest that a specific request from the Prosecutors was required in order to have the vessel released, or - in terms, at least - that any of the considerations mentioned in paragraph 119 above were purely theoretical rather than real. They did say that their position was that there was currently no independent rule of law in Venezuela (a contention not advanced at the final hearing) and that in November 2014 it was becoming apparent that due process via the courts would not be speedy or straightforward, but that is a rather different consideration.

122.   Mr Maciejewski - the charterers' operator for *CV Stealth* - himself said that as at 26 December he expected that the vessel would soon be released.  That is consistent with contemporaneous emails in which he reiterated the charterers' request that the vessel leave in order to

36

bunker in Trinidad. As the owners also pointed out, their Mr Dargan (who was their vessel operator) gave evidence in a statement that at the end of January 2015 the owners thought that the vessel could be released at any moment and that no-one ever said the she would continue to be detained for any lengthy future period. That evidence was unchallenged, the charterers having indicated that they did not wish to cross-examine Mr Dargan. Further, Mr Manzano agreed that he would not have wasted his clients' time and money taking up the means that were pursued in attempts to get the vessel free if he thought they were certain to fail.

123. I note also that the owners' Venezuelan lawyer in his witness statement, cited for other purposes by Mr O'Sullivan, said (in dealing with the earlier proceedings) that once the Prosecutor had failed to establish any link between Barbosa and the vessel he would have expected her not to be detained much longer; and in another passage that he would have expected her to have been able to leave much earlier. That unchallenged evidence provides support for the view that there were good reasons for optimism in January.

124. Against this background, I conclude that it was reasonable to believe at the end of January 2015 that there were reasonable prospects of the vessel being released relatively soon, and certainly within such time as would not frustrate the charter. At the very least, the charterers have not shown the opposite on the balance of probabilities. I therefore conclude that their case on frustration fails.

*Risks of trading to Venezuela*

125. I would just add that I have not given any weight, whether in relation to the frustration case or, earlier, in relation to the indemnity claims, to an argument advanced by the owners to the effect that the charterers knew of some rather vague "risks of trading in and out of Venezuela", especially with an unknown counterparty. Paragraphs 10-14 above are relevant in this respect. It seems to me that whatever

risks the charterers may have considered when fixing to AS Capital, they were unlikely to be of the nature of those actually experienced.

### Reality check

126. Inevitably the owners referred to Rix LJ's "reality check" in *The Sea Angel* at [132]. Whilst I accept, as the charterers argued, that this is not an additional test for frustration, it does seem to me relevant here, not only in relation to frustration but also to an extent in relation to the indemnity claims dealt with earlier, for this reason. If a reasonable commercial shipping person had been asked, on the date this time charter was entered into, "If the charterers order this vessel to load for sub-charterers a cargo which turns out to be illegal and as a result the vessel, although innocent, is detained, then - forgetting for the moment any terms of the charter - who, as between owners and charterers, should bear the risk of that detention?" the answer would be a resounding "The charterers". In my view the terms of the charter support that commonsense response.

### Redelivery

127. Although not necessary if they succeeded in their other claims, as I hold that they do, the owners contended that the charterers were in breach in redelivering the vessel whilst she was detained, on the basis that she was not being placed at the owners' disposal because of the detention. I do not accept that the *Italian Railways* case, upon which Mr Croall relied, supports the owners in this respect, and I agree with Mr O'Sullivan that all that is required for effective redelivery is that the master be told he is now under the owners' orders. *The Greek Fighter* supports that view. In any event if it could be said that the charterers were *prima facie* in breach in this respect, clause 27(a) would relieve the charterers of any liability because of the restraint of princes exception contained in it.

38

*Damages*

128. The charterers said, rightly in my view, that I have to carry out an exercise in speculation: to make my best guess (based on the evidence, of course) as to what would have happened in hypothetical circumstances. The burden, they said (again rightly) was on the owners to show what earnings they would in fact have achieved during the relevant period, and hence I should approach the uncertainties inherent in this exercise in a conservative way. Mr Croall for the owners did not accept the last part of this proposition: if, he said, he proved something that was not conservative he succeeded. My approach is as follows. There were a number of issues of detail between the parties and their experts and I touch on these below. If I am persuaded to one view, I should adopt that. But if I find the arguments equally balanced, the charterers should have the benefit of the doubt.

129. One other general consideration on the calculation of damages is this. Because there were so many differences, some "big picture" and some of relative detail (but nonetheless significant in terms of the effect on the calculation of damages for 111 days) one way of approaching the exercise I have to do would be to tell the parties of my decision on each of the different points in dispute and invite them either to agree quantum or to address me further in the light of those decisions. However, that seems to me an inappropriate way to proceed. For one thing, I believe I sensed a reluctance (entirely understandable) not to have a final decision at this stage. For another, I fear that agreement might well not be possible, leading to further delay and submissions and the attendant costs. Most importantly, though, I do indeed have to conduct an exercise in speculation, as the charterers said; exactitude is impossible and I consider I am as likely to produce a just result by dealing with quantum as I do below as would be the case if further time and cost were devoted to the exercise. Both counsel agreed that I might, without more, decide upon what Mr O'Sullivan termed "a conservative but fair assessment of the average ... daily

rate" for the period in question, and that is how I have decided to proceed.

130. I shall not set out in any detail the differences between the parties' experts, or my views on them. I do not think that would serve any purpose, save to lengthen (and increase the costs of) this award. I state my views quite shortly.

131. A fundamental difference between the parties and their experts (Mr Colin Pearce for the owners and Ms Jean Richards for the charterers) was on the question what data should be used in determining market rates, the contest being between Baltic Exchange data and that provided by Clarksons. The former, relied upon by Mr Pearce, appeared to show a considerable mark-up on what the latter produced by way of average. That is one of the factors I have taken into account in deciding on my figure because I believe this is a matter entitling the charterers to some not insubstantial credit.

132. Towards the end of the hearing both counsel put in calculations they had prepared. In the light of some of Ms Richards' evidence the owners accepted some deductions from their figure of $37,424 per day, bringing that down to $37,228 per day. The charterers' figure was $31,878 per day, a difference of $5,350. They pointed out in their calculation that even allowing for the owners' adjustments (in respect of the points dealt with below) there was an unexplained discrepancy of $118. That remained unexplained and I think I have to give the charterers the benefit of the doubt for this.

133. There was then an issue as to what rates should be looked at in order to get an average market rate for the period 1 April - 20 July. I accept that it is appropriate to look at the matter as if a fixture starting on 1 April had been fixed at about 27 March, as Mr Pearce said. However, I do not think it right to assume that the last fixture to be taken into account would have finished exactly on 20 July, as Mr Pearce did when taking account of fixtures made on 3 (or 10) July. The exercise is one of looking for an average market rate, not one of

constructing a theoretical schedule for performance of voyages that would conveniently end on 20 July.  After all, that date is a purely arbitrary one (being the date of Mr Pearce's report in this arbitration). A substantial discount from the owners' figure has to be made for this factor.

134. The experts had agreed, in their pre-hearing meeting, a WorldScale Flat Rate difference of $11.88 and I see no reason not to keep to that.

135. As regards in-port bunker consumption, I think it appropriate to work on the basis of 100 m.t. per day.

136. As to port charges for the Jose Platform, Ms Richards having accepted the Cory Bros figure put forward by Mr Pearce, I consider that I too should work on that basis.  It is right that WorldScale had issued a circular showing an increase and that the reason for this is unexplained, but in this instance my view is that the commercial organisation, Cory Bros, is more likely to have been up-to-date and accurate than the institution, and therefore there is no reasonable doubt of which I should give the charterers the benefit.

137. There was then a difference about the consumption of bunkers whilst waiting between fixtures, effectively arising from considerations as to whether the vessel would have waited in areas where low-sulphur fuel had to be burnt, or not.  In my view the likelihood is that the answer to this would vary according to the particular circumstances at the time in question.  Accordingly there is here a case for making some allowance against the owners' claim figure, but not as much as the charterers contended for.

138. Similarly, I think it right to accept a split of the difference between the experts on bunker prices.

41

*Conclusion on damages*

139.  Taking all the above considerations into account, I have decided that justice will be done by determining that the average market rate to be used for the owners' damages between 1 April and 20 July 2015 is $34,000 per day. For 111 days that produces a figure of $3,774,000, and that is what I have awarded. For the avoidance of doubt I reiterate that this covers only the owners' trading losses up to 20 July and that all their other claims are stood over.

*Conclusion*

140.  The owners are entitled at this stage to an award for the balance of hire agreed at $824,661.57, $2,000 in respect of the bunker manifold conversion costs and $3,774,000 damages, a total of $4,600,661.57. I also award interest on the first two items from 1 February and on damages from the mid-point between 1 April and 20 July, i.e. 26 May 2015. The owners are also entitled to their costs to date.

141.  **I THEREFORE AWARD AND ADJUDGE** that the charterers are liable to the owners in the sum of $4,600,661.57 (Four million six hundred thousand six hundred and sixty-one United States Dollars and fifty-seven cents), and **I THEREFORE AWARD AND DIRECT** that the charterers shall forthwith pay to the owners the said sum of $$4,600,661.57 together with interest on $826,661.67 from 1 February 2015 and on the balance from 26 May 2015 at the rate of 5% (five per cent) per annum in both cases, compounded at three-monthly rests, until the date of payment.

142.  **I FURTHER AWARD AND DIRECT** that the charterers shall bear and pay their own and the owners' costs of this reference insofar as they relate to the matters dealt with in this award (and I reserve to myself the right to assess the owners' said costs pursuant to section 63(5) of the Arbitration Act 1996 and to make a further award in respect thereof) **AND** that the charterers shall bear and pay the costs of this award which I hereby fix in the sum of £28,105 (Twenty-eight

42

thousand one hundred and five Pounds Sterling) **PROVIDED** that if, in the first instance, the owners shall have paid any amount in respect of the costs hereof, they shall be entitled to an immediate refund from the charterers of the sum so paid.

143. In addition **I DIRECT** that the charterers shall pay the owners interest on the sums referred to in paragraph 142 above at the rate of 5% (five per cent) per annum compounded at three-monthly rests, from the date hereof in respect of the owners' recoverable costs and from the date of any payment to me by the owners in respect of the costs hereof, down to the date of reimbursement by the charterers to the owners in each instance.

144. Finally **I RESERVE** jurisdiction to deal with all other matters referred to me but not determined in this award.


**GIVEN** under my hand this 23rd day of September 2015.


...................................................

Bruce Harris

43