# EXHIBIT 3

# SAVILLE & CO

— SCRIVENER NOTARIES —



One Carey Lane
London EC2V 8AE
Tel: +44 (0)20 7776 9800
Fax: +44 (0)20 7776 9801
www.savillenotaries.com
mail@savillenotaries.com

Sophie Milburn
Nicholas Thompson
Robert Kerss
Andrew MacNab
Christopher Higgins
(General Notary)

Eleonora Ceolin
(General Notary)
Richard Saville
(Consultant)

TO ALL TO WHOM THESE PRESENTS SHALL COME, I ROBERT SCOTT KERSS of the City of London NOTARY PUBLIC by royal authority duly admitted and sworn DO HEREBY CERTIFY the genuineness of the signature of BRUCE ANTHONY HARRIS subscribed to the certificate appearing on the copy second partial final award hereunto annexed relating to the vessel "CV STEALTH", such signature being in the own true and proper handwriting of the said Bruce Anthony Harris, the arbitrator therein named and described.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London aforesaid this twenty fourth day of August two thousand and seventeen.



 



|   | **APOSTILLE** (Convention de La Haye du 5 octobre 1961) | | | |
|---|---|---|---|---|
| 1. | **Country:** Pays / Pais: | United Kingdom of Great Britain and Northern Ireland | | |
|  | **This public document** Le présent acte public / El presente documento público | | | |
| 2. | **Has been signed by** a été signé par ha sido firmado por | Robert Scott Kerss | | |
| 3. | **Acting in the capacity of** agissant en qualité de quien actúa en calidad de | Notary Public | | |
| 4. | **Bears the seal / stamp of** est revêtu du sceau / timbre de y está revestido del sello / timbre de | The Said Notary Public | | |
|  | **Certified** Attesté / Certificado | | | |
| 5. | **at** á / en   London | 6. | **the** le / el dia | 24 August 2017 |
| 7. | **by** par / por | Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs | | |
| 8. | **Number** sous no / bajo el numero | APO-506816 | | |
| 9. | **Seal / stamp** Sceau / timbre Sello / timbre | | 10. | **Signature** Signature Firma   D. O'Sullivan |

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country

To verify this apostille go to www.verifyapostille.service.gov.uk

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:

*I hereby certify that I have had sight of the original document and that this is a complete and accurate copy of the original*

Signed: .................

Name: BRUCE HARRIS

Position: ARBITRATOR

Date: 23 AUGUST 2017

SPACE SHIPPING LTD
of Malta

                                          Claimants
                                         (Owners)

and

ST SHIPPING AND TRANSPORT PTE LTD
of Singapore

                                          Respondents
                                         (Charterers)

## "CV STEALTH" – C/P dd 10.4.12

## SECOND PARTIAL FINAL AWARD

1.    By my Partial Final Award of 23 September 2015 I determined certain issues in this matter. I refer to that award for the history of this unfortunate affair. Following an unsuccessful challenge to my award by the charterers, the owners applied to me for a further award dealing with their claim for trading losses for the period 21 July – 23 September 2015 (i.e. a continuation of the claim dealt with in the first award) and their claims for damages in respect of a number of items of expenditure which they said resulted from the charterers' breach, alternatively "matters for which an indemnity arises and the consequent detention in Venezuela of the vessel".

2. A hearing took place at the IDRC, 70 Fleet Street, London EC4 on 16 and 17 June 2016 when, as before, the owners were represented by Mr Simon Croall QC and Mr Koye Akoni, and the charterers were represented by Mr Sean O'Sullivan QC and Mr James Hatt. The seat of this arbitration remains London, England.

**The trading losses claim**

3. One of the points the charterers took in respect of the owners' claim for continuing trading losses was that the ship would not have remained at the disposal of the owners because the bareboat charter pursuant to which they had possession would have come to an end on 22 July 2015 and would not have been extended.

4. As regards the owners' claim for trading losses this was a threshold issue and I suggested that I determine it before the parties made detailed submissions on the various heads of loss being claimed by the owners. This was agreed to, and after due deliberation, on 22 June 2016 I emailed the parties' solicitors:

> I am afraid that the claimants have not satisfied me, on the balance of probabilities, that but for the respondents' breach they would have exercised their option in January 2015 to extend the bareboat charter. I was tending towards this view by the end of the recent oral hearing, and so I have given particular attention to the claimants' written submissions on this topic. Whilst I appreciate their considerable force, those submissions have not, however, persuaded me.
>
> Although I am not issuing an award, I think it right that I should say immediately that in coming to this conclusion I have carefully considered the evidence of Mr Tokgoz, and that I experienced him as an honest witness who was doing his best to assist me in attempting to reconstruct what he would have done but for the breach.
>
> However, it is my experience that anyone who tries to imagine what they would have thought, said or done in an hypothetical situation inevitably – usually unconsciously – tends towards the theoretical scenario that is more favourable to that person, and I think that happened in this case.

2

> I accept, of course, that the question I have to answer is whether I think that, on the balance of probabilities, the claimants - not some notional owner - would have exercised the option; that Mr Tokgoz was conducting an exercise in reconstruction, and that by definition his evidence is the only factual evidence on this issue. But that very fact in one sense means that his evidence has to be weighed with the greatest care.
>
> I also accept that by the time the option fell to be exercised the market had improved, and there plainly were grounds for some optimism as regards at least the nearer future.
>
> Without here going into any detail as to the experts' analyses of market conditions or their views as to what someone in Mr Tokgoz's position would have done in January 2015 (and I agree that their evidence is, with no disrespect at all, of limited assistance), I have come to the conclusion, on balance, that the likelihood is that the option would not have been exercised.
>
> It seems to me, looking at the evidence as a whole, that the claimants would probably have felt sufficient uncertainty as to the likely earnings in the event of an extension that, coupled with what does seem to have been a somewhat difficult relationship with the head owners (the proceedings in the US in particular in my view took the situation out of the run-of-the-mill type of litigation between commercial parties) and the fact that on the whole the bareboat charter had been loss-making, they would have been less, rather than more, likely to exercise the extension option.
>
> I cannot, of course, say this with certainty. But I have to make my decision on the balance of probabilities: the burden was on the owners to persuade me in that respect and I fear that they have not succeeded.

5. As a result, the owners' claim for trading losses fell away, save in respect of the single day of 21 July 2015 (I having made an award covering trading losses up to 20 July, and taken the view that the owners would have ceased trading the ship on 22 July).

6. The owners suggested that I should award them $34,000 by way of loss of earnings for that single day, alternatively that I should stand the claim over until a subsequent hearing. The $34,000 figure of course was a reflection of the rate of daily loss determined by my first award. The charterers said I should award nothing in respect of this day. They had a number of points in this regard including that it was for the owners to show that they would have had the ship and traded her up to the very

3

last day, but they could not do that. I accept that argument and therefore reject the owners' claim for this single day's loss of earnings. I also agree with the charterers that if they had seen the bareboat charter in the first hearing, they would have been able to argue that losses extending beyond 22 June, the end of the firm period of the bareboat charter (which also had an option for plus or minus 30 days) were dependent on the question whether the owners would have exercised the option to extend. As the charterers did not have the chance of running that argument they said the award I had made for losses up to 20 July was already generous in the assumptions it, by implication, made as to how long the owners would have kept the ship. I dismiss the owners' claim for trading losses altogether.

7. Accordingly all questions of trading losses can now be left on one side.

**The owners' other claims**

8. In respect of the owners' other claims for determination here, the position is that the charterers agreed some, as follows:

> *Extra agency legal costs:* the charterers agreed to pay the claim of $3,742.37.
>
> *Extra agency medical costs:* the charterers agreed to pay the owners' adjusted claim of $20,000.
>
> *Legal costs and disbursements in Venezuela:* the charterers agreed to pay $226,563.84 in respect of Clyde & Co. Venezuela's fees directly to them and to pay the owners' full claims in respect of three other lawyers in the sums of $122,721.70, $40,950 and $234,984.07 respectively, together with P&I Club correspondents' charges of $15,971.

4

9. Further, subject to certain qualifications (which I set out here briefly) the charterers agreed some other items, namely:

> *Garbage and boat costs:* Charterers agreed this claim at $11,413 subject to me finding that the services were indeed additional and therefore recoverable;
>
> *Extra agency costs:*
>
>> *Cost of delivery of supplies in port:* the charterers agreed this claim at $12,348 subject to me finding that the services were indeed additional and therefore recoverable;
>>
>> *Agency costs of arranging shore leave for crew:* the charterers agreed this at $6,775 subject to me finding that these services were indeed additional and therefore recoverable;
>>
>> *Class expenses:* this claim was agreed by the charterers at $7,125 subject to me finding that it is recoverable.
>
> *Fresh water supply:* This claim the charterers agreed at $17,896.50 subject to me finding that the costs are indeed additional and therefore recoverable;
>
> *Class invoices:* The charterers agreed this at $28,735.96 subject to me finding that the charges are recoverable;
>
> *Divers' survey:* The charterers agreed this claim at $13,945 subject to me finding that it is recoverable.

10. In their written opening submission on the claims other than for loss of earnings the owners said that there appeared to be no agreement in respect of four other items, namely:

> *Cost of bunkers consumed whilst the ship was detained:* $335,612.38;
>
> *Cost of crew airfares to and from Venezuela:* $56,129;
>
> *Agency costs for crew changes in Venezuela:* $21,782.89;
>
> *Protective agency costs:* $3,000

5

11. The owners made it clear that the costs and expenses claimed here did not account for all the costs and expenses they had incurred as a consequence of the detention, which were continuing, and asked me to reserve jurisdiction to deal with further claims arising during the detention, as I do (see Conclusion, below).

**The charterers' objections to the owners' claims**

12. Looking at the position broadly, the charterers' main objections to the owners' claims were fourfold. Firstly they argued that the owners had failed to mitigate. This argument was put on two bases. The owners were maintaining, in an arbitration with the head owners under the bareboat charter, that it had become frustrated on 30 April 2015. Therefore, said the charterers, once they took that position the owners should have reduced their losses by stopping manning, operating and maintaining the ship. Their other point on mitigation was that the owners had failed to declare the ship as a CTL under her war risks policy as of 19 September 2015, which would have resulted in manning, operation and maintenance being passed to the underwriters.

13. The charterers additionally argued that any damages arising after one year's detention were legally too remote because it would not have been within the reasonable contemplation of the parties that the owners would have suffered losses beyond the period of detention necessary to justify a CTL. Thirdly the charterers said that not everything claimed by the owners was "additional", in that some of the costs and expenses, at least, would have been incurred in any event during the ordinary course of trading.

14. The charterers also said that there were savings to be brought into account. In the first place they maintained that the owners

6

    had saved the costs of a drydocking that would have had to take place in the summer of 2015 and for which the owners would have had to pay. Secondly, they said that the owners saved bareboat hire (which they had not been paying for some time, contending that the bareboat charter was frustrated); and thirdly there were costs that had or ought to have been saved because the ship was in port rather than trading. Credit should, the charterers said, be given for such matters against the losses claimed by the owners.

15. Against this background the charterers said that I should determine each head of claim and each head of savings, and make declarations as to the extent to which each claim succeeded or each saving fell to be taken into account. I should not feel compelled to do final calculations myself as they might be complex but I should simply provide "the building blocks". I should recall that I might in any event only order any minimum that could be said to due at the date of my award, and as the charterers saw it there would be no such minimum because (mainly) of the saving for avoided costs of drydocking. But even if that was wrong, I should deal with each claim or saving individually in order to make it clear that no other issues were being inadvertently decided.

16. In addition, the charterers said that I did not need to decide any issue of remoteness or foreseeability at this stage, or any issue as to any effect of the possibility of the ship being declared a CTL. Similarly, they said, I could leave over the issue of the saving of bareboat hire resulting from the alleged frustration of the bareboat charter: in fact, they said, subject to one minor point on mitigation, there was no need for me to decide anything about the alleged frustration of the bareboat charter at this stage. I should make it clear that no decision had been

made on any of those issues, that no issue estoppel arises and that they remain open for determination should the need arise in the future. This was effectively agreed with the owners during the hearing before me and I confirm that is my approach and that is how this award should be understood.

*Mitigation*

17. I have concluded that it would not be appropriate for me to determine at this stage anything in respect of the charterers' argument to the effect that the owners failed to mitigate their losses by not, consistently with their argument that the bareboat charter was frustrated on 30 April 2015, effectively handing back the manning, operation and maintenance of the ship to the registered owners. Substantial argument was addressed to me in that respect, but it seems to me that at least one factor that could be relevant to any decision I have to take in due course was not canvassed, namely the idea that in deciding whether it would or would not be reasonable for the owners to have taken that step, I would need to consider the likelihood of the frustration argument succeeding. If I were to decide now that the owners should have ceased performing their bareboat charter obligations, and thus that parts of their claim should be reduced accordingly, and if it was subsequently held that the bareboat charter was not frustrated, that strikes me as likely to lead to an injustice. I therefore decline to make any decision in respect of this argument, at least until the result of the bareboat charter arbitration is known.

18. For the time being, however, in deciding whether to award the owners anything at this stage, and if so what, I think it necessary provisionally to take into account the charterers' argument.

8

*Saved expenses*

19. The same goes for the charterers' contention that credit should be given by the owners for the hire that they have not paid under the bareboat charter (since May 2015) and which they contend they are not liable to pay because of the alleged frustration of that charter. In my view it would be inappropriate for me to decide whether credit should be finally given in this respect, for reasons similar to those just adumbrated, but at the same time I think that in deciding whether there is any minimum sum that I can properly find is presently due to the owners, I must provisionally assume that the charterers' argument has substance.

20. Further, similar considerations apply to the contention that the owners have saved the costs of drydocking. Whether or not that is the case cannot be known for the present: much may depend on the outcome of the bareboat charter arbitration and/or the question whether the ship is abandoned to underwriters, as well as the underlying question whether she will ever be released, and if so when. For the present I think it only fair to the charterers to assume (without deciding at all) that at the end of the day the owners will save and must give credit for such costs. On the other hand, the owners must be entitled in future to advance a claim for the costs of drydocking, if incurred, and I reserve jurisdiction in that regard.

21. For the purposes of presently deciding what allowance I must make in the charterers' favour in respect of the possible saving in drydock costs, I adopt their figure of $1,400,000.

22. The charterers argued that the owners had saved operating expenses: the owners said that I could not fairly answer the question what, if any, "savings" had actually been made in this

9

respect for want of adequate evidence. The charterers agreed and accepted that I should defer any decision on the operating expenses that could or should have been saved, i.e. the wear and tear, spares, oil and insurance costs.

23. The charterers had another point in relation to insurance: they said the owners could and should have reduced their expenses by changing to port-risk insurance. The owners objected that this would have meant the ship could not have been fixed if she were released; that it would have taken too much time to revert to full insurance if the ship was suddenly released and that the authorities might not in fact order her release unless she had full insurance.

24. I do not accept the owners' arguments in this respect. The head owners were bound under the bareboat charter not to withhold approval to proposed insurance arrangements unreasonably. I have little doubt they would have agreed to a proposal from the charterers to change to port-risk insurance, and that a reversion to full cover could very swiftly have been arranged. I agree with the charterers' estimate of a saving of $200 per day, and that they should be allowed credit for this for the period 1 May-21 July 2015 in the sum of $16,200.

*Indemnity claims*

25. There was a considerable debate in the written submissions about whether the owners were entitled, at this stage, to pursue claims under the clause 13 indemnity, the charterers saying that the application being made to me was always for an award in respect of some of the owners' damages, but not any indemnity claim. It does not seem to me that I need to decide that argument, because on any view, having regard to the extent to which the owners' present claims succeed (see below) when

10

compared to the credit that I think must provisionally be given for possibly saved drydocking costs, it would be inappropriate for me to make a monetary award in the owners' favour at this stage. Accordingly, I now deal with the arguments on the individual heads of claim.

26. I turn to deal with the various heads of claim advanced by the owners as set out in paragraphs 9 and 10 above.

*Garbage and boat costs*

27. This claim was the subject of some unsatisfactory exchanges during the cross-examination of Mr Tokgoz. To my mind it was clear that he did not understand the point that was being put to him in cross-examination and I do not think his answers can be relied upon. What is clear to me is that, when trading, the ship would incinerate most of her garbage whilst at sea. In port, as the ship presently is, this cannot be done. So the costs claimed, $11,413, are additional costs resulting from the detention and thus recoverable.

*Extra agency costs*

*Cost of delivery of supplies in port*

Normally, when the ship is trading, supplies would be delivered to her by being craned on board from ashore. In the present circumstances, where I imagine the ship is at anchorage, that is not possible and boats have therefore had to be used to transport the relevant supplies. Again, therefore, I conclude that these costs are additional and therefore recoverable by the owners.

*Agency costs of arranging shore leave to crew*

I accept, as the charterers argued, that some of the expenses incurred under this heading, but not all, were extra. They suggested that the owners should be allowed $5,000 rather than the $6,775 claimed, and that seems to me a reasonable figure. The owners are therefore entitled to $5,000 under this heading.

*Class expenses*

The charterers accepted that the $7,125 claimed under this head, along with the $28,735.96 claimed as *Class Invoices* and the $13,945 claimed under the heading *Divers' Survey Costs*, would be recoverable if they are entitled to credit for avoided drydocking costs, and subject to their arguments on mitigation. Subject to those qualifications, therefore, the owners are entitled to these amounts.

*Fresh water supply*

28. The charterers ultimately accepted that the claim under this heading for $17,896.50 was one for additional costs and thus recoverable, subject to their mitigation arguments. With that qualification, this sum is due to the owners.

*Bunkers*

29. The parties agreed $335,612.38 as being the cost of bunkers consumed while the ship was detained. The charterers' agreement was, of course, subject to their argument on mitigation.

*Crew changes – airfares and agency costs*

30. The owners claimed $56,129 in respect of airfares for crew members flying to and from Venezuela, and $21,782.89 in

12

respect of agency costs incurred in arranging crew changes. The charterers pointed out that the owners' claims covered both the period up to 20 July 2015 (i.e. that dealt with in my first award) and the subsequent period. For the period up to 22 July 2015 I agree with the charterers that there cannot be any claim because, as I held, at the time the ship would have been expected to trade in the Caribbean area and thus the claim, which was based on increased costs compared with those which would have been incurred in Europe, had no foundation since the crew changes could never have been effected from Europe.

31. Mr Tokgoz in his evidence suggested that if the ship had been trading in the Caribbean crew changes would have been effected from Houston. But there was no evidence as to any difference in cost between Houston and Venezuela so I could not reach any conclusions in this respect. In any event this was not how the owners had advanced their claim, and they made no application to amend it.

32. The claim in respect of flight costs could therefore only succeed for the *post* 22 July 2015 period in the sum of $7,103.40 and the related claim for agency charges similarly fell to be reduced to $687.50. (The owners' submissions put forward larger figures, but it seems to me that they ignored the credits which their own claim schedule showed and which reduced the amounts to those I have just set out.) The charterers accepted that the owners were entitled to these amounts subject to their mitigation argument and on condition that the owners do not try to claim further sums for crew flights in the same period under their "indemnity claims". I proceed on that basis.

13

*Protective agency costs*

33. It was said for the owners that because of the detention they appointed protecting agents in Venezuela which they would not have done ordinarily. Mr Tokgoz was unable to give helpful evidence as to the normal level of such agent's charges, and said that whether such agents are appointed in the ordinary course of trading depends on where the vessel is. He could not say whether or where within the Caribbean agents would be appointed normally. In these circumstances, I am unable to accept the owners' claim for $3,000.

## Conclusion

34. For the above reasons, **I AWARD AND DECLARE** that the owners' claims as submitted to me at the hearing leading to this award succeed as follows:

    Extra agency legal costs: $3,742.37
    Extra agency medical costs: $20,000.00
    Legal etc. costs: $122,721.70, $40,950.00, $234,984.07 and $15,971.00
    Garbage and boat costs: $11,413
    Extra agency costs: $12,348.00, $5,000.00 and $7,125.00†

    \* Fresh water supply: $17,896.50
    \* †Class invoices: $28,735.96
    \* †Divers' survey: $13,945.00
    \* Bunkers: $332,219.38
    \* Crew changes - airfares and agency: $7,103.40 and $687.50.

    (\* Subject to the charterers' mitigation arguments which are stood over.

    † Only if charterers entitled to credit for avoided drydocking costs.)

35. Considering that the charterers are provisionally entitled to set against their above liabilities $1,400,000.00 in respect of possibly saved drydocking costs, **I DECLINE** at this stage to

make any monetary award in favour of owners, whilst noting the charterers' agreement to pay direct to Clyde & Co. Venezuela their fees of $226,563.84.

36. **I FURTHER DECLARE** that the costs and expenses claimed by the owners in this hearing are not all the costs and expenses incurred by the owners as a result of the ship's detention, and I therefore reserve jurisdiction to deal with any further claims in that respect that the owners may advance. I have here decided, in the context of the claims as put to me at the hearing leading to this award, only the matters indicated above as being so decided, without more; and accordingly I hold over the issues and repeat the reservations of jurisdiction and the qualifications referred to in paragraphs 16-17, 19-20 and 22 above.

37. For the avoidance of doubt the charterers may hereafter claim an appropriate credit if it is held that the bareboat charter is frustrated and the owners save costs by recovering from head owners on a *quantum meruit* basis in respect of expenses they bore after frustration (or choose not to pursue such claims because they would only benefit the charterers). And at the charterers' specific request I expressly reserve jurisdiction to find that the owners' failure to mitigate their losses based on the frustration argument arose after the period at issue in the hearing leading to this award.

38. **I RESERVE** all questions relating to the costs of the hearing leading to this award and the costs of this award, since no submissions were made to me on these matters and there is clearly scope for argument. My provisional view, for what it is worth, is that the charterers should have the costs of the trading losses argument, which they won, and that each party should bear its own costs in relation to other matters. As to award

15

costs my provisional feeling is that the owners should bear four-fifths and the charterers one-fifth. But I retain a wholly open mind on all these questions.

**GIVEN** under my hand this 8th day of August 2016.

...........................................
Bruce Harris