# EXHIBIT 4

# SAVILLE & CO.

—— SCRIVENER NOTARIES ——

One Carey Lane
London EC2V 8AE
Tel: +44 (0)20 7776 9800
Fax: +44 (0)20 7776 9801
www.savillenotaries.com
mail@savillenotaries.com

Sophie Milburn
Nicholas Thompson
Robert Kerss
Andrew MacNab
Christopher Higgins
(General Notary)

Eleonora Ceolin
(General Notary)
Richard Saville
(Consultant)

TO ALL TO WHOM THESE PRESENTS SHALL COME, I ROBERT SCOTT KERSS of the City of London NOTARY PUBLIC by royal authority duly admitted and sworn DO HEREBY CERTIFY the genuineness of the signature of BRUCE ANTHONY HARRIS subscribed to the certificate appearing on the copy fourth partial final award hereunto annexed relating to the vessel "CV STEALTH", such signature being in the own true and proper handwriting of the said Bruce Anthony Harris, the arbitrator therein named and described.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London aforesaid this twenty fourth day of August two thousand and seventeen.








| | APOSTILLE | | |
|---|---|---|---|
| | (Convention de La Haye du 5 octobre 1961) | | |
| 1. | Country:<br>Pays / Pais: | United Kingdom of Great Britain and Northern Ireland | |
| | **This public document**<br>Le présent acte public / El presente documento público | | |
| 2. | Has been signed by<br>a été signé par<br>ha sido firmado por | Robert Scott Kerss | |
| 3. | Acting in the capacity of<br>agissant en qualité de<br>quien actúa en calidad de | Notary Public | |
| 4. | Bears the seal / stamp of<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | The Said Notary Public | |
| | Certified<br>Attesté / Certificado | | |
| 5. | at<br>á / en | London | 6. the<br>le / el día | 24 August 2017 |
| 7. | by<br>par / por | Her Majesty's Principal Secretary of State<br>for Foreign and Commonwealth Affairs | |
| 8. | Number<br>sous no / bajo el numero | APO-506815 | |
| 9. | Seal / stamp<br>Sceau / timbre<br>Sello / timbre | | 10. Signature<br>Signature<br>Firma | D. O'Sullivan |

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached
UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that
have been photocopied and certified in the UK confirm the signature of the UK official who conducted the certification only.
It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country not party to the Hague Convention of the 5th of October
1961, it should be presented to the consular section of the mission representing that country

To verify this apostille go to www.verifyapostille.service.gov.uk

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**

*I hereby certify that I have had sight of the original document and that this is a complete and accurate copy of the original*

Signed: ....................................................

Name: BRUCE HARRIS

Position: ARBITRATOR

Date: 23 AUGUST 2017

SPACE SHIPPING LTD
of Malta

                                                                    Claimants
                                                                    (Owners)

and

ST SHIPPING AND TRANSPORT PTE LTD
of Singapore

                                                                    Respondents
                                                                    (Charterers)

**"CV STEALTH" – C/P dd 10.4.12**

**FOURTH PARTIAL FINAL AWARD**

1.      This is the fourth Partial Final Award ("PFA") in this matter.  I refer in particular to the first and second PFAs for the history of this case. This award follows a hearing that took place on 10-12 May 2017 which was mainly concerned with the owners' claim to be indemnified in respect of hire and interest awarded to the head owners in the arbitration under the head (bareboat) charter and operating expenses as well as, incidentally, certain items held over from my second PFA. In the relatively informal pleadings leading to this hearing, the charterers took a number of points against the owners' claim.  At the hearing, however, the scope of those was reduced.  In particular, allegations that the owners had not acted reasonably in the Venezuelan proceedings with a view to getting the vessel released were not pursued.  Nor was it said that the owners should have taken,

or caused the registered owners to take steps against the vessel's underwriters to claim a constructive total loss.   (However the charterers did continue to contend that the vessel is in fact a constructive total loss and her insurers will have to pay up accordingly.)

2.      In their written opening for this hearing the charterers said that they disputed the owners' main claim on the following grounds:

(1)     If the indemnity did continue to operate, what was left of the charter ended due to frustration at 13th July 2015, alternatively at any time after that which I might consider appropriate and meeting the demands of justice.

(2)     Alternatively, as a matter of construction the indemnity was not intended to encompass the present claims and accordingly the charterers are not liable because:

(a)     these losses were not reasonably foreseeable, and/or

(b)     these losses were not legally caused by the events which would otherwise give rise to the indemnity (i.e. because they are too remote and/or the chain of causation has been broken);

(c)     insofar as the owners framed their claim as one for damages, the principles of mitigation apply strictly and the owners have failed to mitigate by exploring and finding a solution to the apparently endless nature of their bareboat charter, and/or

(d)     even if the claim be framed as an indemnity claim, similar considerations arise and the costs claimed would not be covered by the indemnity because they are neither necessary nor reasonable.

3.      In the event foreseeability and remoteness were not argued as such. The charterers' essential case was based on frustration.  In particular, they said that what is now causing the owners' loss is not their (the charterers') original order to load the AS Capital cargo in Venezuela, as I had originally held (see paragraphs 72, 75, 76 and 98 of the first PFA) but rather that the present continuing detention – and indeed the detention of the vessel for some considerable period - is due to the local judges acting entirely unreasonably and contrary to the law in a wholly unforeseeable way.

4.     Because the charterers' case on frustration was not clear on the pleadings, at the end of the first day Mr Brian Doctor QC, counsel for the charterers, provided a note clarifying their position in that respect. In that, the charterers contended that frustration of whatever remained of the charterparty occurred on 13 July 2015 (or within such period as was reasonable to appreciate the implications of the decision made by the court on that day), or on each date on which the Venezuelan courts thereafter made a decision declining to set aside the temporary Prohibitive Order, since it would have been known to a reasonable person in the position of the parties on each such date, if it had not been known earlier, that the courts dealing with the matter were not applying Venezuelan law but were acting outside the law for reasons about which the parties would have been only able to speculate, and therefore that the vessel would not be released by normal court processes, at least in the foreseeable or predictable future.

5.     Accordingly, it was said, the frustrating event was the past delay which had occurred on each occasion mentioned above since the temporary Prohibitive Order was put in place, together with:

(a)     the prospect of continued indefinite detention of the vessel; and

(b)     the inexplicable failure of the Venezuelan judges to apply the clear law in this case in favour of release, which meant that the vessel would continue indefinitely to be prohibited from departing, where no legal ground known to Venezuelan law justified such outcome and no legal means existed to obtain the vessel's release.

6.     The effective cause of the frustrating event was thus the (non-legal) reason(s) that were preventing the courts (and the court officials) which heard the case from applying Venezuelan law and releasing the vessel, and which dissuaded legal functionaries in the prosecutors' office (and those which supervise the prosecutors) from taking any or any effective role in persuading the courts to apply the law and

release the vessel.  These reasons were unknown to the parties, and that in itself would have heavily influenced their conclusion, as reasonable parties, that the charter had never been intended or agreed to operate in such unforeseen circumstances.

7.     The charterers contended that the facts on which the above conclusions were based were set out in the evidence of the two legal witnesses which had been served for this hearing, and previous hearings (in respect of which latter facts the charterers would rely on my findings in that regard insofar as those were the subject of my decision) as well as the facts and opinions contained in the report of a certain Dr Belisario served for the present hearing.

8.     The frustrating event was not, the charterers said, in the control of either party, nor was it caused by the acts or omissions of the charterers, whether or not they constituted breaches of the charter in September 2014, save in the irrelevant sense that, but for the original order to load, the vessel would not have been in Venezuela.  Insofar as the order to the master initially caused the temporary Prohibitive Order to be put in place, it did not cause, either as the effective cause or at all, the continuation in force of the temporary Prohibitive Order after 13 July 2015, because its continuation thereafter was caused by the matters referred to above.

9.     Mr Simon Croall QC, counsel for the owners, responded in writing to this note, denying that the charter was frustrated.  His first point was that upon redelivery the charter became executed, leaving no remaining obligations that were capable of becoming impossible to perform or which required radically different performance from that originally envisaged.  Delay, of whatever length, could not frustrate a charter once the vessel has been redelivered and the parties' primary obligations fulfilled; and for that reason matters such as what a reasonable person in the position of the parties would have believed, and the "prospect" of the detention being indefinite, were irrelevant. The charterers' obligations to pay damages as a result of their breach

of clause 28 of the charter, and/or to indemnify the owners for all losses and consequences arising from the detention pursuant to clause 13, had accrued prior to redelivery and/or any date relied upon by the charterers as frustrating the charter, and those obligations were accordingly incapable of being discharged by any frustrating event relied on by the charterers.

10. Secondly, the owners said that the nature of the clause 13 indemnity is such that frustration could not operate to absolve the charterers of their aforesaid obligations, the detention for which the indemnity ran having arisen prior to the alleged frustration of the charter.

11. Thirdly, insofar as anything of the charterparty might remain and be capable of being frustrated, the charterers could not argue that it was frustrated because the allegedly frustrating event took place with blame or fault on their side: in particular, the alleged frustrating event - being the order of 19 September 2014 and the consequent delay until 13 July 2015 (or the later dates alleged) - was caused by the charterers' breach, as I had held in my first PFA and as had been confirmed on the appeal from that award.  The charterers could not therefore rely on the detention as frustrating the contract, as indeed their counsel had conceded at the first hearing.

12. Fourthly, it was argued for the owners, insofar as it was said that the charter was frustrated on or shortly after 13 July 2015 the charterers were precluded from advancing that argument by an issue estoppel: in my first two awards I had found that the charterers were liable to pay the owners sums in damages and pursuant to the indemnity, reflecting losses suffered by the owners up to 20 July 2015 and expenses through to September 2015, and it was a necessary ingredient of my decision that the owners were entitled to such sums that the charterers' obligation to pay them had not been discharged by those dates.

13. Lastly, insofar as the decision of 13 July 2015 or subsequent decisions were relied upon, the owners denied that such were capable of

obliterating the original cause of the delay, namely the 19 September 2014 order, and consequent delay until 13 July 2015, and they denied that such decision or decisions were capable in law of being regarded as a supervening event of the kind required for the doctrine of frustration to apply, even if it could.

14. It follows from all the above that in effect the central factual issue at the hearing leading to this award concerned causation. Before turning to that, though, I should summarise the course of events since my first PFA, in which I set out the history of the matter up to the dates of the hearing leading to that award, 8-11 September 2015.

*Factual developments*

15. The facts up to the date of that award were set out in paragraphs 8-63 and 111-124. The last court decision referred to in that award was of 13 July 2015 (paragraph 45).

16. On 16 February 2016 an application was addressed to the Third Trial Court on behalf of the parties to this arbitration, seeking the release of the vessel. The grounds put forward were that the preparatory and intermediate phases of the proceedings were concluded, the proceedings now being at the trial phase, and a measure to replace custody had been issued for the only accused person (presumably Mr Barbosa); all preliminary procedures for the trial stage had been performed, suggesting that it was not necessary to hold the vessel in order to carry out key activities in the investigation; neither party nor anyone connected with the vessel was subject to investigation; PDVSA had not shown any interest in retaining the vessel, and since the prosecutor had first stated its lack of opposition to releasing the vessel no other legal proceedings had been taken against her or anyone in any way related to her, which confirmed that there was no reason justifying holding her.

17. It was also pointed out that serious losses were being incurred as a result of the detention, that there were repeated clear examples in

case law showing that assets seized in the course of a criminal investigation should be returned as soon as possible provided that this does not interfere with the investigation, and that the continued detention of the vessel was damaging the reputation of Venezuela at least in the international maritime charter sector.

18.   It seems that a similar application was made on behalf of the owners on 26 February 2016.  Further submissions on behalf of the charterers and the owners were put in, respectively, on 26 April and 9 May 2016.

19.   Despite the fact that on 4 February 2016 the Assistant National Prosecutor against Money Laundering and Financial and Economic Crimes had written to the judge expressly confirming that the Public Prosecutor's Office did not oppose lifting of the prohibitive measure under which the vessel was detained, and expressly confirmed that the vessel "is not essential to the investigation ... in respect of which all of the expert assessments and investigations have been carried out" [translation], the judge, in a fairly lengthy judgment, noted that as two parties "claimed to be holders of the property" he rejected the request to release the vessel "until reliably determining to whom the ownership thereof corresponds" [translation].

20.   The evidence of the owners' lawyer was that this decision was odd, if not crazy, not least because the court should have realised that the applicant parties were not the actual owners of the vessel.  He thought the ruling was no more than an excuse for avoiding making a decision for the time being about the release, and he was concerned that if evidence was filed to prove that neither owners nor charterers were the registered owners that itself might be used as an excuse for further delay.  Ultimately, however, such evidence was provided to the court on 19 October 2016.  The day before that, the court in question had asked the prosecutor to say on what procedural basis he had finalised his investigation, leading him to conclude that the vessel was no longer necessary for his investigation.

21.     The charterers' response to that was to file an application on 27
        October again seeking release of the vessel and arguing that the court
        should not seek the information requested from the prosecutor
        because he had exclusive discretion in the handling of the
        investigation.  The court, however, decided on 2 November that it
        would await the prosecutor's reply.  That was forthcoming on 23
        November when the prosecutor simply reiterated that the vessel was
        not essential for the investigation and expressly and unequivocally
        requested her release.  As a result, on 1 December 2016 the court
        issued a further decision insisting on replies to the requests made in
        its 18 October decision.

22.     Between 22 November 2016 and 14 March 2017, the charterers'
        lawyers pursued various steps with the office and, indeed with the
        Director of the relevant division of the Prosecutor General's Office with
        a view to getting the prosecutor to provide responses to the court.
        Ultimately, at a meeting on 21 March 2017, prior to which the
        charterers' lawyers had provided the Director with a draft of what it
        was hoped would be given to the court, the Director, in the words of
        the charterers' lawyer's statement, "indicated that he would not
        expose [the prosecutor] to be seen as having an interest in the case
        by filing so many requests to clear the vessel from sailing, and that it
        was not the responsibility of the Prosecutor General's Office that the
        court was making such unreasonable requests."

23.     That is where matters stand and the vessel remains under detention.
        For the sake of completeness I should relate what happened in
        relation to the Terceria application referred to in paragraphs 42-45
        (for some reason there appears to have been no paragraph 44, for
        which I apologise) of my first PFA.  An appeal against the refusal to
        release the vessel was lodged on 20 July 2015.  Procedural difficulties
        meant that the appellate court did not rule until 4 August 2016, when
        it decided that because the July 2015 decision was not properly
        motivated, the matter should be sent to a different court.  In the
        event, the Third Trial Court took jurisdiction as it was already hearing

the main action.  It appears that the court has effectively consolidated these proceedings with those already before it and with which I have dealt above.

*Causation/frustration*

24.    Mr Doctor pointed, with force, to the fact that the Venezuelan legal experts seemed to agree that the various court decisions were not in accordance with Venezuelan law.  The owners' own lawyer said that if the prosecutor knew of any grounds for claiming against the owners or crew one would have expected to see that in the Conclusive Act (first PFA, para. 34), and that after that was issued there was no longer any reason in Venezuelan law to detain the crew or the vessel.  Nor was there anything in the reasons for the courts' decisions which in his view justified continued detention.  By implication the Conclusive Act meant that the vessel and crew were no longer needed and should be released.

25.    The owners' lawyer further said that he was concerned about the failure to release the vessel by February 2015, that the decision in July 2015 on the Terceria application was a surprise and had no legal basis; there was no legal provision justifying the requirement that the prosecutor apply for the release.  He thought it possible that there were political reasons behind the decision.  The prosecutors were "paralysed" until February 2016 when the prosecutor finally said that he was not opposed to the release of the vessel (but even then, of course, that was insufficient).

26.    He agreed with the charterers' expert, Dr Belisario, that "there is no basis for the vessel to remain in detention since there are no factual or legal reasons to justify her arrest".

27.    Mr Croall sought to counter this case by putting to the charterers' expert the decision in *The B Atlantic* [2015] 1 Lloyd's Rep. 117 and, in particular, the Venezuelan case *The Bichitos* referred to in paragraph 308 and following, suggesting that as long as the "investigative stage"

of the proceedings was not closed there was at least possible justification, on Venezuelan Supreme Court authority, for continuing to detain an asset as in this case.  Mr Doctor objected strongly to the way in which this point was raised, without pleading or notice and in cross-examination, and I have some sympathy with his objections. However, I am not persuaded that these cases assist the owners in any event, because they appear to have concerned actual ongoing investigations which were not continuing in this case: all there was here was a standard-form reservation in the Conclusive Act to cover the eventuality that something might turn up later, but no indication of an ongoing investigation - quite the contrary.

28.    I set out in paragraphs 4-6 above the charterers' essential case on frustration.  Their difficulty on the facts, as I see the position, is that essentially nothing has changed since the first PFA (I shall come back to the owners' other objections to the frustration argument).  Most of the matters relied upon as justifying the charterers' case that it is the judges' ignoring of Venezuelan law that is causing the detention of *CV Stealth* were in existence at the time of the award, and nothing appears to have changed in that respect.  This was not something that counsel for the charterers acknowledged or grappled with.

29.    When one looks at the chain of causation set out in paragraph 72 of the first PFA which I held to be correct (paragraph 74) and the facts as found in that award, what has happened since in relation to the Venezuelan proceedings and the continuing detention of the vessel is of a piece with what had occurred up to September 2015.  As was said for the owners in responding to a written submission from the charterers after the hearing: "... the most that could be said about the evidence on Venezuelan law and its legal system is that it is irrelevant in the light of the charterers' failure to run or establish any case to the effect that there had been any change in Venezuela or its legal system since the time of the detention of the vessel or, at any rate, since the publication of the Conclusive Act.  The net result is there was nothing about Venezuelan law or its legal system which the charterers could

pray in aid to break the chain of causation that had already been established as found in the tribunal's first award."

30. Even if it can be said that the extra delay since the first PFA, and perhaps some extra unusual behaviour on the part of the Venezuelan judges that can be discerned, are of any relevance, such factors are not sufficient to obliterate the original cause of the detention. Although they may be wrong as a matter of Venezuelan law, the judges' later decisions have been consistent with those that went before.

31. For these brief reasons I conclude that the charterers' case on frustration cannot succeed on the facts.

*The effect of redelivery*

32. In any event, I accept that the frustration argument cannot succeed simply because the charter has come to an end following the redelivery of the vessel to the owners on 1 April 2015 and thus there is nothing left that can be frustrated, whether by the passage of time or otherwise. It also seems to be plain that there is no device whereby the charterers' obligations to pay damages for their breach or, more particularly for present purposes, to indemnify the owners under clause 13 can be held to be frustrated: those must continue.

*Blame or fault*

33. The charterers said that a concession by their counsel at the first hearing, to the effect that blame or fault on their part (which I went on to find) meant they could not rely on frustration, was made in the context of their argument that the charter was frustrated in January or, at the latest April, 2015 and could not be held against them in relation to their current frustration argument. Leaving that on one side, since I conclude that the chain of causation as previously found remains unbroken to this day, and since that was triggered by fault on the part of the charterers, it seems to me that the point is still good

and, standing alone, prevents the charterers from relying on any frustration that they might otherwise have been able to prove.

*Issue estoppel*

34.    I also hold, although it is unnecessary to do so in view of my other conclusions, that an issue estoppel does operate against the charterers as argued for by the owners (see paragraph 12 above).

*Conclusion on main claims*

35.    It follows that the owners' claims for hire and interest succeed in principle.   However there are other matters that I must deal with. These concern questions relating to certain expenses held over in my second PFA.   Before turning to them, however, it is appropriate to address the charterers' contention that the vessel is a CTL, and the owners' argument that the provisional credit of $1.4 million for drydocking costs potentially saved should be reversed.

*CTL?*

36.    As Mr Croall said in closing submissions, it was unclear what remained of the charterers' case of CTL given that they no longer pursued a mitigation argument, but in any event the owners' case was that the vessel is not a CTL.   She was insured under the Nordic Insurance Plan of 2013.   Clause 2-9 of that Plan provides cover against war perils, including "capture at sea, confiscation and other similar interventions by a foreign State power ..." and clause 15-1 provides "If the assured has been deprived of the ship by an intervention by foreign State power, for which the insurer is liable under Cl.2-9, the assured may claim for a total loss if the ship has not been released within 12 months ...".

37.    What has happened in this case does not, counsel argued, amount to a deprivation of the ship by capture at sea, confiscation and other

similar interventions by a foreign State power for the purposes of clause 2-9. The Plan is explained by an accompanying Commentary which says that "capture at sea" covers an insured vessel being stopped at sea by a battleship or other representative of the relevant State using power or threatening to do so, and taken into port for further measures, "confiscation" means an appropriation by a State without compensation and, most pertinently, that "other similar interventions" is "aimed at excluding from the war-risk cover the types of interventions that are made as part of the enforcement of customs and police legislation. The ... insurance therefore does not cover losses arising from the ship being detained ... because the crew is suspected of smuggling."

38.  In these circumstances I am bound to conclude on the balance of probabilities that *CV Stealth* is not a CTL.

*Potentially saved drydocking costs*

39.  In my second PFA I declined to make a monetary award (paragraphs 20, 21 and 35) because I took the view that the owners might never have to drydock the vessel pursuant to their obligation so to do following redelivery under the bareboat charter, in which event they would save something of the order of $1.4 million, and that justice required that the charterers should not at that stage have to pay the owners to that extent, but that if ultimately the owners did have to incur drydocking costs they could then claim those from the charterers.  At this hearing the owners urged me to reverse that "credit".

40.  Their first reason was that the arbitrators in the bareboat (head) charter arbitration had found that that charter had not been frustrated.  So, it was said, the principal reason for deferring this issue had been removed.  The only point left was that the vessel might be a CTL which would lead to early termination of the head charter, in which event the owners would not be liable for drydocking her.  I have of course found for the owners on the CTL question, but do not think

13

that is the only consideration to be brought into account, for as things stand there must be a substantial possibility that the vessel will never, in her lifetime, be redelivered to the head owners and thus that the drydocking costs will never have to be borne by the owners here.

41.    In addition, though, the owners argued that but for the charterers' breach/orders, any drydocking expenditure would have been incurred prior to 21 July 2015, and I am not now being asked to deal with any claims arising before that date.  Thus, said the owners, there is no basis for deducting from the present claims putative expenditure for a putative drydocking that would have taken place before 21 July 2015 but which did not.  Regardless of such a drydocking, the expenses now claimed would have been incurred in any event.  With respect, that seems to me a rather narrowly-focused argument that ignores the underlying risk that the costs may never be incurred, and the justice of allowing the charterers a provisional credit (failing which they would have to pay the owners $1.4 million which the owners might never have to pay themselves, and which the charterers might not be able to recover).

42.    Thirdly, it was said for the owners that I am not entitled to take into account savings which have not yet occurred.  The charterers would have to show an actual saving or at least one that is almost certain, and they cannot do that given that the vessel is not a CTL.  Fourthly, any question of a CTL would arise out of collateral arrangements such as the vessel's insurance and must be *res inter alios acta*.  These contentions, however, overlook the possibility of the vessel never being drydocked, for whatever reason, and again pay no regard to what seems to me to be the justice of the situation.  If at some stage the owners do incur drydocking costs, they can come back for a further award in that respect.  I do not think it fair to require the charterers to pay at this stage an amount for which they may never be liable.

43.    It remains, therefore, to deal with the expenses claims.

*Expenses*

44.    Happily the parties were able to agree before the hearing on most of the disputed figures, but two substantial issues remained for determination: the level of crewing and the question of port risks insurance.   In addition, in post-hearing written submissions some other items appeared as not agreed.

45.    As to crewing, the owners appear to have maintained 20 crew members on board from July 2015 until August 2016.  This was, they said, because they hoped the ship might be released and be able to trade imminently.   In August 2016 however they decided to reduce the numbers to 12, which - their evidence showed - was a sufficient number to get the ship to a nearby port for repairs she now needs should she be released.   Just on this, I have to say it seems to me rather strange that, bearing in mind all that had happened until July 2015 and the fact that the head charter was probably going to terminate around that time, the owners did not decide to reduce the crew numbers at that stage rather than over a year later.

46.    I accept that in relation to the indemnity to which the owners are entitled there is no concept of mitigation as such, but if their decision (or failure to act - it may be that at the time there was no consideration given to the question, and thus no decision as such) was unreasonable, that seems to me on the whole to break the chain of causation between the charterers' original default and the incurring of the extra expenses involved.   And in my view it was unreasonable to maintain 20 crew on board for the period in question.   Accordingly the owners' claim under this head falls to be reduced by 45%.

47.    The charterers said that all I need do in respect of this claim was to state what reduction should be effected and the parties would then be able to agree the figures and since the owners did not appear to object to the proposal by the charterers, I have not made a monetary award on this claim - indeed I have overall made a declaration only at this stage.

48.     Port risks insurance raises similar considerations, although on the facts I come to a different conclusion.   I dealt with this on the evidence as it stood at the time and in relation to the period I was then considering in paragraphs 23 and 24 of my second PFA.  At this hearing I had evidence from Mr Nigel Russell, who had been involved in broking the insurances on this vessel until he retired in September 2016.  His witness statement was put in relatively shortly before the hearing, a fact to which Mr Doctor objected, but no attempt was apparently made to seek opposing evidence;  nor was there any application to adjourn this part of the case whilst such evidence was sought.  Instead it was decided not to cross-examine Mr Russell, but simply to criticise his witness statement.

49.     I have taken into account in weighing what Mr Russell said that the charterers may have found themselves in some difficulty given the lateness of his statement, but I nonetheless consider that it deserves to be given a good deal of credence.  In particular I am influenced by the fact that Mr Russell considers it would be necessary to go into the market to seek an underwriter who would provide such insurance rather than, as I had thought, asking the present underwriters to do so, and that it would be unlikely that an underwriter could be found who would take the business, particularly given this vessel's situation and the fact that the insurance would be for a single vessel, something that underwriters do not like.

50.     In addition it appears that port risks insurance is not used for laid-up vessels, and that any such insurance that might be obtained would almost certainly be considerably more expensive than the owners' current insurance.  There are a couple of other factors that reinforce my conclusion that the owners, in maintaining full coverage, were only acting reasonably, but I need not go into them here since the above matters are sufficient in my view.  Accordingly I find that the owners' claim for insurance premiums succeeds in full.

51.    After the hearing some smaller points were taken in written submissions. First, the charterers said that there should be a reduction of $2,714.69 in respect of interest on bunkers because, they said, it was a matter for the owners if they delayed in paying the head owners for bunkers, but the consequences could not be laid at the charterers' door. Not so, said the owners: in written submissions long before the hearing they had pointed out that if they had paid head owners sooner they would then have been entitled to interest from the charterers over the same period. That seems to me right and I dismiss the charterers' case on this point.

52.    There was then a point in relation to three items mentioned in paragraph 34 of my second PFA: $7,125 agency costs, $28,735.96 Class invoices and $13,945 divers' survey fees. The charterers had accepted (see paragraph 27) that these would be recoverable if they were entitled to credit for avoided drydocking costs and subject to their arguments on mitigation, and I held accordingly. Mitigation was not pursued and therefore said the owners, they should get these sums now. That seems to me to be right, so that the owners are entitled to have those amounts paid now, subject to the $1.4 million credit.

*Conclusion*

53.    I conclude in the light of the above that the owners are presently entitled to (a) $4,374,378.12 plus interest in the terms awarded against them in the head charter arbitration, (b) $3,531,990.53 (subject to the reduction provided for in paragraph 46 above, and (c) the sums set out in paragraph 34 of my second PFA, less the provisional credit in respect of potentially saved drydocking costs of $1.4 million, and **I DECLARE** accordingly.

54.    The charterers are also liable for interest on the sums in question, but since I was not addressed on this topic and it might involve some complications given the various dates that could be relevant, I hold it over for later determination, though I hope the parties will be able to

17

reach agreement.  By way of indication I would normally expect - subject to any specific arguments - to award 4.50% per annum, compounded at 3-monthly rests, usually from about 6 weeks after the sums fell due.

55. **I FURTHER DECLARE** that the costs and expenses claimed by the owners in this hearing are not all the costs and expenses incurred by the owners as a result of the ship's detention, and I therefore reserve jurisdiction to deal with any further claims in that respect that the owners may advance.

56. **I AWARD AND ADJUDGE** that the charterers shall bear and pay their own and the owners' costs of and related to this award (the latter on the standard basis, to be assessed by me if the parties cannot agree thereon) and that they shall pay the costs of this award as separately notified **PROVIDED** that if in the first instance the owners shall have paid any amount in respect of the costs hereof they shall be entitled to immediate reimbursement thereof by the charterers.

57. In addition **I DIRECT** that the charterers shall pay the owners interest on the sums referred to in paragraph 56 above at the rate of 5% (five per cent) per annum compounded at three-monthly rests, from the date hereof in respect of the owners' recoverable costs and from the date of any payment to me by the owners in respect of the costs hereof, down to the date of reimbursement by the charterers to the owners in each instance.

58. Finally **I RESERVE** jurisdiction to deal with all other matters referred to me but not determined in this award.

59. By way of postscript I want to say that finding as I do against the charterers gives me no pleasure: I realise this is a hard decision for them, but the losses must lie somewhere and, given what I said in paragraph 126 of my first PFA, it seems only right that this must be with the charterers, unfortunate though they may find that.

**GIVEN** under my hand in London, the seat of this arbitration, this 25th day of May 2017.

....................................................
Bruce Harris